SHEPHERD, FINKELMAN, MILLER
& SHAH, LLP
JAMES C. SHAH
475 White Horse Pike
Collingswood, NJ  08107
Telephone: 856/858-1770
Facsimile: 856/858-7012
jshah@sfmslaw.com
nfinkelman@sfmslaw.com

[Additional Counsel on Signature Page]

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| YOUNG CHO, Individually and as Representative of a Class of Similarly Situated Persons, and on Behalf of the PRUDENTIAL EMPLOYEE SAVINGS PLAN, | **Civil Action No**: |
| | **DEMAND FOR JURY TRIAL** |
| | **CLASS ACTION COMPLAINT** |
| Plaintiff, | |
| vs. | |
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, PRUDENTIAL EMPLOYEE SAVINGS PLAN ADMINISTRATIVE COMMITTEE, PRUDENTIAL EMPLOYEE SAVINGS PLAN INVESTMENT OVERSIGHT COMMITTEE, and DOES NO.1-20, | |
| Defendants. | |

## NATURE OF THE ACTION

1.      Plaintiff, Young Cho ("Plaintiff"), individually and on behalf of all other similarly situated persons and the Prudential Employee Savings Plan (the "Plan"), brings this action under

the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA").

2.          Plaintiff asserts his claims against the Prudential Insurance Company of America ("Prudential"), the Prudential Employee Savings Plan Administrative Committee ("Administrative Committee"), the Prudential Employee Savings Plan Investment Oversight Committee ("Investment Oversight Committee") (together the "Committees"), and Does No. 1-20, who are currently unknown members of the Administrative Committee and the Investment Oversight Committee ,  (collectively, "Defendants"), all of which profited as a result of the unlawful conduct described herein.  On information and belief, the Administrative Committee, comprised of Prudential officers and employees, was responsible for the administration, management, and operation of the Plan.  On information and belief, the Investment Oversight Committee, comprised of Prudential officers and employees, was responsible for selecting and monitoring the Plan's investments.  As fiduciaries for the Plan, both Committees (and their members) had a duty under ERISA to act prudently and solely in the interest of the Plan and its participants and beneficiaries when selecting investments, products, and services for the Plan.  Instead, the Committees put the interests of Prudential ahead of those of the Plan by choosing investment products and pension plan services offered and managed by Prudential subsidiaries and affiliates, which generated substantial revenues for Prudential at great cost to the Plan.

## PRELIMINARY STATEMENT

3.          Defined contribution plans that are qualified as tax-deferred vehicles under Section 401 of the Internal Revenue Code, 26 U.S.C. §§ 401(a) and (k) (i.e.  401(k) plans), have become the primary form of retirement savings in the United States and, as a result, America's *de facto* retirement system.  As of 2016, Americans had cumulatively invested over $7 trillion in

2

assets in defined contribution plans like the Plan at issue here.  Unlike traditional defined benefit retirement plans, in which the employer typically promises a calculable benefit and assumes the risk with respect to high fees or under-performance of pension plan assets used to fund defined benefits, 401(k) plans operate in a manner which participants bear the risk of high fees and investment under-performance.

4.      The importance of defined contribution plans to the United States retirement system has become increasingly pronounced as employer-provided defined benefit plans have become increasingly rare as an offered and meaningful employee benefit.

5.      The potential for disloyalty and imprudence is much greater in defined contribution plans than in defined benefit plans.  In a defined benefit plan, the participant is entitled to a fixed monthly pension payment while the employer is responsible for making sure the plan is sufficiently capitalized. As a result, the employer bears all risks related to excessive fees and investment underperformance.  Therefore, in a defined benefit plan, the employer and the plan's fiduciaries have every incentive to keep costs low and to remove imprudent investments.  But in a defined contribution plan, participants' benefits are limited to the value of their individual accounts, which is determined by the market performance of employee and employer contributions, minus investment expenses.  Thus, the employer has no incentive to keep costs low or to closely monitor the plan to ensure that selected investments are and remain prudent, because all risks caused by high fees and poorly performing investments are borne by the employee.

6.      For financial services companies like Prudential, the potential for imprudent and disloyal conduct is especially high, because the Plan's fiduciaries are in a position to benefit the company through the selection of the Plan's investments by, for example, filling the plan with proprietary investment products that an objective and prudent fiduciary would not choose.

Additionally, here, Prudential serves as the recordkeeper for the Plan, providing yet a further stream of revenue and extra benefit for Prudential.

7.     The effect of such fiduciaries' imprudence on workers can be severe.  According to one study, the average working household with a defined contribution plan will lose $154,794 to fees and lost returns over a 40-year career.  *See* Melanie Hicken, *Your employer may cost you $100k in retirement savings*, CNN Money (June 1, 2014), *available at* http://money.cnn.com/2013/03/27/retirement/401k-fees.  Simply put, a fiduciary's mismanagement of plan assets leading to an investment lineup filled with poor-performing investments and excessive fees can force a participant to work an extra five to six years to compensate for the excess fees that were paid

8.     With nearly $8.7 billion in assets as of December 31, 2017, the Plan is in the top one percent (1%) of all 401(k) plans in terms of assets.  Additionally, as of December 31, 2017, there were nearly 45,000 participants in the Plan.  The marketplace for 401(k) retirement plan services is well-established and can be competitive when fiduciaries of defined contribution retirement plans act in an informed and prudent fashion.  Multi-billion dollar defined contribution plans, like the Plan, have significant bargaining power and the ability to demand low-cost administrative and investment management services within the marketplace for the administration of 401(k) plans and the investment of 401(k) assets.  As fiduciaries to the Plan, Defendants are obligated to act for the exclusive benefit to participants, invest the assets of the Plan in a prudent fashion and ensure that Plan expenses are fair and reasonable.  At all pertinent times, as explained below, Defendants: (a) were fiduciaries under ERISA; (b) breached their fiduciary duties under ERISA by failing to fully disclose to participants the expenses and risk of the Plan's investment options; (c) breached their fiduciary duties under ERISA by allowing

unreasonable expenses to be charged to participants for administration of the Plan; (d) engaged in prohibited transactions, in violation of ERISA; and (e) breached their fiduciary duties under ERISA by selecting and retaining high-cost and poor-performing investments, several of which were managed by Prudential and/or its subsidiaries, instead of offering other readily available, easily identifiable and more prudent alternative investments.

9.      Among other things, Plaintiff alleges that the Defendants violated ERISA by overpopulating the Plan with proprietary mutual funds offered by Prudential and its affiliates, failing to monitor the performance of those funds, and failing to adequately disclose the amount of recordkeeping fees received by Prudential, resulting in the payment of grossly excessive fees to Prudential and significant losses to the Plan and its participants.

10.      The Investment Oversight Committee chose mutual funds and collective investment trusts which were established, offered, and advised by Prudential brands, including: (1) a stable value fund, the PESP Fixed Rate Fund; (2) the Prudential Financial, Inc. Common Stock Fund; (3) a high yield bond fund, the Prudential High Yield Collective Investment Trust; (4) a suite of guaranteed retirement income products: the Prudential IncomeFlex Select Aggressive Fund, Prudential IncomeFlex Select Conservative Fund, Prudential IncomeFlex Select Moderate Fund, and PESP IncomeFlex Target Balanced Fund; (5) the Prudential Jennison Natural Resources Fund; (6) the Prudential Retirement Real Estate Fund; (7) a domestic bond fund, the Core Bond Enhanced Index/PGIM Fund; and (8) a large cap blend fund, the Jennison Opportunistic Equity Collective Investment Trust.  The entities that managed the foregoing investments were affiliates or subsidiaries of Prudential during the Class Period (defined below). These funds were affiliates or subsidiaries of Prudential during the Class Period.  Not only were these funds disloyal selections chosen to provide extra revenue to Prudential, several are also

objectively imprudent investment options.  Based upon available metrics, some of the Prudential-affiliated funds have under-performed reasonable comparators and cost significantly more than readily available peer funds.

