SHEPHERD, FINKELMAN, MILLER
& SHAH, LLP
NATALIE FINKELMAN BENNETT
JAMES C. SHAH
475 White Horse Pike
Collingswood, NJ  08107
Telephone: 856/858-1770
Facsimile: 856/858-7012
nfinkelman@sfmslaw.com
jshah@sfmslaw.com

[Additional Counsel on Signature Page]

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| YOUNG CHO,<br>Individually and as Representative of a Class<br>of Similarly Situated Persons, and on Behalf<br>of the PRUDENTIAL EMPLOYEE<br>SAVINGS 401(k) PLAN,<br><br>Plaintiff,<br><br>vs.<br><br>THE PRUDENTIAL INSURANCE<br>COMPANY OF AMERICA, PRUDENTIAL<br>ADMINISTRATIVE COMMITTEE,<br>PRUDENTIAL INVESTMENT<br>OVERSIGHT COMMITTEE,<br>BELLWETHER CONSULTING LLC,<br>LUCIEN ALZIARI, SARA BONESTEEL,<br>ELLEN BORAK, TINA CAWLEY,<br>THOMAS LAURITA, PATRICK LYNCH,<br>JOSEPH MACHEWIRTH, LYNN<br>MCTAGGART, GARY NEUBECK,<br>KEVIN PRUE, SCOTT RAMSAY, SCOTT<br>SLEYSTER, and SHARON TAYLOR,<br><br>Defendants. | **Civil Action No**: **2:19-cv-19886 (JMV)(SCM)**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**AMENDED CLASS ACTION COMPLAINT** |

## **NATURE OF THE ACTION**

1.      Plaintiff, Young Cho ("Plaintiff"), individually and on behalf of all other similarly situated persons and the Prudential Employee Savings Plan (the "Plan"), brings this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA").

2.       Plaintiff asserts his claims against the Prudential Insurance Company of America ("Prudential"), the Prudential Administrative Committee ("Administrative Committee"), the Prudential Investment Oversight Committee ("Investment Oversight Committee") and Bellwether Consulting LLC ("Bellwether"), as well as Lucien Alziari, Sara Bonesteel, Ellen Borak, Tina Cawley, Thomas Laurita, Patrick Lynch,  Joseph Machewirth, Lynn McTaggart, Gary Neubeck, Kevin Prue, Scott Ramsay, Scott Sleyster and Sharon Taylor ("Committee Members" or "Individual Defendants") (altogether, "Defendants"), for breach of fiduciary duties and other violations of ERISA, 29 U.S.C. § 1001, *et seq.*   The Administrative Committee, comprised of Prudential officers and employees, was (and is) responsible for the administration, management, and operation of the Plan.  The Investment Oversight Committee, comprised of Prudential officers and employees, was responsible for selecting and monitoring the Plan's investments.  As fiduciaries to the Plan, Defendants had a duty under ERISA to act prudently and solely in the interest of the Plan and its participants and beneficiaries when selecting investments, products, and services for the Plan.  Instead, Defendants put the interests of Prudential ahead of those of the Plan by choosing investment products and pension plan services offered and managed by Prudential subsidiaries and affiliates, which generated substantial revenues for Prudential, at great cost to the Plan.

2

## PRELIMINARY STATEMENT

3.      Defined contribution plans that are qualified as tax-deferred vehicles under

Section 401 of the Internal Revenue Code, 26 U.S.C. §§ 401(a) and (k) (i.e. 401(k) plans), have

become the primary form of retirement savings in the United States and, as a result, America's

*de facto* retirement system.  As of 2016, Americans had cumulatively invested over $7 trillion in

assets in defined contribution plans like the Plan at issue here.  Unlike traditional defined benefit

retirement plans, in which the employer typically promises a calculable benefit and assumes the

risk with respect to high fees or under-performance of pension plan assets used to fund defined

benefits, 401(k) plans operate in a manner in which participants bear the risk of high fees and

investment under-performance.

4.       The importance of defined contribution plans to the United States retirement

system has become increasingly pronounced as employer-provided defined benefit plans have

become increasingly rare as an offered and meaningful employee benefit.

5.      The potential for disloyalty and imprudence is much greater in defined

contribution plans than in defined benefit plans.  In a defined benefit plan, the participant is

entitled to a fixed monthly pension payment while the employer is responsible for making sure

the plan is sufficiently capitalized. As a result, the employer bears all risks related to excessive

fees and investment underperformance.  Therefore, in a defined benefit plan, the employer and the

plan's fiduciaries have every incentive to keep costs low and to remove imprudent investments.  But

in a defined contribution plan, participants' benefits are limited to the value of their individual

accounts, which is determined by the market performance of employee and employer contributions,

minus investment expenses.  Thus, the employer has no incentive to keep costs low or to closely

monitor the plan to ensure that selected investments are and remain prudent, because all risks caused

by high fees and poorly performing investments are borne by the employee.

3

6.     For financial services companies like Prudential, the potential for imprudent and disloyal conduct is especially high, because the Plan's fiduciaries are in a position to benefit the company through the selection of the Plan's investments by, for example, filling the plan with proprietary investment products that an objective and prudent fiduciary would not choose. Additionally, here, Prudential serves as the recordkeeper for the Plan, providing yet a further stream of revenue and extra benefit for Prudential.

7.     The effect of such fiduciaries' imprudence on workers can be severe.  According to one study, the average working household with a defined contribution plan will lose $154,794 to fees and lost returns over a 40-year career.  *See* Melanie Hicken, *Your employer may cost you $100k in retirement savings*, CNN Money (June 1, 2014), *available at* http://money.cnn.com /2013/03/27/retirement/401k-fees.  Simply put, a fiduciary's mismanagement of plan assets leading to an investment lineup filled with poor-performing investments and excessive fees can force a participant to work an extra five to six years to compensate for the excess fees that were paid

8.     With nearly $8.7 billion in assets as of December 31, 2017, the Plan is in the top one percent (1%) of all 401(k) plans in terms of assets.  Additionally, as of December 31, 2017, there were nearly 45,000 participants in the Plan.  The marketplace for 401(k) retirement plan services is well-established and can be competitive when fiduciaries of defined contribution retirement plans act in an informed and prudent fashion.  Multi-billion dollar defined contribution plans, like the Plan, have significant bargaining power and the ability to demand low-cost administrative and investment management services within the marketplace for the administration of 401(k) plans and the investment of 401(k) assets.  As fiduciaries to the Plan, Defendants are obligated to act for the exclusive benefit to participants, invest the assets of the Plan in a prudent fashion, and ensure that Plan expenses are fair and reasonable.  At all pertinent

4

times, as explained below, Defendants: (a) were fiduciaries under ERISA; (b) breached their fiduciary duties under ERISA by failing to fully disclose to participants the expenses and risk of the Plan's investment options; (c) engaged in prohibited transactions, in violation of ERISA; and (d) breached their fiduciary duties under ERISA by selecting and retaining high-cost and poor-performing investments, several of which were managed by Prudential and/or its subsidiaries, instead of offering other readily available, easily identifiable and more prudent alternative investments.

9.      Among other things, Plaintiff alleges that Defendants violated ERISA by overpopulating the Plan with proprietary mutual funds offered by Prudential and its affiliates and failing to monitor the performance of those funds, resulting in the payment of grossly excessive fees to Prudential and significant losses to the Plan and its participants.

10.      During the Class Period (defined below), the Investment Oversight Committee chose and maintained mutual funds and collective investment trusts which were established, offered, and advised by Prudential brands, including: (1) a stable value fund, the PESP Fixed Rate Fund; (2) the Prudential Financial, Inc. Common Stock Fund; (3) a high yield bond fund, the Prudential High Yield Collective Investment Trust; (4) a suite of guaranteed retirement income products: the Prudential IncomeFlex Select Aggressive Fund, Prudential IncomeFlex Select Conservative Fund, Prudential IncomeFlex Select Moderate Fund, and PESP IncomeFlex Target Balanced Fund; (5) the Prudential Jennison Natural Resources Fund; (6) the Prudential Retirement Real Estate Fund; (7) a domestic bond fund, the Core Bond Enhanced Index/PGIM Fund; (8) a global bond fund, the PGIM Global Total Return Bond Fund; and (9) a large cap blend fund, the Jennison Opportunistic Equity Collective Investment Trust.  The entities that managed the foregoing investments were affiliates or subsidiaries of Prudential during the Class

Period.  These funds also were affiliates or subsidiaries of Prudential during the Class Period. Not only were these funds disloyal selections chosen to provide extra revenue to Prudential, several are also objectively imprudent investment options.  Based upon available metrics, some of the Prudential-affiliated funds have under-performed reasonable comparators and cost significantly more than readily available peer funds.