11.     By selecting Prudential-affiliated funds, the Defendants placed Prudential's interests above the Plan's interests.  Instead of considering objective criteria like fees and performance to select investments for the Plan, the Investment Oversight Committee selected Prudential Funds because they were familiar and generated substantial revenues for Prudential. Unaffiliated investment products do not generate any fees for Prudential.  As a result, the Committee chose many Prudential funds to benefit Prudential, the sponsor of the Plan, without investigating whether Plan participants would be better served by investments managed by unaffiliated companies.  This is unsurprising, given that Prudential serves as the Plan's recordkeeper, and the Plan utilizes a revenue-sharing arrangement to pay the majority of its administrative expenses.  As Prudential itself performs all recordkeeping and administrative functions for the Plan, as well as manages a significant number of the Plan's investments, Prudential receives additional revenue in the form of direct participant fees and indirect fees via revenue sharing.

12.     Exacerbating the problems arising from these severe conflicts of interest, several of the unaffiliated investment options offered to Plan participants were egregiously expensive and generally underperformed compared to benchmarks selected by the Investment Oversight Committee.

13.     To remedy these fiduciary breaches and other violations of ERISA, Plaintiff brings this class action under ERISA, and, in particular, under 29 U.S.C. §§ 1104, 1106, and 1109, for losses to the Plan caused by Defendants' breaches of fiduciary duty and violations of

ERISA's prohibited transaction provisions.  Based on this conduct, Plaintiff asserts claims against the Defendants for: (a) breach of the fiduciary duties of prudence and loyalty (Count I); (b) engaging in prohibited transactions with a party-in-interest (Count II); (c) engaging in prohibited transactions with a fiduciary (Count III); (d) failure to monitor fiduciaries (Count IV); and, in the alternative, (e) knowing breach of trust (Count V).

14.    Plaintiff brings this class action on behalf of the Plan and its approximately 45,000 participants for losses to the Plan caused by Defendants' conflicted and imprudent selection of investments and services for the Plan.

15.    Plaintiff brings this class action on behalf of the Plan and all other similarly situated current and former participants under 29 U.S.C. §§ 1109 and 1132, to recover the following relief:

- A declaratory judgment and holding that the acts of Defendants described herein violate ERISA and applicable law;

- A permanent injunction against Defendants, prohibiting the practices described herein and affirmatively requiring them to act in the best interests of the Plan and its participants;

- Equitable, legal or remedial relief for all losses and/or compensatory damages;

- Attorneys' fees, costs and other recoverable expenses of litigation; and

- Such other and additional legal or equitable relief that the Court deems appropriate and just under all the circumstances.

## JURISDICTION AND VENUE

16.    Plaintiff seeks relief on behalf of the Plan pursuant to ERISA's civil enforcement remedies with respect to fiduciaries and other interested parties and, specifically, under 29 U.S.C. § 1109 and 29 U.S.C. § 1132.

17.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA Section 502(e), 29 U.S.C. § 1132(e).

18.     Venue is proper in this juridical district pursuant to 29 U.S.C. § 1132(e) because Prudential's principal place of business is in this district.

## THE PARTIES

19.     Plaintiff is a former employee of Prudential and former participant under 29 U.S.C. § 1002(7) of the Plan.  Plaintiff worked for Prudential until May, 2018.  Plaintiff maintained an account with the Plan until March 20, 2019.  Plaintiff is a resident of Los Angeles, California.

20.     The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34). The Plan is a qualified plan under 26 U.S.C. § 401 and is commonly referred to as a "401(k) plan."  Eligible employees, as defined in the Plan Document, may direct the investment of retirement assets into several select investment funds.  The available menu of investment options is curated by Defendants, and specifically by the Investment Oversight Committee, as described in detail below.

21.     Defendant, Prudential, is identified in the Plan Document as the "plan sponsor" of the Plan under 29 U.S.C. § 1002(16)(B).  Prudential is also a "named fiduciary" under 29 U.S.C. § 1102(a)(2).  As the Plan Sponsor, Prudential is by definition, also a party in interest of the Plan.

22.     Defendant, the Administrative Committee, is designated by the Plan Document to assist Prudential with administration of the Plan.  The Administrative Committee is a "named fiduciary" and "administrator" of the Plan identified in the Plan Document under 29 U.S.C. §§ 1002(16)(A)(i) and 1102(a), which exercises discretionary authority and control with respect to

management of the Plan and the Plan's assets.  The Administrative Committee is led by a chairperson who is appointed by the Senior Vice President.  The chairperson, in turn, designates the remaining members of the Administrative Committee, with the only requirement being that the committee is composed of three or more employees, including the chairperson of Prudential or an affiliated entity.  The Administrative Committee has responsibility and discretion to control and manage the operation and administration of the Plan.

23.     Defendant, the Investment Oversight Committee, is designated by the Plan Document to assist Prudential with the selection of investment funds offered for selection by Plan participants.  According to the Plan Document, the Investment Oversight Committee must be comprised of at least three persons appointed by name or title by the Prudential Investment Committee of the Board of Directors.  The Investment Oversight Committee is a "named fiduciary" identified in the Plan Document pursuant to 29 U.S.C. § 1102(a).  Because the Investment Oversight Committee exercises "authority or control respecting management or disposition of the Plan's assets," it is also a fiduciary pursuant to 29 U.S.C. § 1002(21)(A).  The Investment Oversight Committee has "responsibility for implementing the Plan's funding policy . . . and for establishing the Plan's investment policies.  Except with respect to the Company Stock Fund, the Investment Oversight Committee Shall select all Investment Funds . . . ."

24.     Doe Defendants Nos. 1-20 are the members of the Committees.  The members of the Committees have been delegated fiduciary authority pursuant to the Plan Document. Plaintiff is currently unable to determine the membership of both Committees, despite reasonable and diligent efforts because it appears that the current membership of the Committees is not provided to the public.  As such, the defendants are named Does 1-20 as placeholders.  Plaintiff

will move, pursuant to Rule 15 of the Federal Rules of Civil Procedure, to amend this Complaint to name the members of the Committees as defendants as soon as their identities are discovered.

## FACTUAL ALLEGATIONS

### A.  Background

25.    The Plan is established and maintained under a written document in accordance with 29 U.S.C. § 1102 and serves as a vehicle for retirement savings and to produce retirement income for employees of Prudential.  The Plan covers eligible employees of Prudential and its affiliates as described in the Plan Document.  As described above, Prudential has delegated the administration of the Plan to the Administrative Committee and the responsibility for selection of the Plan's investment options to the Investment Oversight Committee.

26.    The Plan is a participant-directed plan in which participants direct their retirement assets into a pre-selected menu of investment offerings consisting of several types of investments.  The amount of retirement income generated by the Plan depends upon contributions made on behalf of each employee by Prudential or its affiliates, deferrals of employee compensation and employer matching contributions, and from the performance of the Plan's investment options (net of fees and expenses).

27.    The Plan has established a trust, which is managed by the Prudential Trust Company, to hold participant and employer contributions and such other earnings, income and appreciation from Plan investments, less payments made by the Plan's trustee, to carry out the purposes of the Trust, in accordance with 29 U.S.C. § 1103.