11.    By selecting Prudential-affiliated funds, the Defendants placed Prudential's interests above the Plan's interests.  Instead of considering objective criteria like fees and performance to select investments for the Plan, the Investment Oversight Committee selected Prudential Funds because they were familiar and generated substantial revenues for Prudential. Unaffiliated investment products do not generate any fees for Prudential.  As a result, the Investment Oversight Committee chose many Prudential funds to benefit Prudential, the sponsor of the Plan, without investigating whether Plan participants would be better served by investments managed by unaffiliated companies.  This is unsurprising, given that Prudential serves as the Plan's recordkeeper, and the Plan utilizes a revenue-sharing arrangement to pay the majority of its administrative expenses.  As Prudential itself performs all recordkeeping and administrative functions for the Plan, as well as manages a significant number of the Plan's investments, Prudential receives additional revenue in the form of direct participant fees and indirect fees via revenue sharing.

12.    Exacerbating the problems arising from these severe conflicts of interest, several of the unaffiliated investment options offered to Plan participants were egregiously expensive and generally underperformed compared to benchmarks selected by the Investment Oversight Committee.

13.     To remedy these fiduciary breaches and other violations of ERISA, Plaintiff brings this class action under ERISA, and, in particular, under 29 U.S.C. §§ 1104, 1106, and 1109, for losses to the Plan caused by Defendants' breaches of fiduciary duty and violations of ERISA's prohibited transaction provisions.  Based on this conduct, Plaintiff asserts claims against the Defendants for: (a) breach of the fiduciary duties of prudence and loyalty (Count I); (b) engaging in prohibited transactions with a party-in-interest (Count II); (c) engaging in prohibited transactions with a fiduciary (Count III); (d) failure to monitor fiduciaries (Count IV); and, in the alternative, (e) knowing breach of trust (Count V).

14.     Plaintiff brings this class action on behalf of the Plan and its approximately 45,000 participants for losses to the Plan caused by Defendants' conflicted and imprudent selection of investments and services for the Plan.

15.     Plaintiff also brings this class action on behalf of the Plan and all other similarly situated current and former participants under 29 U.S.C. §§ 1109 and 1132, to recover the following relief:

- A declaratory judgment and holding that the acts of Defendants described herein violate ERISA and applicable law;

- A permanent injunction against Defendants, prohibiting the practices described herein and affirmatively requiring them to act in the best interests of the Plan and its participants;

- Equitable, legal or remedial relief for all losses and/or compensatory damages;

- Attorneys' fees, costs and other recoverable expenses of litigation; and

- Such other and additional legal or equitable relief that the Court deems appropriate and just under all the circumstances.

## JURISDICTION AND VENUE

16.     Plaintiff seeks relief on behalf of the Plan pursuant to ERISA's civil enforcement remedies with respect to fiduciaries and other interested parties and, specifically, under 29 U.S.C. § 1109 and 29 U.S.C. § 1132.

17.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA Section 502(e), 29 U.S.C. § 1132(e).

18.     Venue is proper in this juridical district pursuant to 29 U.S.C. § 1132(e) because Prudential's principal place of business is in this district.

## THE PARTIES

19.     Plaintiff is a former employee of Prudential and former participant under 29 U.S.C. § 1002(7) of the Plan.  Plaintiff worked for Prudential until May, 2018 and maintained an account with the Plan until March 20, 2019.  Plaintiff is a resident of Los Angeles, California.

20.     The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34). The Plan is a qualified plan under 26 U.S.C. § 401 and is commonly referred to as a "401(k) plan."  Eligible employees, as defined in the Plan Document, may direct the investment of retirement assets into several select investment funds.  The available menu of investment options is curated by Defendants and, specifically, by the Investment Oversight Committee, as described in detail below.

21.     Defendant, Prudential, is identified in the Plan Document as the "plan sponsor" of the Plan under 29 U.S.C. § 1002(16)(B).  Prudential is also a "named fiduciary" under 29 U.S.C. § 1102(a)(2).  As the Plan Sponsor, Prudential is, by definition, also a party in interest of the Plan.

22.    Defendant, the Administrative Committee, is designated by the Plan Document to assist Prudential with administration of the Plan. The Administrative Committee is a "named fiduciary" and "administrator" of the Plan identified in the Plan Document under 29 U.S.C. §§ 1002(16)(A)(i) and 1102(a), which exercises discretionary authority and control with respect to management of the Plan and the Plan's assets. The Administrative Committee is led by a chairperson who is appointed by the Senior Vice President. The chairperson, in turn, designates the remaining members of the Administrative Committee, with the only requirement being that the committee is composed of three or more employees, including the chairperson of Prudential or an affiliated entity. The Administrative Committee has the responsibility and discretion to control and manage the operation and administration of the Plan.

23.    Defendant, the Investment Oversight Committee, is designated by the Plan Document to assist Prudential with the selection of investment funds offered for selection by Plan participants. According to the Plan Document, the Investment Oversight Committee must be comprised of at least three persons appointed by name or title by the Prudential Investment Committee of Prudential's Board of Directors. The Investment Oversight Committee is a "named fiduciary" identified in the Plan Document pursuant to 29 U.S.C. § 1102(a). Because the Investment Oversight Committee exercises "authority or control respecting management or disposition of the Plan's assets," it is also a fiduciary pursuant to 29 U.S.C. § 1002(21)(A). The Investment Oversight Committee has the "responsibility for implementing the Plan's funding policy . . . and for establishing the Plan's investment policies. Except with respect to the Company Stock Fund, the Investment Oversight Committee Shall select all Investment Funds . . . ."

24.     Defendant, Lucien Alziari ("Alziari"), is an individual who served as a Member of the Investment Oversight Committee from 2017-2018.  Alziari has served as the Chairperson of the Investment Oversight Committee since 2018.

25.     Defendant, Sara Bonesteel ("Bonesteel"), is an individual who has served as a Member of the Investment Oversight Committee since 2019.

26.     Defendant, Ellen Borak ("Borak"), is an individual who served as a Member of the Administrative Committee from prior to 2014 until 2018.

27.     Defendant, Tina Cawley ("Cawley"), is an individual who served as a Member of the Administrative Committee from prior to 2014 until 2020.

28.     Defendant, Thomas Laurita ("Laurita"), is an individual who has served as a Member of the Administrative Committee since 2020.

29.     Defendant, Patrick Lynch ("Lynch"), is an individual who served as a Member of the Administrative Committee from 2016 until 2020.

30.     Defendant, Joseph Machewirth ("Machewirth"), is an individual who has served as a Member of the Administrative Committee since 2020.

31.     Defendant, Lynn McTaggart ("McTaggart"), is an individual who served as a Member of the Administrative Committee from prior to 2014 until 2016.

32.     Defendant, Gary Neubeck ("Neubeck"), is an individual who has served as a Member of the Investment Oversight Committee since prior to 2013.

33.     Defendant, Kevin Prue ("Prue"), is an individual who has served as the Chairperson of the Administrative Committee since prior to 2014.

34.     Defendant, Scott Ramsay ("Ramsay"), is an individual who has served as a Member of the Administrative Committee since prior to 2014.

35.     Defendant, Scott Sleyster ("Sleyster"), is an individual who served as a Member of the Investment Oversight Committee since prior to 2013 until 2019.

36.     Defendant, Sharon Taylor ("Taylor"), is an individual who served as Chairperson of the Investment Oversight Committee from prior to 2013 until 2017.

37.     Defendant, Bellwether Consulting LLC ("Bellwether"), is a limited liability company organized under the laws of New Jersey that maintains its headquarters and principal place of business in Millburn, New Jersey.  At all pertinent times, Bellwether served as the investment adviser for the Plan and acted as a fiduciary of the Plan.

38.     The Individual Defendants of the Administrative Committee and Investment Oversight Committee (collectively, "Committees") have been delegated fiduciary authority pursuant to the Plan Document.

39.     At all pertinent times, Bellwether was a fiduciary of the Plan pursuant to 29 U.S.C. § 1002(21) and was responsible for ensuring that the investments included in the Plan were prudent.  Bellwether provided periodic reporting to the Committees and Prudential but failed to apply a rigorous process to ensure that only prudent investments would be maintained in the Plan.  By failing to recommend the timely removal and replacement of the below-challenged investments, Bellwether breached its fiduciary duty owed to the Plan and its beneficiaries.

## FACTUAL ALLEGATIONS

### A.     Background

40.     The Plan is established and maintained under a written document in accordance with 29 U.S.C. § 1102 and serves as a vehicle for retirement savings and to produce retirement income for employees of Prudential.  The Plan covers eligible employees of Prudential and its affiliates as described in the Plan Document.  As described above, Prudential has delegated the

administration of the Plan to the Administrative Committee and the responsibility for selection of the Plan's investment options to the Investment Oversight Committee.

41.    The Plan is a participant-directed plan in which participants direct their retirement assets into a pre-selected menu of investment offerings consisting of several types of investments.  The amount of retirement income generated by the Plan depends upon contributions made on behalf of each employee by Prudential or its affiliates, deferrals of employee compensation and employer matching contributions, and from the performance of the Plan's investment options (net of fees and expenses).

42.    The Plan has established a trust, which is managed by the Prudential Trust Company, to hold participant and employer contributions and such other earnings, income and appreciation from Plan investments, less payments made by the Plan's trustee, to carry out the purposes of the trust, in accordance with 29 U.S.C. § 1103.