28.    As of December 31, 2018, the Plan offered the following types of investment options: mutual funds, separately managed accounts ("SMAs"), Prudential Financial, Inc.

common stock, collective investment trusts, guaranteed retirement income products, and a fixed rate fund structured as a group annuity contract.

29.     Mutual funds are publicly-traded investment vehicles consisting of a pool of funds collected from many investors for the purpose of investing in a portfolio of equities, bonds, and other securities.  Mutual funds are operated by professional investment advisers, who, like the mutual funds, are registered with the Securities and Exchange Commission ("SEC").  Mutual funds are subject to SEC regulation, and are required to provide certain investment and financial disclosures and information in the form of a prospectus.

30.     SMAs are investment portfolios that begin with the same allocation as that of their mutual fund counterpart, but for which the professional investment adviser will make individual investment decisions that may depart from that of the mutual fund.  In essence, SMAs are mutual funds customized for that investor.  However, unlike mutual funds, SMAs do not issue registered prospectuses and, as such, their fees and other disclosures are not as transparent.

31.     Collective investment trusts are, in essence, mutual funds without the SEC regulation.  Collective investment trusts fall under the regulatory purview of the Office of the Comptroller of the Currency or individual state banking departments.  Collective investment trusts were first organized under state law in 1927 and were blamed for the market crash in 1929.  As a result, collective investment trusts were severely restricted, giving rise to the more transparent and publicly-traded mutual funds.  Today, banks create collective investment trusts only for their trust clients and for employee benefit plans like the Plan.  The main advantage of opting for a collective investment trust, rather than a mutual fund, is the negotiability of the fees, so larger retirement plans are able to leverage their size for lower fees.

32.     The Plan offers a suite of Prudential IncomeFlex Funds that provide guaranteed income for life.  These products are designed to function as annuities, but without requiring an irrevocable election to receive benefit payments.  The IncomeFlex Funds are structured as insurance company separate accounts offered through group annuity insurance contracts issued by the Prudential Retirement Insurance and Annuity Company.  Prudential identifies the participants' investments in the Prudential IncomeFlex Funds as its own assets on its balance sheet since it takes legal ownership of the separate accounts and then uses these separate account assets to improve the condition of its balance sheet, thereby providing Prudential with increased liquidity and an ability to earn additional fees – which it earns as a result of its ownership of the separate accounts (but which it fails to credit to the benefit of the Plan in violation of ERISA's prohibited transaction rules).

33.     The PESP Fixed Rate Fund is structured as a group annuity contract and provides investors with a guaranteed interest rate, which is determined based on a formula and reset quarterly.  The Fixed Rate Fund's guarantees of principal and interest are backed by the assets of the Prudential Insurance Company of America.

B.      **ERISA's Fiduciary Standards**

34.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the

Defendant(s) as fiduciaries of the Plan. 29 U.S.C. § 1104(a), states, in relevant part:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A)     for the exclusive purpose of
>
> > (i)      providing benefits to participants and their beneficiaries; and
> >
> > (ii)     defraying reasonable expenses of administering the plan;
> >
> > [and]
>
> (B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like arms.

35.     Under 29 U.S.C. § 1103(c)(1), with certain exceptions not relevant here,

> The assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

36.     Under ERISA, fiduciaries that exercise any authority or control over plan assets,

including the selection of plan investments and service providers, must act prudently and solely

in the interest of participants in a plan.

37.     ERISA's fiduciary duties are "the highest known to the law" and must be

performed "with an eye single" to the interest of the participants.

38.     Although ERISA fiduciaries must act in accordance with plan documents, that

duty applies only if the plan documents are in accord with the fiduciary duties of ERISA.  29

U.S.C. § 1104(a)(1)(D).

39.    ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries.  29

U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a

breach by another fiduciary and knowingly failing to cure any breach of duty.  ERISA states, in

relevant part:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2)    if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)    if he has knowledge of a breach of such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

40.    The fiduciary duties of loyalty and prudence imposed by 29 U.S.C. § 1104 are

supplemented by numerous types of transactions which are prohibited by 29 U.S.C. § 1106.

These prohibited transactions are "*per se*" violations because of their high propensity to cause

harm to participants of retirement plans.

41.    Section 1106(a)(1) states, in pertinent part, that:

[A] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if
he knows or should know that such transaction constitutes a direct or indirect –

> (A)    sale or exchange, or leasing, of any property between the plan and a party in interest; . . .
>
> (C)    furnishing of goods, services, or facilities between the plan and party in interest;
>
> (D)    transfer to, or use by or for the benefit of a party in interest, of any assets of the plan . . . .

14

Section 1106(b) further provides:

> [A] fiduciary with respect to the plan shall not –

> > (1)    deal with the assets of the plan in his own interest or for his own account,

> > (2)    in his individual or in any other capacity act in a transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interest of the plan or the interest of its participants or beneficiaries, or

> > (3)    receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

42.    29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109. Section 1109(a) provides, in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

43.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action, on behalf of the Plan, to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

## C.    <u>Defendants' Violations of ERISA</u>

44.    Defendants have severely mismanaged the Plan and engaged in self-dealing with Plan assets as further detailed below. Defendants have failed to monitor all of the investments in the Plan to ensure that they provided adequate returns and were not excessively priced, as were most of the investments in the Plan.

45.     Among other things, Defendants are responsible for selecting investments and service-providers for the Plan.  These selections must be made prudently and solely in the interest of the Plan's participants and beneficiaries.

46.     The Investment Oversight Committee and its members had the discretion and authority to select the menu of investments available to participants of the Plan.  During the relevant time period (defined below) the Investment Oversight Committee and its members used that discretion to encourage participants to direct billions of dollars of their assets into Prudential-affiliated proprietary funds.

47.     The Investment Oversight Committee and its members knew, or should have known by virtue of their senior positions at a large financial services company, that better-performing, lower-cost, comparable investments were readily available from unaffiliated entities.

48.     The significant overconcentration of proprietary investment options in the Plan gives rise to an inference that the Investment Oversight Committee failed to investigate whether there were nonproprietary investment options available that would have better met the needs of Plan participants due to lower fees and/or superior investment management services.

49.     A prudent fiduciary would have limited the Plan menu to the asset classes and investment options that offered the best opportunity for participants to maximize the value of their accounts at an appropriate level of risk, while excluding funds that interfered with that goal due to their high fees, poor track record, inexperienced managers, or inappropriate risk/reward profile.  Defendants' complete failure to limit either the asset classes offered within the Plan's menu or the particular options within each asset class gives rise to an inference that the Plan fiduciaries did not investigate which asset classes and investment options would best meet the

needs of participants. This failure further evidences Defendants' failure to engage in a meaningful monitoring of the Plan's investment options to ensure that they remained prudent.

50.     Defendants' conduct in managing the Plan's investment options furthered Prudential's corporate interests in multiple of ways.  First, Prudential collected fee revenue as a result of the Plan's excessive use of Prudential funds.  Additionally, the Plan's use of Prudential-affiliated funds ensured that Prudential's employees, many of whom may sell others on the benefits of owning Prudential funds, would themselves own Prudential funds, thereby building loyalty, product knowledge, and a built-in sales pitch touting the employees' personal investment in the pitched products.

51.     The Plan's investments in the Prudential funds, as well as its failure to fully credit the Plan with the earnings arising from the insurance company separate accounts in the Plan, were prohibited transactions under ERISA, as were the payment of fees to other Prudential subsidiaries and affiliates, such as Prudential, Prudential Retirement Insurance and Annuity Company, PGIM, and Jennison Associates, LLC.