43.    As of December 31, 2018, the Plan offered the following types of investment options: mutual funds, separately managed accounts ("SMAs"), Prudential Financial, Inc. common stock, collective investment trusts, guaranteed retirement income products, and a fixed rate fund structured as a group annuity contract.

44.    Mutual funds are publicly-traded investment vehicles consisting of a pool of funds collected from many investors for the purpose of investing in a portfolio of equities, bonds, and other securities.  Mutual funds are operated by professional investment advisers, who, like the mutual funds, are registered with the Securities and Exchange Commission ("SEC").  Mutual funds are subject to SEC regulation, and are required to provide certain investment and financial disclosures and information in the form of a prospectus.

45.     SMAs are investment portfolios that begin with the same allocation as that of their mutual fund counterpart, but for which the professional investment adviser will make individual investment decisions that may depart from that of the mutual fund.  In essence, SMAs are mutual funds customized for that investor.  However, unlike mutual funds, SMAs do not issue registered prospectuses and, as such, their fees and other disclosures are not as transparent.

46.     Collective investment trusts are, in essence, mutual funds without the SEC regulation.  Collective investment trusts fall under the regulatory purview of the Office of the Comptroller of the Currency or individual state banking departments.  Collective investment trusts were first organized under state law in 1927 and were blamed for the market crash in 1929. As a result, collective investment trusts were severely restricted, giving rise to the more transparent and publicly-traded mutual funds.  Today, banks create collective investment trusts only for their trust clients and for employee benefit plans like the Plan.  The main advantage of opting for a collective investment trust, rather than a mutual fund, is the negotiability of the fees, so larger retirement plans are able to leverage their size for lower fees.

47.     The Plan offers a suite of Prudential IncomeFlex Funds that provide guaranteed income for life.  These products are designed to function as annuities, but without requiring an irrevocable election to receive benefit payments.  The IncomeFlex Funds are structured as insurance company separate accounts offered through group annuity insurance contracts issued by the Prudential Retirement Insurance and Annuity Company.  Prudential identifies the participants' investments in the Prudential IncomeFlex Funds as its own assets on its balance sheet since it takes legal ownership of the separate accounts and then uses these separate account assets to improve the condition of its balance sheet, thereby providing Prudential with increased liquidity and an ability to earn additional fees – which it earns as a result of its ownership of the

13

separate accounts (but which it fails to credit to the benefit of the Plan, in violation of ERISA's prohibited transaction rules).

48.    The PESP Fixed Rate Fund is structured as a group annuity contract and provides investors with a guaranteed interest rate, which is determined based on a formula and reset quarterly.  The Fixed Rate Fund's guarantees of principal and interest are backed by the assets of Prudential Insurance Company of America.

**B.    ERISA's Fiduciary Standards**

49.    ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendant(s) as fiduciaries of the Plan. 29 U.S.C. § 1104(a), states, in relevant part:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A)    for the exclusive purpose of
>
> > (i)    providing benefits to participants and their beneficiaries; and
> >
> > (ii)    defraying reasonable expenses of administering the plan;
> >
> > [and]
>
> (B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like arms.

50.    Under 29 U.S.C. § 1103(c)(1), with certain exceptions not relevant here,

> The assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

51.     Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and solely in the interest of participants in a plan.

52.     ERISA's fiduciary duties are "the highest known to the law" and must be performed "with an eye single" to the interest of the participants.

53.     Although ERISA fiduciaries must act in accordance with plan documents, that duty applies only if the plan documents are in accord with the fiduciary duties of ERISA.  29 U.S.C. § 1104(a)(1)(D).

54.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries.  29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty.  ERISA states, in relevant part:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)     if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2)     if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)     if he has knowledge of a breach of such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

55.     The fiduciary duties of loyalty and prudence imposed by 29 U.S.C. § 1104 are supplemented by numerous types of transactions which are prohibited by 29 U.S.C. § 1106.

These prohibited transactions are "*per se*" violations because of their high propensity to cause harm to participants of retirement plans.

56.    Section 1106(a)(1) states, in pertinent part, that:

[A] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –

(A)    sale or exchange, or leasing, of any property between the plan and a party in interest; . . .

(C)    furnishing of goods, services, or facilities between the plan and party in interest; or

(D)    transfer to, or use by or for the benefit of a party in interest, of any assets of the plan . . . .

Section 1106(b) further provides:

[A] fiduciary with respect to the plan shall not –

(1)    deal with the assets of the plan in his own interest or for his own account,

(2)    in his individual or in any other capacity act in a transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interest of the plan or the interest of its participants or beneficiaries, or

(3)    receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

57.    29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109.  Section 1109(a) provides, in relevant part:

Any person who is a fiduciary with respect to a plan who breaches any of responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

58.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action, on behalf of the Plan, to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

**C.    Defendants' Violations of ERISA**

59.    Defendants have severely mismanaged the Plan and engaged in self-dealing with Plan assets as further detailed below.  Defendants have failed to monitor all of the investments in the Plan to ensure that they provided adequate returns and were not excessively priced, as were many of the investments in the Plan lineup.

60.    Among other things, Defendants are responsible for selecting investments and service providers for the Plan.  These selections must be made prudently and solely in the interest of the Plan's participants and beneficiaries.

61.    The Investment Oversight Committee and its members had the discretion and authority to select the menu of investments available to participants of the Plan.  During the Class Period, the Investment Oversight Committee and its members used that discretion to encourage participants to direct billions of dollars of their assets into Prudential-affiliated proprietary funds.

62.    The Investment Oversight Committee and its members knew, or should have known by virtue of their senior positions at a large financial services company, that better-performing, lower-cost, comparable investments were readily available from unaffiliated entities.

63.    The significant overconcentration of proprietary investment options in the Plan gives rise to an inference that the Investment Oversight Committee failed to investigate whether there were nonproprietary investment options available that would have better met the needs of Plan participants due to lower fees and/or superior investment management services.

64.    A prudent fiduciary would have limited the Plan menu to the asset classes and investment options that offered the best opportunity for participants to maximize the value of their accounts at an appropriate level of risk, while excluding funds that interfered with that goal due to their high fees, poor track record, inexperienced managers, or inappropriate risk/reward profile. Defendants' complete failure to limit either the asset classes offered within the Plan's menu, or the particular options within each asset class, gives rise to an inference that the Plan fiduciaries did not investigate which asset classes and investment options would best meet the needs of participants. This failure further evidences Defendants' failure to engage in a meaningful monitoring of the Plan's investment options to ensure that they remained prudent.

65.    Defendants' conduct in managing the Plan's investment options furthered Prudential's corporate interests in multiple ways. First, Prudential collected fee revenue as a result of the Plan's excessive use of Prudential funds. Additionally, the Plan's use of Prudential-affiliated funds ensured that Prudential's employees, many of whom may sell others on the benefits of owning Prudential funds, would themselves own Prudential funds, thereby building loyalty, product knowledge, and a built-in sales pitch touting the employees' personal investment in the pitched products.

66.    The Plan's investments in the Prudential funds, as well as its failure to fully credit the Plan with the earnings arising from the insurance company separate accounts in the Plan, were prohibited transactions under ERISA, as were the payment of fees to other Prudential subsidiaries and affiliates, such as Prudential, Prudential Retirement Insurance and Annuity Company, PGIM, and Jennison Associates, LLC.

67.    Defendants, all of which are and were fiduciaries or co-fiduciaries of the Plan at all pertinent times, violated 29 U.S.C. § 1104 by failing to act solely in the interest of the Plan

and its participants and beneficiaries and failing to exercise the required care, skill, prudence, and diligence in investing the assets of the Plan and disclosing the fees charged to the participants.  The Investment Oversight Committee caused the Plan to purchase shares, units, or interests in Prudential-affiliated funds, which charged significantly higher fees than comparable, unaffiliated funds, while simultaneously providing poor returns.  Simply put, Defendants placed the revenue-generating interests of Prudential and its affiliates and subsidiaries ahead of the Plan's interest in providing prudent investments at reasonable costs.

68.    Defendants also violated 29 U.S.C. § 1106, which prohibits transactions between a plan and related parties, by causing the Plan to invest in Prudential-affiliated funds and purchase investment management and other products and services, including recordkeeping services, from Prudential subsidiaries and affiliates.

69.    The number of proprietary investments in the Plan lineup have produced millions of dollars of revenue for Prudential while imposing high costs and delivering poor investment returns for the Plan.

70.    Defendants' violations of ERISA caused losses to the Plan for which Defendants are liable to the Plan and Class members pursuant to 29 U.S.C. §§ 1109 and 1132(a)(2).