52.     Defendants, all of which are and were fiduciaries or co-fiduciaries of the Plan at all pertinent times, violated 29 U.S.C. § 1104 by failing to act solely in the interest of the Plan and its participants and beneficiaries and failing to exercise the required care, skill, prudence, and diligence in investing the assets of the Plan and disclosing the fees charged to the participants.  The Investment Oversight Committee caused the Plan to purchase shares, units, or interests in Prudential-affiliated Funds, which charged significantly higher fees than comparable, unaffiliated funds, while simultaneously providing poor returns.  Simply put, Defendants placed the revenue-generating interests of Prudential and its affiliates and subsidiaries ahead of the Plan's interest in providing prudent investments at reasonable costs.

53.     Defendants also violated 29 U.S.C. § 1106, which prohibits transactions between a plan and related parties, by causing the Plan to invest in Prudential-affiliated funds and purchase investment management and other products and services, including recordkeeping services, from Prudential subsidiaries and affiliates.

54.     The number of proprietary investments in the Plan lineup have produced millions of dollars of revenue for Prudential while imposing high costs and delivering poor investment returns for the Plan.

55.     Defendants' violations of ERISA caused losses to the Plan for which Defendants are liable to the Plan and Class members pursuant to 29 U.S.C. §§ 1109 and 1132(a)(2).

### 1.     Excessive Fees of the Selected Funds

56.     Defendants have breached their fiduciary duties to the extent that they have consistently offered participants of the Plan an investment menu containing mutual funds and collective investment trusts with excessively high expense ratios. These fees are, on their face, unreasonable in many instances and are often many times higher than the expense ratios of investable alternatives readily available in the marketplace.  The impact of such high fees on participant balances is aggravated by the effects of compounding, to the significant detriment of participants over time. This effect is illustrated by the below chart,[1] published by the SEC, showing the 20-year impact on a balance of $100,000 by fees of 25 basis points (0.25%), 50 basis points (0.50%), and 100 basis points (1.00%).

---

[1] *Investor Bulletin*, "How Fees and Expenses Affect Your Investment Portfolio," U.S. Securities and Exchange Commission ("SEC") Office of Investor Education and Advocacy.



57.     Despite the fact that higher fees significantly reduce retirement account balances over time, as of June 30, 2018, the Plan's investment menu includes the following investments:

| Investment Option | Expense Ratio |
|---|---|
| AllianceBernstein Core Opportunities Fund | 0.32% |
| Core Bond Enhanced Index/PGIM Fund | 0.14% |
| Delaware Small Cap Core Equity Fund | 0.50% |
| Jennison Opportunistic Equity Collective Investment Trust | 0.32% |
| PESP Fixed Rate Fund | N/A |
| PESP IncomeFlex Target Balanced Fund | 1.03% |
| Prudential Financial, Inc. Common Stock Fund | N/A |
| Prudential High Yield Fund Collective Investment Trust | 0.32% |
| Prudential IncomeFlex Select Aggressive Fund | 0.92% |
| Prudential IncomeFlex Select Conservative Fund | 0.95% |
| Prudential IncomeFlex Select Moderate Fund | 0.93% |
| Prudential Retirement Real Estate Fund | 0.70% |
| QMA International Developed Markets Index Account | 0.10% |
| QMA U.S. Broad Market Index Fund | 0.02% |

| | |
|---|---|
| Vanguard Emerging Markets Stock Index Fund Inst | 0.11% |
| Vanguard Intermediate-Term Government Bond Index Fund Inst | 0.05% |
| Vanguard Short-Term Investment Grade Fund Admiral | 0.10% |
| Vanguard Small Cap Index Fund InstPlus | 0.03% |
| Wells Capital International Bond Inst Select Fund | 0.36% |
| WTC CIF II Diversified Inflation Hedges Portfolio | 0.79% |
| WTC CIF II International Opportunities Portfolio | 0.64% |

58.     The fees charged by many of the investments in the Plan lineup significantly exceed those charged by comparable investable alternatives, including Institutional Class Vanguard Funds with similar investment styles, as shown in the table below.

*Expense Ratios of Prudential Funds and Vanguard Alternatives*

| Prudential Fund | ER | Index | Vanguard Alternative | ER |
|---|---|---|---|---|
| AllianceBernstein Core Opportunities Fund | 0.32 | Russell 1000 Index | Vanguard Russell 1000 Index Fund | 0.08 |
| Delaware Small Cap Core Equity Fund | 0.50 | Russell 2000 Index | Vanguard Russell 2000 Index Fund | 0.08 |
| Jennison Opportunistic Equity CIT | 0.32 | Russell 1000 Index | Vanguard Russell 1000 Index Fund | 0.08 |
| Prudential High Yield Fund CIT | 0.32 | Bloomberg Barclays Corporate High Yield | Vanguard High Yield Corporate Fund Adm | 0.13 |
| Prudential Retirement Real Estate Fund | 0.70 | Prudential Custom Real Estate Benchmark | Vanguard Real Estate Index Fund | 0.10 |
| Wells Capital International Bond Fund Inst Select | 0.36 | Bloomberg Barclays Glbl Agg ex US (Unhedged) | Vanguard Total International Bond Index Fund | 0.07 |
| WTC CIF II Diversified Inflation Hedges Portfolio | 0.79 | Multi-Asset Inflation | Vanguard Inflation-Protected Securities Fund | 0.07 |
| WTC CIF II International Opportunities Portfolio | 0.64 | MSCI EAFE (net) | Vanguard FTSE All-World ex-US Index Fund | 0.08 |
| **AVERAGE** | 0.49 | | | 0.09 |

59.     The AllianceBernstein Core Opportunities Fund has an expense ratio of 32 basis points (0.32%), which is four times the 8 basis point (0.08%) fee charged by the comparable Vanguard Russell 1000 Index Fund.

60.     The Delaware Small Cap Core Equity Fund carries a 50-basis point (0.50%) expense ratio, which is over six times the 8-basis point (0.08%) fee charged by the comparable

20

Vanguard Russell 2000 Index Fund, a comparable alternative in the small cap equity marketplace.

61.     The Jennison Opportunistic Equity Collective Investment Trust carries a 32-basis point (0.32%) charge, while the comparable Vanguard Russell 1000 Index Fund costs only 8 basis points (0.08%).

62.     The Prudential High Yield Fund Collective Investment Trust has an expense ratio of 32 basis points (0.32%).  By contrast, the comparable Vanguard High Yield Corporate Fund, Admiral Class, charges just 13 basis points (0.13%), or less than half the Prudential proprietary option.

63.     The Prudential Retirement Real Estate Fund has a 70-basis point (0.70%) fee, charging a staggering seven times more than the comparable Vanguard Real Estate Index Fund, which offers a 10-basis point (0.10%) expense ratio.

64.     The Wells Capital International Bond Institutional Select Fund charges a 36-basis point (0.36%) fee, over five times the 7-basis point (0.07%) expense ratio of the comparable Vanguard Total International Bond Index Fund.

65.     The Wellington Trust Company CIF II Diversified Inflation Hedges Portfolio has a substantial 79-basis point expense ratio (0.79%), dwarfing the 7 basis point (0.07%) charge of the comparable Vanguard Inflation-Protected Securities Fund, an investment similarly designed to provide investors protection against the decreased purchasing power of currency as a product of inflation.