### 1.    Excessive Fees of the Selected Funds

71.    Defendants have breached their fiduciary duties to the extent that they have consistently offered participants of the Plan an investment menu containing mutual funds and collective investment trusts with excessively high expense ratios. These fees are, on their face, unreasonable in many instances and are often many times higher than the expense ratios of investable alternatives readily available in the marketplace.  The impact of such high fees on participant balances is aggravated by the effects of compounding, to the significant detriment of

participants over time. This effect is illustrated by the below chart,[1] published by the SEC, showing the 20-year impact on a balance of $100,000 by fees of 25 basis points (0.25%), 50 basis points (0.50%), and 100 basis points (1.00%).



72.    Despite the fact that higher fees significantly reduce retirement account balances over time, as of June 30, 2019, the Plan's investment menu includes the following investments:

| Investment Option | Expense Ratio |
|---|---|
| AllianceBernstein Core Opportunities Fund | 0.26% |
| Delaware Small Cap Core Equity Fund | 0.49% |
| DFA Global Allocation 60/40 Portfolio Inst | 0.49% |
| PESP Fixed Rate Fund | N/A |
| PESP IncomeFlex Target Balanced Fund | 1.00% |
| PGIM Global Total Return Bond Fund R6 | 0.58% |
| Prudential Core Conservative Bond Fund | 0.08% |
| Prudential Financial, Inc. Common Stock Fund | N/A |

---

[1] *Investor Bulletin*, "How Fees and Expenses Affect Your Investment Portfolio," U.S. Securities and Exchange Commission ("SEC") Office of Investor Education and Advocacy.

| | |
|---|---|
| Prudential High Yield Collective Investment Trust | 0.32% |
| Prudential IncomeFlex Select Aggressive Fund | 0.89% |
| Prudential IncomeFlex Select Conservative Fund | 0.91% |
| Prudential IncomeFlex Select Moderate Fund | 0.90% |
| Prudential Retirement Real Estate Fund | 0.65% |
| QMA International Developed Markets Index Account | 0.06% |
| QMA U.S. Broad Market Index Fund | 0.02% |
| Vanguard Emerging Markets Stock Index Fund Inst | 0.10% |
| Vanguard Intermediate-Term Treasury Index Fund Inst | 0.05% |
| Vanguard Short-Term Investment Grade Fund Admiral | 0.10% |
| Vanguard Small Cap Index Fund InstPlus | 0.03% |
| WTC CIF II Diversified Inflation Hedges Portfolio | 0.72% |
| WTC CIF II International Opportunities Portfolio | 0.58% |

73.    The fees charged by many of the investments in the Plan lineup significantly exceed those charged by comparable investable alternatives, including Institutional Class Vanguard Funds with similar investment styles, as shown in the table below.

*Expense Ratios of PESP Funds and Vanguard Alternatives*

| Prudential Fund | ER | Index | Vanguard Alternative | ER |
|---|---|---|---|---|
| AllianceBernstein Core Opportunities Fund | 0.26 | Russell 3000 Index | Vanguard Russell 3000 Index Fund | 0.08 |
| Delaware Small Cap Core Equity Fund | 0.49 | Russell 2000 Index | Vanguard Russell 2000 Index Fund | 0.08 |
| Prudential High Yield Fund CIT | 0.32 | Bloomberg Barclays US High Yield Ba/B 1% Issuer Cap Index | Vanguard High Yield Corporate Fund Adm | 0.13 |
| Prudential Retirement Real Estate Fund | 0.65 | Prudential Custom Real Estate Benchmark | Vanguard Real Estate Index Fund | 0.10 |
| PGIM Global Total Return Bond Fund R6 | 0.58 | Bloomberg Barclays Global Agg Bond Index | Vanguard Total International Bond Index Fund | 0.07 |
| WTC CIF II Diversified Inflation Hedges Portfolio | 0.72 | Multi-Asset Inflation | Vanguard Inflation-Protected Securities Fund | 0.07 |
| WTC CIF II International Opportunities Portfolio | 0.58 | MSCI ACWI ex US Index | Vanguard FTSE All-World ex-US Index Fund | 0.08 |
| **AVERAGE** | 0.51 | | | 0.09 |

74.     The AllianceBernstein Core Opportunities Fund has an expense ratio of 26 basis points (0.26%), which is over three times the 8 basis point (0.08%) fee charged by the comparable Vanguard Russell 3000 Index Fund.

75.     The Delaware Small Cap Core Equity Fund carries a 49 basis point (0.49%) expense ratio, which is over six times the 8 basis point (0.08%) fee charged by the Vanguard Russell 2000 Index Fund, a comparable alternative in the small cap equity marketplace.

76.     The Prudential High Yield Collective Investment Trust has an expense ratio of 32 basis points (0.32%).  By contrast, the comparable Vanguard High Yield Corporate Fund Admiral Class charges just 13 basis points (0.13%), or less than half the Prudential proprietary option.

77.     The Prudential Retirement Real Estate Fund has a 65 basis point (0.65%) fee, charging a staggering six and a half times more than the comparable Vanguard Real Estate Index Fund, which offers a 10 basis point (0.10%) expense ratio.

78.     The PGIM Global Total Return Bond Fund Class R6 charges a 58 basis point (0.58%) fee, over eight times the 7 basis point (0.07%) expense ratio of the comparable Vanguard Total International Bond Index Fund.

79.     The Wellington Trust Company CIF II Diversified Inflation Hedges Portfolio has a substantial 72 basis point expense ratio (0.72%), dwarfing the 7 basis point (0.07%) charge of the comparable Vanguard Inflation-Protected Securities Fund, an investment similarly designed to provide investors protection against the decreased purchasing power of currency as a product of inflation.

80.     The Wellington Trust Company CIF II International Opportunities Portfolio's 58 basis point (0.58%) fee is blatantly excessive when compared to the Vanguard FTSE All-World

ex-US Index Fund, a comparable international equity fund alternative. The latter fund charges just one-seventh of the former's fees, with an 8-basis point (0.08%) expense ratio.

81.    The Jennison Opportunistic Equity Collective Investment Trust, which was removed from the Plan lineup in 2019, carried a 32 basis point (0.32%) charge, while the comparable Vanguard Russell 3000 Index Fund costs only 8 basis points (0.08%).

82.    The Wells Capital International Bond Institutional Select Fund, which was also removed from the Plan in 2019, charged a 36 basis point (0.36%) fee, over five times the 7-basis point (0.07%) expense ratio of the comparable Vanguard Total International Bond Index Fund.

83.    The extent to which Plan participants have been harmed by excessive investment management fees is illustrated in the chart below, comparing the fees paid by the Plan with its current lineup to a menu with the proposed Vanguard alternatives substituted for the expensive funds.

*Investment Management Fees Spent Chasing Excess Returns*

|  | 2013 | 2014 | 2015 | 2016 | 2017 | Total |
|---|---|---|---|---|---|---|
| Prudential Funds | 2,749,988 | 4,072,654 | 8,439,540 | 9,008,501 | 10,957,874 | 35,228,557 |
| Vanguard Alternatives | 2,101,867 | 2,386,946 | 3,700,138 | 3,817,031 | 4,542,594 | 16,548,576 |
| **Fees Chasing Excess Returns** | 648,121 | 1,685,708 | 4,739,402 | 5,191,470 | 6,415,280 | **18,679,981** |

84.     In sum, Defendants have imprudently failed to reduce costs when possible. To the contrary, many of the investments Defendants have selected, including several managed by Prudential and its affiliates, are among the most expensive when measured against comparable funds.

## 2.     Underperformance of Available Funds

85.     In addition to the unreasonably excessive fees charged by several of the investments available to Plan participants, several of the most expensive funds also produced poor returns relative to their respective benchmarks, rendering these objectively imprudent investments, and their selection and retention by Defendants a breach of their fiduciary duty.

86.     *The Prudential Retirement Real Estate Fund*.  This proprietary fund has consistently and significantly underperformed its benchmark[2] during the Class Period on a rolling five- and ten-year annualized basis.

---

[2] Until the third quarter of 2017, the MSCI US REIT Index served as the fund's benchmark. In Q3, it was replaced by the custom Prudential Retirement Real Estate Fund Benchmark, an alteration which failed to mask the Fund's underperformance. All returns data for the Fund reflect its then-current benchmark at each respective date.