66.     The Wellington Trust Company CIF II International Opportunities Portfolio's 64-basis point (0.64%) fee is blatantly excessive when compared to the Vanguard FTSE All-World

ex-US Index Fund, a comparable international equity fund alternative. The latter fund charges just one-eighth of the former's fees, with an 8-basis point (0.08%) expense ratio.

67.     The extent to which Plan participants have been harmed by excessive investment management fees is illustrated in the chart below, comparing the fees paid by the Plan with its current lineup to a menu with the proposed Vanguard alternatives substituted for the expensive funds.

| *Investment Management Fees Spent Chasing Excess Returns* | | | | | | |
|---|---|---|---|---|---|---|
| | **2013** | **2014** | **2015** | **2016** | **2017** | **Total** |
| Prudential Funds | 2,749,988 | 4,072,654 | 8,439,540 | 9,008,501 | 10,957,874 | 35,228,557 |
| Vanguard Alternatives | 2,101,867 | 2,386,946 | 3,700,138 | 3,817,031 | 4,542,594 | 16,548,576 |
| **Fees Chasing Excess Returns** | 648,121 | 1,685,708 | 4,739,402 | 5,191,470 | 6,415,280 | **18,679,981** |



68.     In sum, Defendants have imprudently failed to reduce costs when possible. To the contrary, many of the investments Defendants have selected, including several managed by

Prudential and its affiliates, are among the most expensive when measured against comparable funds.

### 2.      Underperformance of Available Funds

69.      In addition to the unreasonably excessive fees charged by several of the investments available to Plan participants, several of the most expensive funds also produced poor returns relative to their respective benchmarks. The tables below show the outperformance and underperformance (shown in parentheses) of the investments over rolling 1-, 5-, and 10-year periods.

*Quarterly 1-year Rolling Outperformance*

| Fund | Benchmark | 3/14 | 6/14 | 9/14 | 12/14 | 3/15 | 6/15 | 9/15 | 12/15 | 3/16 | 6/16 |
|------|-----------|------|------|------|-------|------|------|------|-------|------|------|
| Prudential High Yield | Blbg Bcly Corporate High Yield | (0.4) | (0.7) | (0.2) | 1.7 | 1.9 | 2.1 | 4.0 | 3.8 | 3.3 | 1.4 |
| Wells Capital Intl Bond | Blbg Bcly Glbl Agg X US (Unhedged) | | | | | | | (0.7) | (3.3) | (4.1) | (2.0) |
| Jennison OppEquity | Russell 1000 | | | | | | | | | | (7.5) |
| WTC Intl Opps | MSCI EAFE (net)* | | | (0.2) | (2.4) | 3.2 | 2.2 | 1.2 | (0.7) | (4.3) | (2.6) |
| QMA Intl Dev Mkts | MSCI ACWI X US Index** | 10.9 | (3.8) | (33.2) | (28.7) | (21.4) | (7.5) | (2.6) | 5.5 | 5.0 | (3.3) |
| Prudential Real Estate | Prudential Custom Real Estate*** | 6.6 | 0.8 | (1.3) | (17.2) | (10.2) | 6.3 | 2.7 | 9.1 | 6.5 | (12.2) |
| WTC Div Infl Hedges | Multi-Asset Inflation Index | (2.9) | 1.4 | 1.9 | (1.4) | (0.8) | (1.6) | (2.1) | (1.6) | (2.5) | (2.3) |

| Fund | Benchmark | 9/16 | 12/16 | 3/17 | 6/17 | 9/17 | 12/17 | 3/18 | 6/18 | 9/18 | 12/18 |
|------|-----------|------|-------|------|------|------|-------|------|------|------|-------|
| Prudential High Yield | Blbg Bcly Corporate High Yield | (2.0) | (4.8) | (4.6) | (2.1) | (1.2) | (0.2) | 0.2 | 0.1 | 0.1 | 0.8 |
| Wells Capital Intl Bond | Blbg Bcly Glbl Agg X US (Unhedged) | (0.7) | (0.7) | (0.6) | 0.4 | (0.5) | 0.0 | (1.2) | (3.9) | (3.7) | (1.6) |
| Jennison OppEquity | Russell 1000 | (2.2) | 3.7 | 5.2 | 3.0 | (0.3) | (5.8) | (3.3) | (3.1) | (4.3) | (17.7) |
| WTC Intl Opps | MSCI EAFE (net)* | (5.4) | (0.0) | (0.6) | (0.9) | (1.0) | (0.1) | 1.5 | (1.5) | (3.4) | (5.1) |
| QMA Intl Dev Mkts | MSCI ACWI X US Index** | 0.5 | (3.3) | (1.2) | (0.1) | (0.4) | (2.1) | (1.8) | (0.3) | 1.1 | 0.5 |
| Prudential Real Estate | Prudential Custom Real Estate*** | (9.8) | (1.6) | 2.6 | 7.6 | (0.2) | (0.6) | 0.7 | 0.2 | 0.2 | (0.2) |
| WTC Div Infl Hedges | Multi-Asset Inflation Index | 1.5 | 2.4 | 3.2 | 2.2 | (0.9) | (0.1) | 0.2 | (1.9) | (2.9) | (2.7) |

*Pre Q4 2016, benchmark was MSCI World X US SMID NR USD
**Pre Q4 2016, benchmark was MSCI India NR USD
***Pre Q3 2017, benchmark was MSCI US REIT Index

### Quarterly 5-year Rolling Outperformance

| Fund | Benchmark | 3/14 | 6/14 | 9/14 | 12/14 | 3/15 | 6/15 | 9/15 | 12/15 | 3/16 | 6/16 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Prudential High Yield | Blbg Bcly Corporate High Yield | (3.8) | (1.9) | (1.1) | (0.5) | (0.3) | (0.4) | 0.3 | 0.7 | 0.8 | 0.3 |
| WTC Intl Opps | MSCI EAFE (net)* | | | | | | | | | | |
| Prudential Real Estate | Prudential Custom Real Estate** | (20.6) | (12.3) | (3.3) | (3.2) | (1.5) | 0.1 | 1.3 | 0.7 | 0.4 | (0.8) |
| WTC Div Infl Hedges | Multi-Asset Inflation Index | 2.4 | 1.4 | 0.8 | 0.2 | 0.2 | 0.2 | (0.3) | (0.9) | (1.1) | (1.0) |

| Fund | Benchmark | 9/16 | 12/16 | 3/17 | 6/17 | 9/17 | 12/17 | 3/18 | 6/18 | 9/18 | 12/18 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Prudential High Yield | Blbg Bcly Corporate High Yield | (0.3) | (0.4) | (0.3) | (0.2) | (0.1) | 0.0 | 0.2 | 0.2 | 0.2 | 0.4 |
| WTC Intl Opps | MSCI EAFE (net)* | | | | | | | | | 0.1 | (0.8) |
| Prudential Real Estate | Prudential Custom Real Estate** | (3.7) | (0.5) | 0.7 | 1.1 | (0.3) | (0.3) | (0.1) | (0.0) | (0.0) | (0.2) |
| WTC Div Infl Hedges | Multi-Asset Inflation Index | (0.3) | (0.3) | (0.5) | (0.6) | (0.7) | (0.7) | (0.7) | (0.5) | (0.6) | (0.9) |

*Pre Q4 2016, benchmark was MSCI World X US SMID NR USD
**Pre Q3 2017, benchmark was MSCI US REIT Index