**Five-Year Trailing Performance**

| As of | Performance, adjusted for investment expense | MSCI US REIT Index/ Prudential Retirement Real Estate Benchmark Performance | Investment Option Performance/Underperformance Compared to Benchmark |
|---|---|---|---|
| 2Q2016 | 11.62% | 12.53% | -0.91% |
| 3Q2016 | 12.08% | 15.79% | -3.71% |
| 4Q2016 | 11.31% | 11.86% | -0.55% |
| 1Q2017 | 10.49% | 9.82% | 0.67% |
| 2Q2017 | 10.46% | 9.38% | 1.08% |
| 3Q2017 | 10.31% | 10.68% | -0.37% |
| 4Q2017 | 10.20% | 10.53% | -0.33% |
| 1Q2018 | 9.73% | 9.85% | -0.12% |
| 2Q2018 | 10.15% | 10.22% | -0.07% |
| 3Q2018 | 9.78% | 9.86% | -0.08% |
| 4Q2018 | 9.09% | 9.31% | -0.22% |
| 1Q2019 | 9.54% | 9.83% | -0.29% |
| 2Q2019 | 8.89% | 9.20% | -0.31% |
| 3Q2019 | 9.16% | 9.53% | -0.37% |
| 4Q2019 | 8.58% | 8.90% | -0.32% |



**Ten-Year Trailing Performance**

| As of | Performance, adjusted for investment expense | MSCI US REIT Index/ Prudential Retirement Real Estate Benchmark Performance | Investment Option Performance/Underperformance Compared to Benchmark |
|---|---|---|---|
| 1Q2016 | 4.54% | 6.49% | -1.95% |
| 2Q2016 | 4.54% | 7.35% | -2.81% |
| 3Q2016 | 4.13% | 6.22% | -2.09% |
| 4Q2016 | 3.53% | 4.96% | -1.43% |
| 1Q2017 | 3.21% | 4.71% | -1.50% |
| 2Q2017 | 3.08% | 5.94% | -2.86% |
| 3Q2017 | 2.92% | 4.60% | -1.68% |
| 4Q2017 | 3.22% | 4.89% | -1.67% |
| 1Q2018 | 3.37% | 4.93% | -1.56% |
| 2Q2018 | 3.77% | 5.41% | -1.64% |
| 3Q2018 | 4.02% | 5.88% | -1.86% |

| 4Q2018[3] | 6.31% | 7.50% | -1.19% |
| --- | --- | --- | --- |



87.    When an investment option's track record is so apparently poor, as it is here, Defendants should necessarily replace the fund in the Plan with an alternative that has demonstrated the ability to consistently outperform the benchmark, or, at the very least, retain an alternative that tracks the benchmark.  By way of example and to illustrate, there is a Vanguard Real Estate Index Fund that simply tracks the MSCI US REIT Index, with a very low expense ratio of 10 basis points (0.10%) for the Institutional share class.  While participants should have had the option to achieve the index's returns at minimal cost, Defendants' imprudence in retaining the Prudential Retirement Real Estate Fund instead forced them to pay at least 65 basis points (0.65%)[4] to consistently lag the index.  Defendants' failure to replace this underachieving investment option with better performing alternatives was a severe breach of fiduciary duty.

---

[3] Ten-year annualized returns data is not available on the Plan's online participant portal for 2019.
[4] At the beginning of the Class Period, the Fund carried a 100 basis point (1.00%) expense ratio.

88.    ***The Prudential High Yield Collective Investment Trust***.  According to the Plan's Summary Plan Description, the objective of the Prudential High Yield CIT is to outperform its benchmark[5] by 150 basis points (1.50%) over a full market cycle.  The Collective Trust failed to achieve this even once during the Class Period.  In addition to its abject failure to meet its stated target, the Collective Trust also suffered significant and prolonged periods of underperformance on a rolling five-year annualized basis.

### Five-Year Trailing Performance

| As of | Performance, adjusted for investment expense | Bmbg Bcly Corp HY Index/ Barclays US HY Ba/B 1% Issuer Cap Index Performance | Investment Option Performance/Underperformance Compared to Benchmark |
|---|---|---|---|
| 3Q2014 | 9.58% | 10.64% | -1.06% |
| 4Q2014 | 8.63% | 9.10% | -0.47% |
| 1Q2015 | 8.36% | 8.66% | -0.30% |
| 2Q2015 | 8.31% | 8.68% | -0.37% |
| 3Q2015 | 6.42% | 6.15% | 0.27% |
| 4Q2015 | 5.76% | 5.04% | 0.72% |
| 1Q2016 | 5.69% | 4.93% | 0.76% |
| 2Q2016 | 6.17% | 5.84% | 0.33% |
| 3Q2016 | 8.00% | 8.34% | -0.34% |
| 4Q2016 | 6.92% | 7.36% | -0.44% |
| 1Q2017 | 6.56% | 6.82% | -0.26% |

[5] Until the second quarter of 2019, the Bloomberg Barclays Corporate High Yield Index served as the Fund's benchmark. In Q2, it was replaced by the Barclays US High Yield Ba/B 1% Issuer Cap Index. All returns data for the Fund reflect its then-current benchmark at each respective date.

| 2Q2017 | 6.72% | 6.89% | -0.17% |
| 3Q2017 | 6.31% | 6.36% | -0.05% |



89.    Again, when an investment option's track record is so apparently poor and it has repeatedly shown an inability to meet its stated objective, Defendants should undoubtedly replace the fund in the Plan with an alternative that has demonstrated the ability to consistently outperform the benchmark, or, at the very least, retain an alternative that tracks the benchmark. By way of example and to illustrate, there is a Vanguard High Yield Corporate Fund that regularly beats the same benchmark, with a very low expense ratio of 13 basis points (0.13%) for the Admiral share class.  While participants should have had the option to achieve the index's returns, at minimum, at minimal cost, Defendants' imprudence in retaining the Prudential High Yield Collective Investment Trust instead forced them to pay at least 32 basis points (0.32%)[6] to consistently lag the index.  Defendants' failure to replace this underachieving investment option with better performing alternatives was a severe breach of fiduciary duty.

---

[6]At the beginning of the Class Period, the CIT carried a 40 basis point (0.40%) expense ratio.

90.    *The Wellington Trust Company CIF II Diversified Inflation Hedges Portfolio*.

The Portfolio was added to the Plan investment lineup in the second quarter of 2017.  At the time

of its selection, the Portfolio had already exhibited substantial and consistent underperformance

when measured against its benchmark, the Multi-Asset Inflation Index, on a rolling five-year

annualized basis.  This poor record has persisted throughout the Class Period.  The Portfolio's

demonstrated inability to beat or even meet the benchmark renders it an inappropriate addition to

the Plan menu.

**Five-Year Trailing Performance**

| As of | Performance, adjusted for investment expense | Multi-Asset Inflation Index Performance | Investment Option Performance/Underperformance Compared to Benchmark |
|---|---|---|---|
| 3Q2015 | -5.53% | -5.19% | -0.34% |
| 4Q2015 | -8.72% | -7.81% | -0.91% |
| 1Q2016 | -8.95% | -7.88% | -1.07% |
| 2Q2016 | -6.69% | -5.65% | -1.04% |
| 3Q2016 | -2.93% | -2.66% | -0.27% |
| 4Q2016 | -3.28% | -3.02% | -0.26% |
| 1Q2017 | -4.34% | -3.86% | -0.48% |
| 2Q2017 | -3.85% | -3.27% | -0.58% |
| 3Q2017 | -4.10% | -3.36% | -0.74% |
| 4Q2017 | -2.76% | -2.02% | -0.74% |
| 1Q2018 | -2.83% | -2.10% | -0.73% |
| 2Q2018 | -0.24% | 0.30% | -0.54% |
| 3Q2018 | -1.36% | -0.73% | -0.63% |

| 4Q2018 | -4.23% | -3.35% | -0.88% |
| 1Q2019 | -3.11% | -2.11% | -1.00% |
| 2Q2019 | -4.07% | -3.04% | -1.03% |
| 3Q2019 | -3.14% | -2.18% | -0.96% |
| 4Q2019 | -2.18% | 1.00% | -0.22% |



91.     Again, when an investment option's track record is so apparently poor, Defendants should necessarily replace the fund in the Plan with an alternative that has demonstrated the ability to consistently outperform its benchmark, or, at the very least, retain an alternative that tracks its benchmark.  By way of example and to illustrate, for exposure to inflation-sensitive securities there is a Vanguard Inflation Protected Securities Fund, with a very low expense ratio of 7 basis points (0.07%) for the Institutional share class.  While participants should have had the option to hedge against inflation risk at minimal cost, Defendants' imprudence in retaining the Wellington Trust Company CIF II Diversified Inflation Hedges

Portfolio instead forced them to pay at least 72 basis points (0.72%)[7] for the same privilege. Defendants' failure to replace this expensive, underachieving investment option with cheaper, better performing alternatives was a severe breach of fiduciary duty.

92.     ***The Jennison Opportunistic Equity Collective Investment Trust***.  This investment is sub-advised by Jennison Associates LLC as a collective investment trust of the Prudential Trust Company.  It was added to the Plan lineup immediately upon inception at the beginning of the third quarter of 2015.  On December 7, 2018, citing performance issues, Defendants acknowledged their error in selecting the Collective Trust and chose to remove it from the Plan lineup.  The Investment Oversight Committee viewed the below chart of the Collective Trust's quarterly returns against its benchmark, the Russell 3000 Index, and decided that underperformance in 13 of the most recent 20 quarters required removal of the investment.



93.     By that very same criteria, using the same chart Defendants viewed at least quarterly, the Collective Trust should have been replaced several years prior to December 2018. By the end of the second quarter of 2016, one full year after the investment was added, the Collective Trust's returns had lagged those of its benchmark in 13 of the most recent 20 quarters, the exact same measure of underperformance that Defendants deemed sufficient to fire the manager in late 2018.  Apparently, the Collective Trust's status as an investment offered by a

---

[7] When the Portfolio was added in 2017, it carried a 79 basis point (0.79%) expense ratio.