### Quarterly 10-year Rolling Outperformance

| Fund | Benchmark | 3/14 | 6/14 | 9/14 | 12/14 | 3/15 | 6/15 | 9/15 | 12/15 | 3/16 | 6/16 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Prudential High Yield | Blbg Bcly Corporate High Yield | (0.4) | (0.3) | (0.3) | (0.0) | 0.0 | (0.0) | 0.2 | 0.3 | 0.4 | 0.3 |
| QMA Intl Dev Mkts | MSCI ACWI X US Index* | (5.3) | (8.4) | (7.5) | (6.8) | (7.2) | (5.4) | (5.1) | (4.1) | (3.0) | (4.6) |
| Prudential Real Estate | Prudential Custom Real Estate** | | | | | | | | | (1.9) | (2.8) |
| WTC Div Infl Hedges | Multi-Asset Inflation Index | | | | | | | | | | |

| Fund | Benchmark | 9/16 | 12/16 | 3/17 | 6/17 | 9/17 | 12/17 | 3/18 | 6/18 | 9/18 | 12/18 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Prudential High Yield | Blbg Bcly Corporate High Yield | 0.3 | 0.2 | 0.2 | 0.3 | 0.2 | (0.1) | (0.2) | (0.3) | (0.8) | (1.4) |
| QMA Intl Dev Mkts | MSCI ACWI X US Index* | (3.2) | (0.1) | (0.2) | 0.0 | 0.2 | 0.2 | 0.1 | 0.4 | 0.3 | (0.1) |
| Prudential Real Estate | Prudential Custom Real Estate** | (2.0) | (1.4) | (1.5) | (2.8) | (1.6) | (1.6) | (1.5) | (1.6) | (1.8) | (1.1) |
| WTC Div Infl Hedges | Multi-Asset Inflation Index | | | | | | | (0.9) | (1.1) | (0.8) | 0.8 |

*Pre Q4 2016, benchmark was MSCI India NR USD
**Pre Q3 2017, benchmark was MSCI US REIT Index

70.    ***The Jennison Opportunistic Equity Collective Investment Trust***.  This fund is sub-advised by Jennison Associates LLC as a collective investment trust of the Prudential Trust Company.  It was added to the Plan lineup immediately upon inception in April 2015, or shortly thereafter that year. As no five-year return can be observed for the fledgling fund, its rolling 1-year returns are the only available metric by which to judge its performance.  Unfortunately, the Jennison Opportunistic Equity CIT did not get off to a good start and performed poorly from the outset, as shown clearly in the chart below:



For eight of the 11 quarters through December 31, 2018, the fund's trailing one-year return underperformed its benchmark, the Russell 1000 Index, sometimes dramatically so. For example, as of the quarter ended June 30, 2016, the fund had returned -4.60% in its first year in existence, or 7.53% below the return of the Russell 1000 Index for the same period. The fund performed so poorly that it has been removed from the Plan lineup in 2019. Given the fund's absent track record when it was initially selected by the Investment Oversight Committee, it is apparent that its status as an investment offered by a Prudential affiliate was the deciding factor in its imprudent addition to the Plan lineup.

71. ***The Prudential High Yield Fund Collective Investment Trust***. In the five-year period from January 1, 2014 to December 31, 2018, the Prudential High Yield Fund CIT underperformed its benchmark, the Bloomberg Barclays Corporate High Yield Index, approximately 50% of the time. For the 20 quarters comprising the aforementioned period, the fund's returns trailed its benchmark in nine quarters on a rolling one-year basis, 11 quarters on a rolling five-year basis, and 10 quarters on a rolling 10-year basis, as shown in the charts below.







According to the Plan's Summary Plan Description, the objective of the Prudential High Yield Fund CIT is to outperform its benchmark by 150 basis points (1.50%) over a full market cycle. The fund failed to achieve this even once during the relevant time period.

72.     ***The Prudential Retirement Real Estate Fund***.  This proprietary fund produced returns that fell short of its benchmarks during the 2014 to 2018 period, with its rolling 10-year performance being particularly poor. In the second quarter of 2017, the fund's benchmark was changed from the MSCI US REIT Index to a custom Prudential Retirement Real Estate Fund Benchmark.  The alteration failed to help improve the appearance of the fund's performance. During the 20 quarter period, the fund fell short of its benchmark in 9 quarters on a rolling one-year basis and 14 quarters on a rolling five-year basis, as shown in the charts below.





For the 12 quarter period beginning in January 1, 2016 (the Prudential Retirement Real Estate Fund launched in the first quarter of 2006), the fund's rolling 10-year performance failed to beat that of its benchmark in any quarter, as shown in the chart below.



73. ***The QMA International Developed Markets Index Fund***. The fund seeks to provide performance that corresponds to that of the international equity markets as represented by the MSCI EAFE Index. From mid-2014 to mid-2015, the fund was profoundly unsuccessful. For the one-year period ended September 30, 2014, the fund returned 4.37%, falling staggeringly short of its benchmark's 37.61% return. During the six-quarter period beginning April 1, 2014, the fund underperformed its benchmark on a rolling one-year basis by at least 257 basis points (2.57%) at each quarter. In 13 of the 20 quarters during the 2014 to 2018 period, the fund trailed its benchmark on a rolling one-year basis by greater than its 10 basis point (0.10%) annual fee, as shown in the chart below.



On a rolling 10-year basis, the fund underperformed its benchmark by at least 297 basis points (2.97%) for 11 straight quarters, as shown in the chart below.



74.   ***The Wells Capital International Bond Institutional Select Fund***.  The Wells Capital Fund was added to the Plan lineup immediately upon its inception in September 2014 or shortly thereafter, and performed poorly from day one. By the end of 2018, the fund's returns had trailed those of its benchmark, the Bloomberg Barclays Global Aggregate ex US (Unhedged) Index, on a rolling one-year basis in 12 of 14 quarters, as shown in the chart below.



75.    *The Wellington Trust Company CIF II Diversified Inflation Hedges Portfolio*.

The fund was added to the Plan investment lineup sometime in 2017.  From the third quarter of

2015 through the end of 2018, the fund's performance on a rolling five-year basis trailed its

benchmark, the Multi-Asset Inflation Index, every single quarter, as shown in the chart below.



The fund's five-year returns fell short of the benchmark for at least six quarters preceding the

Investment Oversight Committee's selection of the fund and continued to do so thereafter. From

the start of 2014 through the end of 2016, the fund's rolling one-year performance failed to exceed that of the benchmark in eight of the 12 quarters, as shown in the chart below.



76.     *The Wellington Trust Company CIF II International Opportunities Portfolio*. The Investment Oversight Committee added this fund as a Plan investment option within a year of its inception in August 2013.  The fund has failed to beat either of the benchmarks it has had for the relevant time period with any consistency.  The MSCI India NR USD was the benchmark until the fourth quarter of 2016, at which point it was replaced by the MSCI ACWI ex USA Index.  Regardless of the benchmark, after the third quarter of 2015, the fund could not produce equal returns.  From the fourth quarter of 2015 through the end of 2018, the fund's one-year rolling returns trailed those of its benchmark in every quarter except one, as shown in the chart below.