Prudential affiliate held sway with Defendants, who failed to maintain a rigorous and consistent process to ensure that poor performing investment choices were timely removed.  Indeed, Defendants' failure to consistently apply the same performance standards needlessly saddled participants with over two extra years of the Collective Trust's poor returns.

94.    ***The Wells Capital International Bond Institutional Select Fund***.  Similarly to the Jennison Opportunistic Equity CIT, Defendants failed to apply consistent performance criteria in their evaluation of the Wells Capital International Bond Fund.  Defendants chose to replace the fund on December 7, 2018, citing its four consecutive quarters of returns that lagged its benchmark, the Bloomberg Barclays Global Aggregate ex-US Index.  Considering the Fund's rolling one-year returns also failed to beat the benchmark for seven consecutive quarters beginning in the third quarter of 2015, the Fund should necessarily have been removed at least six quarters before the decision was ultimately made.  The chart below demonstrates both periods of consecutive underperformance, the poor returns deemed sufficient by Defendants to replace the Fund at the end of 2018, and those ignored by Defendants from the third quarter of 2015 through the first quarter of 2017.  Again, Defendants' failure to maintain a rigorous and consistent process burdened participants with nearly two additional years of the fund's lacking returns.



### 3. GoalMaker

95.     GoalMaker is an optional asset allocation and proprietary tool created and provided to the Plan by Prudential that allocates a participant's retirement funds among certain Plan investment options according to the participant's age and risk tolerance.  The service automatically rebalances a participant's assets among the various funds in accordance with a predetermined asset mix that shifts to become more conservative as one gets closer to retirement. GoalMaker creates model portfolios from investments already in a plan's investment menu. These portfolios, based on a participant's time horizon, are broken down into Conservative, Moderate, and Aggressive.  In the Plan, the program served as another tool for Prudential to further enrich itself by funneling participant dollars into proprietary Prudential products.

96.     At all times during the Class Period, GoalMaker has advanced the interests of Defendants by disproportionately allocating participant funds to investments managed by Prudential or its affiliates.  The Plan lineup is substantially composed of proprietary investments, with Prudential-affiliated funds comprising 57% of the options as of June 30, 2019.  By contrast, GoalMaker creates portfolios from choices that are 70% Prudential-affiliated and allocates at

least 71% of assets to Prudential products no matter how close an individual is to retirement.  By the time participants reach retirement, GoalMaker has almost completely phased out their investments in any non-Prudential fund; an individual over age 65, and therefore considered "in retirement" by GoalMaker, will have an incredible 98% of their retirement assets in products managed by Prudential or its affiliates.

97.    Exacerbating GoalMaker's transparent attempts to direct participant assets into proprietary funds is the Conservative GoalMaker portfolio's role since 2008 as the Plan's Qualified Default Investment Alternative ("QDIA").  A retirement plan can designate one of the investment offerings or, in this case, a service as a substitute for an investment offering, from its lineup as a QDIA to aid participants who lack the knowledge or confidence to make investment elections for their retirement assets; if participants do not direct where their assets should be invested, all contributions are automatically invested in the QDIA.  Plan fiduciaries are responsible for the prudent selection and monitoring of an appropriate QDIA.  GoalMaker's function as the QDIA has helped augment its number of users in the Plan; as of December 31, 2017, approximately 27.6% of the Plan's 44,910 participants utilized the GoalMaker tool. Indeed, over a quarter of the Plan's participants were having their funds gradually steered toward products that would further enrich Prudential and its affiliates through the collection of investment management fees and away from those funds from which Prudential derived no revenues.

98.    In addition to directing millions of participant dollars into Prudential products, GoalMaker has also produced poor returns for investors when compared to target date funds,[8]

---

[8]A target date fund is an all-in-one retirement solution that serves the same function as GoalMaker, providing simple asset allocation through a portfolio of underlying funds that gradually shifts to become more conservative as the year of retirement approaches.

which are by far the most widely utilized QDIA in defined contribution plans.  The table below

shows the returns as of December 31, 2017[9] of the Conservative GoalMaker portfolio, which

serves as the Plan's default investment, at different ages, next to the vintage of Vanguard target

date fund[10] with a time horizon most closely resembling GoalMaker's.[11]

| 1-Year Trailing Return | | | |
|---|---|---|---|
| **Conserative GoalMaker** | | **Vanguard TDF** | **GoalMaker** |
| Years to Retirement | Return | Target Year | Return | Outperformance |
| 0-5 | 8.35% | 2020 | 14.08% | -5.73% |
| 6-10 | 10.29% | 2025 | 15.94% | -5.65% |
| 11-15 | 12.34% | 2030 | 17.52% | -5.18% |
| 16+ | 14.74% | 2035 | 19.12% | -4.38% |

| 3-Year Trailing Return | | | |
|---|---|---|---|
| **Conserative GoalMaker** | | **Vanguard TDF** | **GoalMaker** |
| Years to Retirement | Return | Target Year | Return | Outperformance |
| 0-5 | 4.90% | 2020 | 6.61% | -1.71% |
| 6-10 | 5.75% | 2025 | 7.30% | -1.55% |
| 11-15 | 6.46% | 2030 | 7.85% | -1.39% |
| 16+ | 7.20% | 2035 | 8.39% | -1.19% |

| 5-Year Trailing Return | | | |
|---|---|---|---|
| **Conserative GoalMaker** | | **Vanguard TDF** | **GoalMaker** |
| Years to Retirement | Return | Target Year | Return | Outperformance |
| 0-5 | 5.52% | 2020 | 8.50% | -2.98% |
| 6-10 | 6.82% | 2025 | 9.36% | -2.54% |
| 11-15 | 7.72% | 2030 | 10.13% | -2.41% |
| 16+ | 8.58% | 2035 | 10.90% | -2.32% |

99.    Across all time horizons, participant retirement assets would be far better served

in a target date fund such as the Vanguard offering.  Defendants should have removed their

proprietary GoalMaker as a tool from the plan and replaced it with a more suitable TDF; likewise

GoalMaker never should have been designated as the Plan's QDIA.

---

[9] This is the most recent date for which returns data is available for both investment alternatives.

[10] The Investor shares of the Vanguard Target Retirement Funds are the most popular target date series in the industry.

[11] For example, by the end of 2017, a participant who fell into the "11-15 years to retirement" bracket would appropriately invest in a 2030 target date fund, as the fund series are offered for every five years.

### 4.        The PESP Fixed Rate Fund

100.    Though the GoalMaker service is analogous to a target date fund, its ability to generate substantial returns is hampered by the profusion of Prudential products, including the PESP Fixed Rate Fund (the "Fixed Rate Fund"), a proprietary stable value fund which assets are held in Prudential's general account.  In the GoalMaker service, the Fixed Rate Fund occupies, at all time horizons, between a 6% and 36% position in the Plan's QDIA.  The Plan's overall asset mix weighs even more heavily to the Fixed Rate Fund, with 41% of its nearly $8.7 billion in assets invested in the stable value option, or over $3.5 billion.  This incredible balance is problematic for the Plan's overall ability to grow participants' retirement savings; though the Fixed Rate Fund provides a guaranteed interest rate, currently set at 3.5%, its substantial concentration is a considerable drag on the Plan's performance.  A benchmarking study provided to Defendants by CEM Benchmarking determined that the Plan participants' 2017 average total return measured well below par in a universe of similarly situated defined contribution plans.[12]



---

[12] The universe comprises 122 plans with total assets between $1.2 billion and $20.1 billion.  The median asset size of the universe is $5.7 billion.

101.    The study identified the Plan's asset mix as the root cause, and specifically observed that the 41% concentration of assets in the stable value option (*i.e.*¸ the Fixed Rate Fund) was a red flag.  By contrast, the average plan in the similarly situated universe had 11% of assets in its stable value option; the median plan came in at 8%.  Indeed, there are far more assets in the Fixed Rate Fund than in the stable value fund in the average plan in Prudential's own defined contribution plan book of business.

| Percent of Plan Assets in Stable Value Option | | | | | |
|---|---|---|---|---|---|
| Participant Age | | | | | |
| | >25 | 25-34 | 35-44 | 45-54 | 55-65 | 65+ |
| PESP | 8.2% | 8.6% | 12.9% | 22.1% | 41.3% | 68.0% |
| Prudential Book of Business | 10.4% | 9.0% | 10.5% | 15.8% | 27.9% | 46.7% |

102.    As another product generating significant revenues for Prudential, both from fees and the spread between the crediting rate and what the Fixed Rate Fund actually returns, Defendants were incentivized to steer participant dollars into the fund.  Before the Fixed Rate Fund served as a significant component in the Plan's current QDIA, it *was* the Plan's QDIA until 2008.  It is obvious that Defendants have directed all participants to the GoalMaker and Fixed Rate Fund because it would enrich Prudential.  It was a significant and apparent breach of fiduciary for Defendants to do so.