### 3.    Excessive Use of Prudential-Affiliated Funds

77.    At all pertinent times, at least half of the funds offered to participants were Prudential-affiliated funds, which provided millions of dollars of revenue for Prudential and its affiliates and subsidiaries.  The following funds all provided additional revenue in the form of investment management fees which were borne by the Plan participants: (1) a stable value fund, the PESP Fixed Rate Fund; (2) the Prudential Financial, Inc. Common Stock Fund; (3) a high yield bond fund, the Prudential High Yield Collective Investment Trust; (4) a suite of guaranteed retirement income products: the Prudential IncomeFlex Select Aggressive Fund, Prudential IncomeFlex Select Conservative Fund, Prudential IncomeFlex Select Moderate Fund, and PESP IncomeFlex Target Balanced Fund; (5) the Prudential Jennison Natural Resources Fund; (6) the Prudential Retirement Real Estate Fund; (7) a domestic bond fund, the Core Bond Enhanced Index/PGIM Fund; and (8) a large cap blend fund, the Jennison Opportunistic Equity Collective Investment Trust.

78.    In addition to the fact that the funds provided a substantial additional revenue stream for Prudential, as discussed above, many of the Prudential-affiliated funds were

unnecessarily expensive, consistently and considerably underperformed compared to their respective benchmarks, or both.  By choosing the financial interests of Prudential over Plan participants, Defendants caused participants to incur unnecessary costs and lose the opportunity to invest in more appropriate available funds.

79.    Although mutual fund expenses and fees are paid directly by the mutual fund to various Prudential affiliates, including the Prudential Retirement Insurance and Annuity Company, Jennison Associates LLC, and Prudential, the fees are nevertheless paid indirectly by the Plan.  The payment of such fees had a direct and detrimental impact on the value of the Plan's assets, as earnings for the Prudential Funds were passed on to investors, net of fees. As the United States Department of Labor studies have recognized, the

> [e]xpenses of operating and maintaining an investment portfolio that are debited against the participant's account constitute an opportunity cost in the form of foregone investments in every contribution period. The laws of compound interest dictate that these small reductions in investment are magnified greatly over the decades in which many employees will be 401(k) plan participants . . . .  The effect of … higher levels of expenses would be to reduce the value of potential future account balances for these participants.

Study of 401(k) Plan Fees and Expenses (Apr. 13, 1998) ("Fee Study") (*available at* http://www.dol.gov/ebsa/pdf/401krept.pdf.).  Applied to the Plan, which contains roughly $8.7 billion in assets, over the course of several years, the compounded opportunity cost of excessive fees causes substantial damage to the Plan's assets and participants.

80.    Prudent fiduciaries would have investigated alternative available investments in order to maximize the Plan's retirement assets in the interest of the participants.  Instead, Defendants simply offered Prudential products because they were familiar options that provided additional benefits to Prudential and its affiliates.  This type of self-dealing and objective imprudence violates ERISA.

34

81.     There are innumerable fairly priced and well-managed investment options in the 401(k) marketplace, especially for a plan the size of the Plan.  Despite this fact, Defendants decided to overpopulate the Plan with funds managed by Prudential and its affiliates, and the only reasonable inference to be drawn is that Defendants did this to generate profits for Prudential and its affiliates.

## CLASS ACTION ALLEGATIONS

82.     This action is brought as a class action by Plaintiff on behalf of himself and the following proposed class ("Class"):

**Class**:

> All participants and beneficiaries in the Prudential Employee Savings Plan (the "Plan") at any time on or after November 5, 2013 to the present (the "Class Period" or "Relevant Time Period"), including any beneficiary of a deceased person who was a participant in the Plan at any time during the Class Period.

Excluded from the Class are Defendants and Judge to whom this case is assigned or any other judicial officer having responsibility for this case who is a beneficiary.

83.     This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

84.     **Numerosity**.  Plaintiff is informed and believes that there are at least thousands of Class members throughout the United States.  As a result, the members of the Class are so numerous that their individual joinder in this action is impracticable.

85.     **Commonality**.  There are numerous questions of fact and/or law that are common to Plaintiff and all the members of the Class, including, but not limited to the following:

(a)      whether Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants for the exclusive purpose of providing benefits to participants and their beneficiaries;

(b)      whether Defendants breached their fiduciary duties under ERISA by failing to defray the reasonable expenses of administering the Plan; and

(c)      whether and what form of relief should be afforded to Plaintiff and the Class.

86.      **Typicality**.  Plaintiff, who is a member of the Class, has claims that are typical of all of the members of the Class.  Plaintiff's claims and all of the Class members' claims arise out of the same uniform course of conduct by Defendants and arise under the same legal theories that are applicable as to all other members of the Class.

87.      **Adequacy of Representation**.  Plaintiff will fairly and adequately represent the interests of the members of the Class.  Plaintiff has no conflicts of interest with or interests that are any different from the other members of the Class.  Plaintiff has retained competent counsel experienced in class action and other complex litigation, including class actions under ERISA

88.      **Predominance**.  Common questions of law and fact predominate over questions affecting only individual Class members, and the Court, as well as the parties, will spend the vast majority of their time working to resolve these common issues.  Indeed, virtually the only individual issues of significance will be the exact amount of damages recovered by each Class member, the calculation of which will ultimately be a ministerial function and which does not bar Class certification.

89.      **Superiority**.  A class action is superior to all other feasible alternatives for the resolution of this matter.  The vast majority, if not all, of the Class members are unaware of

Defendants' breaches of fiduciary duty and prohibited transactions such that they will never

bring suit individually.  Furthermore, even if they were aware of the claims they have against

Defendants, the claims of the virtually all Class members would be too small to economically

justify individual litigation.  Finally, individual litigation of multiple cases would be highly

inefficient, a gross waste of the resources of the courts and of the parties, and potentially could

lead to inconsistent results that would be contrary to the interests of justice.

90.     **Manageability**.  This case is well-suited for treatment as a class action and easily

can be managed as a class action since evidence of both liability and damages can be adduced,

and proof of liability and damages can be presented, on a Class-wide basis, while the allocation

and distribution of damages to Class members would be essentially a ministerial function.

91.     Defendants have acted on grounds generally applicable to the Class by uniformly

subjecting them to the breaches of fiduciary duty described above.  Accordingly, injunctive

relief, as well as legal and/or equitable monetary relief (such as disgorgement and/or restitution),

along with corresponding declaratory relief, are appropriate with respect to the Class as a whole.

## COUNT I
### (For Breach of Fiduciary Duty)

92.     Plaintiff incorporates the allegations in the previous paragraphs of this Complaint

as if fully set forth herein.

93.     Defendants' conduct, as set forth above, violates the fiduciary duties under

ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A), (B), and (C), in that Defendants

failed and continue to fail to discharge their duties with respect to the Plan solely, in the interest

of the Plan's participants and their beneficiaries and (a) for the exclusive purpose of (i) providing

benefits to participants and their beneficiaries, and (ii) defraying reasonable expenses of

administering the Plan with (b) the care, skill, prudence, and diligence under the circumstances

then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and like aims, and (c) by failing to act in accordance with the documents and instruments governing the Plan.  In addition, as set forth above, Defendants violated their respective fiduciary duties under ERISA to monitor other fiduciaries of the Plan in the performance of their duties.

94.     As a direct result of Defendants' breaches of duties, Plaintiff and the Plan have suffered losses and damages.

95.     Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502, Defendants are liable to restore to the Plan the losses that have been suffered as a direct result of Defendants' breaches of fiduciary duty and are liable for damages and any other available equitable or remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs and other recoverable expenses of litigation.

## COUNT II
### (Prohibited Transactions With a Party in Interest in Violation of 29 U.S.C. § 1106(a)(1))

96.     Plaintiff incorporates the allegations in previous paragraphs of this Complaint as if fully set forth herein.

97.     At all relevant times and as alleged above, Defendants have been fiduciaries to the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

98.     Under 29 U.S.C. §1106(a)(1)(C), a fiduciary shall not cause a plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect furnishing of services between the Plan and a party in interest.