### 5.    Excessive Use of Prudential-Affiliated Funds

103.    At all pertinent times, at least half of the funds offered to participants were Prudential-affiliated funds, which provided millions of dollars of revenue for Prudential and its affiliates and subsidiaries.  The following funds all provided additional revenue in the form of investment management fees, which were borne by the Plan participants: (1) the PESP Fixed Rate Fund; (2) the Prudential Financial, Inc. Common Stock Fund; (3) a high yield bond fund, the Prudential High Yield Collective Investment Trust; (4) a suite of guaranteed retirement

income products: the Prudential IncomeFlex Select Aggressive Fund, Prudential IncomeFlex Select Conservative Fund, Prudential IncomeFlex Select Moderate Fund, and PESP IncomeFlex Target Balanced Fund; (5) the Prudential Jennison Natural Resources Fund; (6) the Prudential Retirement Real Estate Fund; (7) a domestic bond fund, the Core Bond Enhanced Index/PGIM Fund; (8) a global bond fund, the PGIM Global Total Return Bond Fund; and (9) a large cap blend fund, the Jennison Opportunistic Equity Collective Investment Trust.

104.    In addition to the fact that the funds provided a substantial additional revenue stream for Prudential, as discussed above, many of the Prudential-affiliated funds were unnecessarily expensive, consistently and considerably underperformed compared to their respective benchmarks, or both.  By choosing the financial interests of Prudential over Plan participants, Defendants caused participants to incur unnecessary costs and lose the opportunity to invest in more appropriate available funds.

105.    Although mutual fund expenses and fees are paid directly by the mutual fund to various Prudential affiliates, including the Prudential Retirement Insurance and Annuity Company, Jennison Associates LLC and Prudential, the fees are nevertheless paid indirectly by the Plan.  The payment of such fees had a direct and detrimental impact on the value of the Plan's assets, as earnings for the Prudential Funds were passed on to investors, net of fees. As the United States Department of Labor studies have recognized, the

> [e]xpenses of operating and maintaining an investment portfolio that are debited against the participant's account constitute an opportunity cost in the form of foregone investments in every contribution period. The laws of compound interest dictate that these small reductions in investment are magnified greatly over the decades in which many employees will be 401(k) plan participants . . . . The effect of … higher levels of expenses would be to reduce the value of potential future account balances for these participants.

Study of 401(k) Plan Fees and Expenses (Apr. 13, 1998) ("Fee Study") (*available at*

http://www.dol.gov/ebsa/pdf/401krept.pdf.).  Applied to the Plan, which contains roughly $8.7 billion in assets, over the course of several years, the compounded opportunity cost of excessive fees causes substantial damage to the Plan's assets and participants.

106.    Prudent fiduciaries would have investigated alternative available investments in order to maximize the Plan's retirement assets in the interest of the participants.  Instead, Defendants simply offered Prudential products because they were familiar options that provided additional benefits to Prudential and its affiliates.  This type of self-dealing and objective imprudence violates ERISA.

107.    There are innumerable fairly priced and well-managed investment options in the 401(k) marketplace, especially for a plan the size of the Plan.  Despite this fact, Defendants decided to overpopulate the Plan with funds managed by Prudential and its affiliates, and the only reasonable inference to be drawn is that Defendants did this to generate profits for Prudential and its affiliates.

### 6.    Prudential's Provision of Inaccurate Data to Participants

108.    The Plan's online participant portal contains significant amounts of erroneous data that render it difficult for participants to make investment elections.  As Defendants knew or should have known, the performance information on participants' online portal is the most accessible source of returns for the investments in the Plan lineup, as the returns for most of these investments are not publicly reported in light of their proprietary nature.  As such, it is critical that the data upon which participants base their investment research, and, therefore, a substantial part of their decision-making process, is complete and accurate.  Instead, in the case of the Plan, the data provided by Defendants is riddled with inconsistencies, inaccuracies and incomplete information.  The following are some examples of the profound informational

problems that plague Prudential's portal: (a) a participant may see a different number for a particular fund's five-year return as of June 30, 2018 if they entered the online portal in January 2020 and then returned in July; (b) several investments, which have previously displayed five- and ten-year returns in the online portal, no longer provide those data points; (c) historical ten-year returns for the respective benchmarks of the investments, which were all present on the portal in 2019, are now no longer available for most funds; (d) most concerningly, the benchmarks shown on the portal for the Wellington Trust Company CIF II International Opportunities Portfolio and the QMA International Developed Markets Index Fund are swapped — specifically, (1) while all fact sheets, participant notices, and internal Prudential documents identify the MSCI ACWI ex-US Index as the benchmark for the Wellington Portfolio and the MSCI EAFE Index as the benchmark for the QMA Fund, the online portal compares the returns of the Wellington Portfolio to the MSCI EAFE and of the QMA Fund to the MSCI ACWI ex-US; and (2) as these two indices do not at all represent the same segment of the international market, this error can cause participants to make incorrect judgments about either investment option's historical track record and affect their investment decisions in an adverse manner.  The failure of Prudential, one of the largest recordkeepers in the world, to provide accurate and complete information regarding the investments in the Plan to its own participants (and the failure of all of these Defendants to identify and correct these errors) is, in a word, shocking.

## **CLASS ACTION ALLEGATIONS**

109.    This action is brought as a class action by Plaintiff on behalf of himself and the following proposed class ("Class"):

**Class**:

> All participants and beneficiaries in the Prudential Employee Savings Plan (the "Plan") at any time on or after November 5, 2013

> to the present (the "Class Period" or "Relevant Time Period"),
> including any beneficiary of a deceased person who was a participant
> in the Plan at any time during the Class Period.

Excluded from the Class are Defendants, any other fiduciaries to the Plan and Judge to whom this

case is assigned or any other judicial officer having responsibility for this case who is a beneficiary.

110.    This action may be maintained as a class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure.

111.    **Numerosity**.  Plaintiff is informed and believes that there are at least thousands of

Class members throughout the United States.  As a result, the members of the Class are so

numerous that their individual joinder in this action is impracticable.

112.    **Commonality**.  There are numerous questions of fact and/or law that are common

to Plaintiff and all the members of the Class, including, but not limited to the following:

(a)    whether Defendants failed and continue to fail to discharge their duties

with respect to the Plan solely in the interest of the Plan's participants for the exclusive purpose

of providing benefits to participants and their beneficiaries;

(b)    whether Defendants breached their fiduciary duties under ERISA by

failing to defray the reasonable expenses of administering the Plan; and

(c)    whether and what form of relief should be afforded to Plaintiff and the

Class.

113.    **Typicality**.  Plaintiff, who is a member of the Class, has claims that are typical of

all of the members of the Class.  Plaintiff's claims and all of the Class members' claims arise out

of the same uniform course of conduct by Defendants and arise under the same legal theories that

are applicable as to all other members of the Class.

114.    **Adequacy of Representation**.  Plaintiff will fairly and adequately represent the

interests of the members of the Class. Plaintiff has no conflicts of interest with or interests that are any different from the other members of the Class. Plaintiff has retained competent counsel experienced in class action and other complex litigation, including class actions under ERISA.

115. **Predominance**. Common questions of law and fact predominate over questions affecting only individual Class members, and the Court, as well as the parties, will spend the vast majority of their time working to resolve these common issues. Indeed, virtually the only individual issues of significance will be the exact amount of damages recovered by each Class member, the calculation of which will ultimately be a ministerial function and which does not bar Class certification.

116. **Superiority**. A class action is superior to all other feasible alternatives for the resolution of this matter. The vast majority, if not all, of the Class members are unaware of Defendants' breaches of fiduciary duty and prohibited transactions such that they will never bring suit individually. Furthermore, even if they were aware of the claims they have against Defendants, the claims of virtually all Class members would be too small to economically justify individual litigation. Finally, individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the courts and of the parties, and potentially could lead to inconsistent results that would be contrary to the interests of justice.

117. **Manageability**. This case is well-suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a Class-wide basis, while the allocation and distribution of damages to Class members would be essentially a ministerial function.

118. Defendants have acted on grounds generally applicable to the Class by uniformly subjecting them to the breaches of fiduciary duty described above. Accordingly, injunctive

relief, as well as legal and/or equitable monetary relief (such as disgorgement and/or restitution), along with corresponding declaratory relief, are appropriate with respect to the Class as a whole.

## <u>COUNT I</u>
### (For Breach of Fiduciary Duty – Against All Defendants)

119.    Plaintiff incorporates the allegations in the previous paragraphs of this Amended Complaint as if fully set forth herein.

120.    Defendants' conduct, as set forth above, violates the fiduciary duties defined under ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A), (B), and (C), in that Defendants failed and continue to fail to discharge their duties with respect to the Plan solely, in the interest of the Plan's participants and their beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries, and (ii) defraying reasonable expenses of administering the Plan with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and like aims, and (c) by failing to act in accordance with the documents and instruments governing the Plan.  In addition, as set forth above, Defendants violated their respective fiduciary duties under ERISA to monitor other fiduciaries of the Plan in the performance of their duties and by failing to provide timely, accurate and complete information to the Plan participants regarding the investments in the Plan when they undertook the duty to do so.