99.     Under 29 U.S.C. §1106(a)(1)(D), a fiduciary shall not cause a plan to engage in a transaction, if he knows or should have known that such transaction constitutes a direct or indirect transfer to, or use by or for the benefit of a party in interest of any assets of the Plan.

100.     Defendants violated ERISA's prohibition on transactions between the Plan and a party in interest through their actions and omissions in authorizing or causing the Plan to invest in the unduly expensive investment options managed by Prudential and/or its affiliates, thereby causing the Plan to engage in transactions that Defendants knew or should have known constituted a direct or indirect furnishing of services between the Plan and the parties in interest, and/or the transfer to, or use by or for the benefit of the parties in interest, of the assets of the Plan.

101.     As a direct and proximate result of these prohibited transactions, the Plan, Plantiff, and other Plan participants and beneficiaries, directly or indirectly paid millions of dollars in fees in connection with transactions that were prohibited under ERISA, resulting in significant losses to the Plan and its participants, and/or unjust profits to the parties in interest.

102.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a), Defendants are liable to restore the losses sustained by the Plan and/or the unjust profits received by Defendants as parties in interest, as a result of these prohibited transactions.

## COUNT III
### (Prohibited Transaction With a Fiduciary, 29 U.S.C. § 1106)

103.     Plaintiff incorporates the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

104.     Defendants dealt with the assets of the Plan in their own interest and for their own accounts when they caused the Plan to pay investment management fees and expenses to Prudential out of Plan assets, in violation of 29 U.S.C § 1106(b)(1).

105.     Defendants received consideration for their own personal accounts from parties dealing with the Plan in connection with transactions involving the assets of the Plan.  These transactions occurred regularly when fees and expenses were deducted from assets being held for

Plan participants in exchange for services performed by Prudential.  Accordingly, payments to Prudential constituted prohibited transactions, in violation of 29 U.S.C. § 1106(b)(3).

106.    Based on the foregoing facts and other incorporated facts, Defendants knowingly caused the Plan to engage in prohibited transactions with Prudential, a fiduciary to the Plan, in violation of 29 U.S.C. § 1106(b).

107.    Pursuant to 29 U.S.C. §§ 1109(a),1132(a)(2), and 1132(a)(3), Defendants are liable to restore all losses suffered by the Plan as a result of the prohibited transactions and disgorge all revenues received and/or earned by Defendants resulting, directly or indirectly, from the above-mentioned prohibited transactions. Plaintiffs also are entitled to appropriate equitable relief on behalf of the Plan pursuant to 29 U.S.C. § 1132(a)(3).

## COUNT IV
### (Failure to Monitor Fiduciaries)

108.    Plaintiff incorporates the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

109.    Prudential is responsible for appointing, overseeing, and removing members of the Administrative Committee and the Investment Oversight Committee, who, in turn, are responsible for appointing, overseeing, and removing members of the Committees.

110.    In light of its appointment and supervisory authority, Prudential had a fiduciary responsibility to monitor the performance of the Committees and their members.  In addition, Prudential, the Administrative Committee, and Investment Oversight Committee had a fiduciary responsibility to monitor the performance of the members of the respective Committees.

111.    A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they

are not.

112.    To the extent that fiduciary monitoring responsibilities of Prudential or the Committees were delegated, each Defendant's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

113.    Prudential and the Committees breached their fiduciary monitoring duties by, among other things:

(a)    Failing to monitor and evaluate the performance of their appointees or have a system in place for doing so, standing idly by as the Plan suffered enormous losses as a result of the appointees' imprudent actions and omissions with respect to the Plan;

(b)    Failing to monitor their appointees' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein, in clear violation of ERISA; and

(c)    Failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and Plan participants' retirement savings.

114.    As a consequence of these breaches of the fiduciary duty to monitor, the Plan suffered substantial losses.  Had Prudential and the Committees discharged their fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct result of the breaches of fiduciary duties alleged herein, the Plan and its participants have lost millions of dollars of retirement savings.

115.    Prudential and the Committees are liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, to restore to the Plan any profits made through use of Plan assets, and are subject to other equitable or remedial relief as appropriate.  Each also knowingly participated in the breaches of the other Defendants, knowing that such acts were a breach; enabled the other Defendants to commit a breach by failing to lawfully discharge their own fiduciary duties; and knew of the breaches by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breaches. Prudential, thus, is liable for the losses caused by the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT V
### (In the Alternative, Liability for Knowing Breach Of Trust)

116.    Plaintiff incorporates the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

117.    In the alternative, to the extent that [any of the] Defendants are not deemed a fiduciary or co-fiduciary under ERISA, each such Defendant should be enjoined or otherwise subject to equitable relief as a non-fiduciary from further participating in a knowing breach of trust.

118.    To the extent [any of] the Defendants are not deemed to be fiduciaries and/or are not deemed to be acting as fiduciaries for any and all applicable purposes, any such Defendants are liable for the conduct at issue here, since all Defendants possessed the requisite knowledge and information to avoid the fiduciary breaches at issue here and knowingly participated in breaches of fiduciary duty by permitting the Plan to offer a menu of poor and expensive investment options that cannot be justified in light of the size of the Plan and other expenses of the Plan.

WHEREFORE, Plaintiff, on behalf of himself and the Plan, demands judgment against Defendants, for the following relief:

(a)     Declaratory and injunctive relief pursuant to ERISA § 502, 29 U.S.C. § 1132, as detailed above;

(b)     Equitable, legal or remedial relief to return all losses to the Plan and/or for restitution and/or damages as set forth above, plus all other equitable or remedial relief as the Court may deem appropriate pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132, as detailed above;

(c)     Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity;

(d)     Attorneys' fees, costs, and other recoverable expenses of litigation; and

(e)     Such further and additional relief to which Plaintiff and the Plan may be justly entitled and the Court deems appropriate and just under all the circumstances.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

## **NOTICE PURSUANT TO ERISA § 502(h)**

To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h), the undersigned hereby affirms that, on this date, a true and correct copy of this Complaint was served upon the Secretary of Labor and Secretary of Treasury by certified mail, return receipt requested.

Dated: November 5, 2019                    Respectfully Submitted,

                                           SHEPHERD, FINKELMAN,
                                           MILLER & SHAH, LLP

                                           /s/ James C. Shah
                                           James C. Shah
                                           Shepherd Finkelman Miller
                                            & Shah, LLP
                                           475 White Horse Pike
                                           Collingswood, NJ 08107
                                           Telephone: (856) 858-1770
                                           Facsimile: (866) 300-7367
                                           Email: jshah@sfmslaw.com

                                           Ronald S. Kravitz
                                           Kolin C. Tang
                                           Shepherd Finkelman Miller
                                           & Shah, LLP
                                           201 Filbert Street, Suite 201
                                           San Francisco, CA 94133
                                           Telephone: (415) 429-5272
                                           Facsimile: (866) 300-7367
                                           Email: rkravitz@sfmslaw.com
                                                   ktang@sfmslaw.com

                                           James E. Miller
                                           Laurie Rubinow
                                           Shepherd Finkelman Miller
                                           & Shah, LLP
                                           65 Main Street
                                           Chester, CT 06412
                                           Telephone: (860) 526-1100
                                           Facsimile: (866) 300-7367
                                           Email: jmiller@sfmslaw.com
                                                   lrubinow@sfmslaw.com

                                           **Attorneys For Plaintiff, the Plan,
                                           and the Proposed Class**