121.    As a direct result of Defendants' breaches of duties, Plaintiff and the Plan have suffered losses and damages.

122.    Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502, Defendants are liable to restore to the Plan the losses that have been suffered as a direct result of Defendants' breaches of fiduciary duty and are liable for damages and any other available equitable or

remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs and other recoverable expenses of litigation.

## COUNT II
**(Prohibited Transactions With a Party in Interest in Violation of 29 U.S.C. § 1106(a)(1) – Against All Defendants)**

123.    Plaintiff incorporates the allegations in the previous paragraphs of this Amended Complaint as if fully set forth herein.

124.    At all relevant times and as alleged above, Defendants have been fiduciaries to the Plan within the meaning of 29 U.S.C. § 1002(21)(A).

125.    Under 29 U.S.C. §1106(a)(1)(C), a fiduciary shall not cause a plan to engage in a transaction if he/she/it knows or should know that such transaction constitutes a direct or indirect furnishing of services between the Plan and a party in interest.

126.    Under 29 U.S.C. §1106(a)(1)(D), a fiduciary shall not cause a plan to engage in a transaction if he/she/it knows or should have known that such transaction constitutes a direct or indirect transfer to, or use by or for the benefit of a party in interest of any assets of the Plan.

127.    Defendants violated ERISA's prohibition on transactions between the Plan and a party in interest through their actions and omissions in authorizing or causing the Plan to invest in the unduly expensive investment options managed by Prudential and/or its affiliates, thereby causing the Plan to engage in transactions that Defendants knew or should have known constituted a direct or indirect furnishing of services between the Plan and the parties in interest, and/or the transfer to, or use by or for the benefit of the parties in interest, of the assets of the Plan.

128.    As a direct and proximate result of these prohibited transactions, the Plan, Plaintiff, and other Plan participants and beneficiaries, directly or indirectly paid millions of

dollars in fees in connection with transactions that were prohibited under ERISA, resulting in

significant losses to the Plan and its participants, and/or unjust profits to the parties in interest.

129.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a), Defendants are liable to restore the

losses sustained by the Plan and/or the unjust profits received by Defendants as parties in

interest, as a result of these prohibited transactions.

## COUNT III
**(Prohibited Transaction With a Fiduciary, 29 U.S.C. § 1106 – Against All Defendants)**

130.    Plaintiff incorporates the allegations in the previous paragraphs of this Amended

Complaint as if fully set forth herein.

131.    Defendants dealt with the assets of the Plan in their own interest and for their own

benefit when they caused the Plan to pay investment management fees and expenses to

Prudential out of Plan assets, in violation of 29 U.S.C § 1106(b)(1).

132.    Defendants received consideration for their own personal accounts from parties

dealing with the Plan in connection with transactions involving the assets of the Plan.  These

transactions occurred regularly when fees and expenses were deducted from assets being held for

Plan participants in exchange for services performed by Prudential.  Accordingly, payments to

Prudential constituted prohibited transactions, in violation of 29 U.S.C. § 1106(b)(3).

133.    Based on the foregoing facts and other incorporated facts, Defendants knowingly

caused the Plan to engage in prohibited transactions with Prudential, a fiduciary to the Plan, in

violation of 29 U.S.C. § 1106(b).

134.    Pursuant to 29 U.S.C. §§ 1109(a),1132(a)(2), and 1132(a)(3), Defendants are

liable to restore all losses suffered by the Plan as a result of the prohibited transactions and

disgorge all revenues received and/or earned by Defendants resulting, directly or indirectly, from the above-mentioned prohibited transactions. Plaintiffs also are entitled to appropriate equitable relief on behalf of the Plan pursuant to 29 U.S.C. § 1132(a)(3).

**<u>COUNT IV</u>**
**(Failure to Monitor Fiduciaries – Against Prudential and the Committees)**

135.    Plaintiff incorporates the allegations in the previous paragraphs of this Amended Complaint as if fully set forth herein.

136.    Prudential is responsible for appointing, overseeing, and removing members of the Administrative Committee and the Investment Oversight Committee, who, in turn, are responsible for appointing, overseeing, and removing members of the Committees.

137.    In light of its appointment and supervisory authority, Prudential had a fiduciary responsibility to monitor the performance of the Committees, the Individual Defendants, and Bellwether.  In addition, Prudential, the Administrative Committee and Investment Oversight Committee had a fiduciary responsibility to monitor the performance of Individual Defendants and Bellwether.

138.    A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

139.    To the extent that fiduciary monitoring responsibilities of Prudential or the Committees were delegated, each Defendant's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

140.    Prudential and the Committees breached their fiduciary monitoring duties by, among other things:

(a)     Failing to monitor and evaluate the performance of their appointees or have a system in place for doing so, standing idly by as the Plan suffered enormous losses as a result of the appointees' imprudent actions and omissions with respect to the Plan;

(b)     Failing to monitor their appointees' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein, in clear violation of ERISA; and

(c)     Failing to remove appointees whose performances were inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and Plan participants' retirement savings.

141.    As a consequence of these breaches of the fiduciary duty to monitor, the Plan suffered substantial losses.  Had Prudential and the Committees discharged their fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct result of the breaches of fiduciary duties alleged herein, the Plan and its participants have lost millions of dollars of retirement savings.

142.    Prudential and the Committees are liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, to restore to the Plan any profits made through use of Plan assets, and are subject to other equitable or remedial relief as appropriate.  Each also knowingly participated in the breaches of the other Defendants, knowing that such acts were a breach; enabled the other Defendants to commit a breach by failing to lawfully discharge their own fiduciary duties; and knew of the breaches by the other Defendants yet failed to make any reasonable effort under the

circumstances to remedy the breaches. Prudential, thus, is liable for the losses caused by the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT V
**(In the Alternative, Liability for Knowing Breach of Trust – Against All Defendants)**

143.    Plaintiff incorporates the allegations in the previous paragraphs of this Amended Complaint as if fully set forth herein.

144.    In the alternative, to the extent that [any of the] Defendants are not deemed a fiduciary or co-fiduciary under ERISA, each such Defendant should be enjoined or otherwise subject to equitable relief as a non-fiduciary from further participating in a knowing breach of trust.

145.    To the extent [any of] the Defendants are not deemed to be fiduciaries and/or are not deemed to be acting as fiduciaries for any and all applicable purposes, any such Defendants are liable for the conduct at issue here, since all Defendants possessed the requisite knowledge and information to avoid the fiduciary breaches at issue here and knowingly participated in breaches of fiduciary duty by permitting the Plan to offer a menu of poor and expensive investment options that cannot be justified in light of the size of the Plan and other expenses of the Plan.

WHEREFORE, Plaintiff, on behalf of himself and the Plan, demands judgment against Defendants for the following relief:

(a)    Declaratory and injunctive relief pursuant to ERISA § 502, 29 U.S.C. § 1132, as detailed above;

(b)    Equitable, legal or remedial relief to return all losses to the Plan and/or for restitution and/or damages as set forth above, plus all other equitable or remedial relief as the

Court may deem appropriate pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132, as detailed above;

(c)    Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity;

(d)    Attorneys' fees, costs, and other recoverable expenses of litigation; and

(e)    Such further and additional relief to which Plaintiff and the Plan may be justly entitled and the Court deems appropriate and just under all the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

## NOTICE PURSUANT TO ERISA § 502(h)

To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h), the undersigned hereby affirms that, on this date, a true and correct copy of this Amended Complaint was served upon the Secretary of Labor and Secretary of Treasury by certified mail, return receipt requested.

Dated: September 17, 2020                    Respectfully submitted,

**SHEPHERD, FINKELMAN,
MILLER & SHAH, LLP**

*/s/ James C. Shah*
Natalie Finkelman Bennett
James C. Shah
Shepherd Finkelman Miller
 & Shah, LLP
475 White Horse Pike
Collingswood, NJ 08107
Telephone: (856) 526-1100
Facsimile: (866) 300-7367
Email: jshah@sfmslaw.com
            nfinkelman@sfmslaw.com

James E. Miller

Laurie Rubinow
Shepherd Finkelman Miller
& Shah, LLP
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (866) 300-7367
Email: jmiller@sfmslaw.com
          lrubinow@sfmslaw.com

Ronald S. Kravitz
Kolin C. Tang
Shepherd Finkelman Miller
& Shah, LLP
201 Filbert Street, Suite 201
San Francisco, CA 94133
Telephone: (415) 429-5272
Facsimile: (866) 300-7367
Email: rkravitz@sfmslaw.com
          ktang@sfmslaw.com

James E. Cecchi
Caroline F. Bartlett
Carella Byrne Cecchi Olstein Brody
& Agnello, P.C.
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
Email: jcecchi@carellabyrne.com
         cbartlett@carellabyrne.com

***Attorneys for Plaintiff, the Plan,
and the Proposed Class***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 17, 2020, the foregoing was filed electronically.

Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

Parties may access this filing through the Court's system.

*/s/James C. Shah*