MILLER SHAH LLP
NATALIE FINKELMAN BENNETT
JAMES C. SHAH
2 Hudson Place, Suite 100
Hoboken, NJ 07030
Telephone: (866) 540-5505
Facsimile: (856) 300-7367
Email: nfinkelman@millershah.com
        jcshah@millershah.com

[Additional Counsel on Signature Page]

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| YOUNG CHO,<br>Individually and as Representative of a Class<br>of Similarly Situated Persons, and on Behalf<br>of the PRUDENTIAL EMPLOYEE<br>SAVINGS 401(k) PLAN,<br><br>                       Plaintiff,<br><br>      v.<br><br>THE PRUDENTIAL INSURANCE<br>COMPANY OF AMERICA *et al.*,<br><br>                 Defendants. | **Civil Action No**: **2:19-cv-19886<br>(JMV)(SCM)**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**THIRD AMENDED<br>CLASS ACTION COMPLAINT** |

## NATURE OF THE ACTION

1.　Plaintiff Young Cho ("Plaintiff"), individually and on behalf of the Prudential Employee Savings Plan (the "Plan") and a proposed class of participants and beneficiaries in the Plan, brings this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*

2.      Plaintiff asserts his claims against the Prudential Insurance Company of America ("Prudential") and the Prudential Investment Oversight Committee ("Investment Oversight Committee"), as well as Lucien Alziari, Sara Bonesteel, Gary Neubeck, Scott Sleyster and Sharon Taylor ("Committee Members" or "Individual Defendants") (collectively, "Defendants"), for breach of fiduciary duties and other violations of ERISA, 29 U.S.C. § 1001, *et seq*.  The Investment Oversight Committee, comprised of Prudential officers and employees, was (and is) responsible for selecting and monitoring the Plan's investments.  As fiduciaries to the Plan, Defendants have a duty under ERISA to act prudently and solely in the interest of the Plan and its participants and beneficiaries when selecting investments, products and services for the Plan and monitoring those investments, products and services to ensure that they remain appropriate and prudent for the Plan.  Instead, Defendants put the interests of Prudential ahead of those of the Plan by choosing investment products offered and managed by Prudential subsidiaries and affiliates, which generated substantial revenues for Prudential, at great cost to the Plan.  This Third Amended Complaint ("TAC" or "Complaint") is filed pursuant to Federal Rule of Civil Procedure 15(a)(2) and the Court's Order entered on August 12, 2022 (ECF No. 129).[1]

## PRELIMINARY STATEMENT

3.      Defined contribution plans that are qualified as tax-deferred vehicles under Section 401 of the Internal Revenue Code, 26 U.S.C. §§ 401(a) and (k) (*i.e.*, 401(k) plans), have become the primary form of retirement savings in the United States and, as a result, America's *de facto* retirement system.  Unlike traditional defined benefit retirement plans, in which the employer typically promises a calculable benefit and assumes the risk with respect to high fees

---

[1]Pursuant to Local Civil Rule 15.1(b)(2), attached as Exhibit "A" is a form of the Third Amended Complaint reflecting all changes from the Second Amended Complaint.

or under-performance of pension plan assets used to fund defined benefits, 401(k) plans operate in a manner in which participants bear the risk of high fees and investment under-performance.

4.      The importance of defined contribution plans to the United States retirement system has become increasingly pronounced as employer-provided defined benefit plans have become rare as an offered and meaningful employee benefit.

5.      The potential for imprudence and other breaches of fiduciary duty is much greater in defined contribution plans than in defined benefit plans.  In a defined benefit plan, the participant is entitled to a fixed monthly pension payment while the employer is responsible for making certain the plan is sufficiently capitalized.  As a result, the employer bears all risks related to excessive fees and investment underperformance.  Therefore, in a defined benefit plan, the employer and the plan's fiduciaries have every incentive to keep costs low and to remove imprudent investments.  But in a defined contribution plan, participants' benefits are limited to the value of their individual accounts, which is determined by the market performance of employee and employer contributions, minus investment expenses.  Thus, the employer has little or no incentive to keep costs low or to closely monitor the plan to ensure that selected investments are and remain prudent, because all risks caused by high fees and poorly performing investments are borne by participants.

6.      For financial services companies like Prudential, the potential for imprudent and other breaches of fiduciary duty is particularly high, because a plan's fiduciaries are in a position to benefit the company through the selection of the plan's investments by, for example, filling the plan with proprietary investment products that an objective and prudent fiduciary would not choose or by effectively steering participants to proprietary investment products through a default investment selection (*i.e.*, a QDIA – as defined and discussed below) or through other

means.  Additionally, here, Prudential serves as the recordkeeper for the Plan, providing yet a further stream of revenue and extra benefit for Prudential.

7.     The effect of such fiduciaries' imprudence and related breaches of duty on workers can be severe.  According to one study, the average working household with a defined contribution plan will lose $154,794 to fees and lost returns over a 40-year career.  *See* Melanie Hicken, *Your employer may cost you $100k in retirement savings*, CNN Money (June 1, 2014), *available at* http://money.cnn.com /2013/03/27/retirement/401k-fees.  Simply put, a fiduciary's mismanagement of plan assets leading to an investment lineup filled with poor-performing investments and excessive fees can force a participant to work an extra five to six years to compensate for the excess fees that were paid

8.     With nearly $9.9 billion in assets as of December 31, 2020, the Plan is in the top one percent (1%) of all 401(k) plans in terms of assets.  Additionally, as of December 31, 2020, there were over 45,000 participants in the Plan.  The marketplace for 401(k) retirement plan services is well-established and can be competitive when fiduciaries of defined contribution retirement plans act in an informed and prudent fashion.  Multi-billion dollar defined contribution plans, like the Plan, have significant bargaining power and the ability to demand low-cost administrative and investment management services within the marketplace for the administration of 401(k) plans and the investment of 401(k) assets.  As fiduciaries to the Plan, Defendants are obligated to act for the exclusive benefit to participants, invest the assets of the Plan in a prudent fashion, and ensure that Plan expenses are fair and reasonable.  At all pertinent times, as explained below, Defendants: (a) were fiduciaries under ERISA; (b) breached their fiduciary duties under ERISA by selecting and retaining high-cost and poor-performing investments, several of which were managed by Prudential and/or its subsidiaries, instead of

4

offering other readily available, easily identifiable and more prudent alternative investments; which (c) caused losses to the Plan.  Since Defendants had and have the discretion to select and retain the investments made available to participants, Defendants' breaches are the direct cause of the losses incurred by the Plan, as alleged herein.

9.      To remedy these fiduciary breaches and other violations of ERISA, Plaintiff brings this class action under ERISA, and, in particular, under 29 U.S.C. §§ 1104 and 1109, for losses to the Plan caused by Defendants' breaches of fiduciary duty.  Based on this conduct, Plaintiff asserts claims against the Defendants for: (a) breach of the fiduciary duty of prudence (Count I); and (b) failure to monitor fiduciaries (Count II).

10.      Plaintiff brings this class action on behalf of the Plan and its approximately 45,000 participants for losses to the Plan caused by Defendants' imprudent selection and retention of investments and services for the Plan and other violations alleged herein.

11.      Plaintiff also brings this class action on behalf of the Plan and all other similarly situated current and former participants under 29 U.S.C. §§ 1109 and 1132, to recover the following relief:

- A declaratory judgment and holding that the acts of Defendants described herein violate ERISA and applicable law;

- A permanent injunction against Defendants, prohibiting the practices described herein and affirmatively requiring them to act in the best interests of the Plan and its participants;

- Equitable, legal or remedial relief for all losses and/or compensatory damages;

- Attorneys' fees, costs and other recoverable expenses of litigation; and

- Such other and additional legal or equitable relief that the Court deems appropriate and just under all the circumstances.

## JURISDICTION AND VENUE

12.     Plaintiff seeks relief on behalf of the Plan pursuant to ERISA's civil enforcement remedies with respect to fiduciaries and other interested parties and, specifically, under 29 U.S.C. § 1109 and 29 U.S.C. § 1132.

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA Section 502(e), 29 U.S.C. § 1132(e).

14.     Venue is proper in this juridical district pursuant to 29 U.S.C. § 1132(e) because Prudential's principal place of business is in this district.

15.     Plaintiff has standing to bring this action.  ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes any participant, fiduciary or the Secretary of Labor to bring suit as a representative of a plan, with any recovery necessarily flowing to a plan.  As explained herein, the Plan has suffered millions of dollars in losses resulting from Defendants' fiduciary breaches and remains vulnerable to continuing harm, all redressable by this Court.  In addition, although standing under ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2), is established by these Plan-wide injuries, Plaintiff and all Plan participants suffered financial harm as a result of the Plan's imprudent investment options and excessive fees, and were deprived of the opportunity to invest in prudent options with reasonable fees, among other injuries.

## THE PARTIES

16.     Plaintiff is a former employee of Prudential and former participant in the Plan under 29 U.S.C. § 1002(7).  Plaintiff worked for Prudential until May 2018 and maintained an account with the Plan until March 20, 2019.  During the Class Period, Plaintiff maintained an investment through the Plan in the Alliance Bernstein Core Opportunities Fund, the Delaware Small Cap Core Equity Fund, the GE Institutional International Equity Fund, the Jennison Large

Cap Growth Fund, the Jennison Midcap Growth Fund, the Jennison Opportunistic Equity Collective Investment Trust, the LSV Large Cap Value Fund, the QMA US Broad Market Index Fund, the Prudential Small Company Fund, the Vanguard Small Cap Index Fund, the Wellington International Opportunities Collective Investment Trust, and Prudential common stock.  Plaintiff is a resident of Los Angeles, California.

17.    The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34). The Plan is a qualified plan under 26 U.S.C. § 401 and is commonly referred to as a "401(k) plan."  Eligible employees, as defined in the Plan Document, may direct the investment of retirement assets into several select investment funds.  The available menu of investment options is curated by Defendants and, specifically, by the Investment Oversight Committee, as described in detail below.

18.    Defendant, Prudential, is identified in the Plan Document as the "plan sponsor" of the Plan under 29 U.S.C. § 1002(16)(B).  Prudential is also a "named fiduciary" under 29 U.S.C. § 1102(a)(2).  As the Plan Sponsor, Prudential is, by definition, also a party in interest of the Plan.

19.    Defendant, the Investment Oversight Committee, is designated by the Plan Document to assist Prudential with the selection of investment funds offered for selection by Plan participants.  According to the Plan Document, the Investment Oversight Committee must be comprised of at least three persons appointed by name or title by the Prudential Investment Committee of Prudential's Board of Directors.  The Investment Oversight Committee is a "named fiduciary" identified in the Plan Document pursuant to 29 U.S.C. § 1102(a).  Because the Investment Oversight Committee exercises "authority or control respecting management or

disposition of the Plan's assets," it is also a fiduciary pursuant to 29 U.S.C. § 1002(21)(A).  The Investment Oversight Committee has the "responsibility for implementing the Plan's funding policy . . . and for establishing the Plan's investment policies.  Except with respect to the Company Stock Fund, the Investment Oversight Committee Shall select all Investment Funds . . . ."  The Investment Oversight Committee is distinct from the Prudential Administrative Committee, which is responsible for the administration, management, and operation of the Plan.

20.    Defendant, Lucien Alziari ("Alziari"), is an individual who served as a Member of the Investment Oversight Committee since 2017.  Alziari has served as the Chairperson of the Investment Oversight Committee since 2018.  As a Member of the Investment Oversight Committee, Alziari attended meetings on December 6, 2017; March 26, 2018; May 23, 2018; August 21, 2018; December 7, 2018; March 5, 2019; June 4, 2019; October 11, 2019; December 9, 2019; and March 9, 2020.  At each of these meetings, Aliazi was put on notice of the poor performance of the several challenged funds identified below, but failed to suggest any further analysis or act to remove any of the imprudent investment options from the Plan lineup.

21.    Defendant, Sara Bonesteel ("Bonesteel"), is an individual who has served as a Member of the Investment Oversight Committee since 2019.  As a Member of the Investment Oversight Committee, Bonesteel attended meetings on March 5, 2019; June 4, 2019; October 11, 2019; December 9, 2019; and March 9, 2020.  At each of these meetings, Bonesteel was put on notice of the poor performance of the several challenged funds identified below, but failed to suggest any further analysis or act to remove any of the imprudent investment options from the Plan lineup.

22.    Defendant, Gary Neubeck ("Neubeck"), is an individual who has served as a Member of the Investment Oversight Committee since prior to 2013.  As a Member of the

Investment Oversight Committee, Neubeck attended meetings on December 12, 2013; March 4,

2014; June 3, 2014; August 20, 2014; December 1, 2014; March 9, 2015; May 29, 2015; August

27, 2015; December 2, 2015; March 2, 2016; May 26, 2016; September 12, 2016; December 7,

2016; March 1, 2017; May 23, 2017; September 8, 2017; December 6, 2017; March 26, 2018;

May 23, 2018; August 21, 2018; December 7, 2018; March 5, 2019; June 4, 2019; October 11,

2019; December 9, 2019; and March 9, 2020.  At each of these meetings, Neubeck was put on

notice of the poor performance of the several challenged funds identified below, but failed to

suggest any further analysis or act to remove any of the imprudent investment options from the

Plan lineup.

      23.    Defendant, Scott Sleyster ("Sleyster"), is an individual who served as a Member

of the Investment Oversight Committee since prior to 2013 until 2019.  As a Member of the

Investment Oversight Committee, Sleyster attended meetings on December 12, 2013; March 4,

2014; August 20, 2014; December 1, 2014; March 9, 2015; May 29, 2015; August 27, 2015;

December 2, 2015; March 2, 2016; May 26, 2016; September 12, 2016; December 7, 2016;

March 1, 2017; May 23, 2017; September 8, 2017; December 6, 2017; March 26, 2018; May 23,

2018; August 21, 2018; and December 7, 2018.  At each of these meetings, Sleyster was put on

notice of the poor performance of the several challenged funds identified below, but failed to

suggest any further analysis or act to remove any of the imprudent investment options from the

Plan lineup.

      24.    Defendant, Sharon Taylor ("Taylor"), is an individual who served as Chairperson

of the Investment Oversight Committee from prior to 2013 until 2017.  As a Member of the

Investment Oversight Committee, Taylor attended meetings on December 12, 2013; March 4,

2014; June 3, 2014; August 20, 2014; December 1, 2014; March 9, 2015; May 29, 2015; August

27, 2015; December 2, 2015; March 2, 2016; May 26, 2016; September 12, 2016; December 7, 2016; March 1, 2017; and May 23, 2017.  At each of these meetings, Taylor was put on notice of the poor performance of the several challenged funds identified below, but failed to suggest any further analysis or act to remove any of the imprudent investment options from the Plan lineup.

25.     The Individual Defendants of Investment Oversight have been delegated fiduciary authority pursuant to the Plan Document.

## FACTUAL ALLEGATIONS

**A.    Background**

26.     The Plan is established and maintained under a written document in accordance with 29 U.S.C. § 1102 and serves as a vehicle for retirement savings and to produce retirement income for employees of Prudential.  The Plan covers eligible employees of Prudential and its affiliates as described in the Plan Document.  As explained above, Prudential has delegated the administration of the Plan to the Administrative Committee and the responsibility for selection of the Plan's investment options to the Investment Oversight Committee.

27.     The Plan is a participant-directed plan in which participants direct their retirement assets into a pre-selected menu of investment offerings consisting of several types of investments.  The amount of retirement income generated by the Plan depends upon contributions made on behalf of each employee by Prudential or its affiliates, deferrals of employee compensation and employer matching contributions, and from the performance of the Plan's investment options (net of fees and expenses).

28.     The Plan has established a trust, which is managed by the Prudential Trust Company, to hold participant and employer contributions and such other earnings, income and

appreciation from Plan investments, less payments made by the Plan's trustee, to carry out the purposes of the trust, in accordance with 29 U.S.C. § 1103.

29.     As of December 31, 2020, the Plan offered the following types of investment options: mutual funds, separately managed accounts ("SMAs"), Prudential Financial, Inc. common stock, collective investment trusts, guaranteed retirement income products, and a fixed rate fund structured as a group annuity contract.

30.     Mutual funds are publicly-traded investment vehicles consisting of a pool of funds collected from many investors for the purpose of investing in a portfolio of equities, bonds, and other securities.  Mutual funds are operated by professional investment advisers, who, like the mutual funds, are registered with the U.S. Securities and Exchange Commission ("SEC").  Mutual funds are subject to SEC regulation, and are required to provide certain investment and financial disclosures and information in the form of a prospectus.

31.     SMAs are investment portfolios that begin with the same allocation as that of their mutual fund counterpart, but for which the professional investment adviser will make individual investment decisions that may depart from that of the mutual fund.  In essence, SMAs are mutual funds customized for that investor.  However, unlike mutual funds, SMAs do not issue registered prospectuses and, as such, their fees and other disclosures are not as transparent.

32.     Collective investment trusts are, in essence, mutual funds without the SEC regulation.  Collective investment trusts fall under the regulatory purview of the Office of the Comptroller of the Currency or individual state banking departments.  Collective investment trusts were first organized under state law in 1927 and were blamed for the market crash in 1929.  As a result, collective investment trusts were severely restricted, giving rise to the more transparent and publicly-traded mutual funds.  Today, banks create collective investment trusts

only for their trust clients and for employee benefit plans like the Plan. The main advantage of opting for a collective investment trust, rather than a mutual fund, is the negotiability of the fees, so larger retirement plans are able to leverage their size for lower fees.

33.     The Plan offers a suite of Prudential IncomeFlex Funds that provide guaranteed income for life. These products are designed to function as annuities, but without requiring an irrevocable election to receive benefit payments. The IncomeFlex Funds are structured as insurance company separate accounts offered through group annuity insurance contracts issued by the Prudential Retirement Insurance and Annuity Company.

34.     The PESP Fixed Rate Fund is structured as a group annuity contract and provides investors with a guaranteed interest rate, which is determined based on a formula and reset quarterly. The Fixed Rate Fund's guarantees of principal and interest are backed by the assets of Prudential Insurance Company of America.

**B.     ERISA's Fiduciary Standards**

35.     ERISA imposes strict fiduciary duties of prudence upon the Defendant(s) as fiduciaries of the Plan. ERISA Section 404(a) 29 U.S.C. § 1104(a), states, in relevant part:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A)     for the exclusive purpose of
>
> > (i)     providing benefits to participants and their beneficiaries; and
> >
> > (ii)     defraying reasonable expenses of administering the plan;
>
> [and]
>
> (B)     with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like arms.

36.     Under 29 U.S.C. § 1103(c)(1), with certain exceptions not relevant here,

> The assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

37.     Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and solely in the interest of participants in a plan.

38.     ERISA's fiduciary duties are "the highest known to the law" and must be performed "with an eye single" to the interest of the participants.  *Donovan v. Bierwirth*, 680 F.2d 263, 271, n.8 (2d Cir. 1982).

39.     Although ERISA fiduciaries must act in accordance with plan documents, that duty applies only if the plan documents are in accord with the fiduciary duties of ERISA.  *See* 29 U.S.C. § 1104(a)(1)(D).

40.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries.  29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty.  ERISA states, in relevant part:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)     if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2)     if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)    if he has knowledge of a breach of such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

41.    The fiduciary duties of loyalty and prudence imposed by ERISA Section 404, 29 U.S.C. § 1104.

42.    ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under ERISA Section 409, 29 U.S.C. § 1109.  Section 1109(a) provides, in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

43.    ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action, on behalf of the Plan, to enforce a breaching fiduciary's liability to the Plan under ERISA Section 409(a), 29 U.S.C. § 1109(a).

**C.    Defendants' Violations of ERISA**

44.    Defendants have severely mismanaged the Plan, as further detailed below. Defendants have failed to monitor all of the investments in the Plan to ensure that they provided adequate returns and were not excessively priced, as were many of the investments in the Plan lineup.

45.    Among other things, Defendants are responsible for selecting investments and service providers for the Plan.  These selections must be made prudently and solely in the interest of the Plan's participants and beneficiaries.

46.     The Investment Oversight Committee and its members had the discretion and authority to select and maintain the menu of investments available to participants of the Plan.

47.     The Investment Oversight Committee and its members knew, or should have known by virtue of their senior positions at a large financial services company, that better-performing, lower-cost, comparable alternative investments were readily available, as compared to the challenged investments discussed below.

48.     A prudent fiduciary would have limited the Plan menu to the asset classes and investment options that offered the best opportunity for participants to maximize the value of their accounts at an appropriate level of risk, while excluding funds that interfered with that goal due to their high fees, poor track record, inexperienced managers, or inappropriate risk/reward profile.  Defendants' complete failure to limit either the asset classes offered within the Plan's menu, or the particular options within each asset class, gives rise to an inference that the Plan fiduciaries did not investigate which asset classes and investment options would best meet the needs of participants.  This failure further evidences Defendants' failure to engage in a meaningful monitoring of the Plan's investment options to ensure that they remained prudent.

49.     Defendants, all of which are and were fiduciaries or co-fiduciaries of the Plan at all pertinent times, violated ERISA Section 404, 29 U.S.C. § 1104 by failing to act solely in the interest of the Plan and its participants and beneficiaries and failing to exercise the required care, skill, prudence, and diligence in investing the assets of the Plan and disclosing the fees charged to the participants.

50.     Defendants' violations of ERISA caused losses to the Plan for which Defendants are liable to the Plan and Class members pursuant to ERISA Sections 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2).

### 1.    Underperformance of Available Funds

51.    In addition to the unreasonably excessive fees charged by several of the investments available to Plan participants, several of the most expensive funds also produced poor returns relative to their respective benchmarks and other similar alternative funds, rendering these objectively imprudent investments, and their selection and retention by Defendants, a breach of their fiduciary duty.  It is a basic principle of investment theory that the risks associated with an investment must first be justified by its potential returns for that investment to be rational.  This principle applies even before considering the purpose of the investment and the needs of the investor, such as the retirement assets here.  The Capital Asset Pricing Model ("CAPM"), which is used for pricing securities and generating expected returns for assets given the risk of those assets and the cost of capital, provides a mathematical formula distilling this principle:

$ERi = Rf + \beta i(ERm - Rf)$, where:

$ERi$ = expected return of investment
$Rf$ = risk-free rate
$\beta i$ = beta of the investment
$(ERm - Rf)$ = market risk premium

Applied here and put simply, the $\beta i$ is the risk associated with an actively-managed mutual fund or collective trust, which can only be justified if the $ERi$ of the investment option is, at the very least, above that of its benchmark, $Rf$.[2]  Otherwise, the model collapses, and it would be imprudent to assume any risk without an expectation of achieving associated return above the benchmark returns.

---

[2]In this instance, the index benchmark takes place of the "risk-free" rate, as the investment option is measured against the performance of that investment category, rather than the typical U.S. Treasury Bonds or equivalent government security in a general CAPM calculation.

52.     Investment professionals and investment policy statements for virtually all competently managed defined contribution retirement plans appropriately recognize that the three-year and five-year annualized returns are the most important metrics for evaluating whether investment options should be maintained in a retirement plan lineup.  Indeed, the Plan's own Investment Policy Statement ("IPS") explicitly lists performance over a three- and five-year basis among its criteria for both selecting and evaluating an investment option.  No shorter, or longer-term performance metrics, such as one, seven or ten-year returns, are mentioned in the IPS, because the Defendants understood what all prudent fiduciaries do: that those periods of time most closely approximating a market cycle (namely the three- and five-year periods) are the most appropriate time frame over which to appraise an investment manager's ability to beat their chosen segment of the market and execute their stated mandate.  Among the explicit criteria identified,[3] the IPS lists for any of the Plan's investment options to be placed on a watch list are the investment's net performance and risk adjusted performance relative to an appropriate benchmark, and performance ranked against a peer group, **_all over a three- and five-year period_**. The IPS articulates this particular window as an automatic trigger for a poor performing investment to be placed on a watch list so as not to permit the Investment Oversight Committee to allow such an investment to linger in the Plan lineup long enough for it to, for example, produce a consistent pattern of underperforming ten-year returns.  Delaying the removal of a clearly floundering investment option and subjecting Plan participants to inferior returns until

---

[3]Per the IPS, investment options may also be placed on watch for any reason not listed among the criteria at the discretion of the Investment Oversight Committee.  In other words, investment options can be deemed unsatisfactory and placed on watch or replaced without satisfying every criterion necessary for the automatic trigger.

such investment exhibits a pattern of ten-year trailing underperformance would itself constitute a severe breach of fiduciary duty.

53.     The IPS also specifically enumerates the level of underperformance that is sufficiently concerning for an investment to be automatically placed on watch.  Indeed, the Investment Oversight Committee acknowledged in the IPS that, as little as 20 basis points of net annualized underperformance compared to a benchmark over a three- and five-year period, is sufficient to raise concerns about an investment option's performance and, accordingly, its suitability for the Plan lineup.  That is because 20 basis points of performance shortfall, *annualized*, is not the same as 20 basis points of cumulative underperformance over a specified time period.  Accordingly, all returns cited in this Third Amended Complaint, are annualized, unless otherwise specified, meaning the differences between the returns of Plan investments and any comparator or benchmark are equivalent to the specified difference in *each* of the three or five years in the period.  Regular annualized three- and five-year performance shortfalls of over 20 basis points represent persistent and substantial shortcomings (especially when considered on a compounded basis) that could not have supported a determination that the below challenged funds could be justifiably retained in the Plan.  Most importantly, a performance shortfall of such magnitude cannot be deemed to be insubstantial or a small disparity in relative performance for **this Plan** because the IPS of **this Plan**, which guides the Investment Oversight Committee in its investment selection and monitoring activities, expressly articulates that 20 basis points annualized is sufficient cause to place a Plan investment on watch and determine whether it should be removed.  In other words, the IPS for the Plan explicitly acknowledges that 20 basis points of underperformance on an annualized basis is *per se* material for the investments at issue in this case.

54.    *The Prudential Retirement Real Estate Fund*.  This proprietary fund has consistently and significantly underperformed its benchmark[4] on a three- and five-year annualized basis during the Class Period.  The Investment Oversight Committee was regularly furnished with the Fund's disappointing performance data during the Class Period, yet neglected to follow a prudent investment evaluation process and ignored this negative trend.  For example, the quarterly report for the Second Quarter of 2016, reflecting investment returns as of the end of the same quarter, showed the Real Estate Fund underperforming its benchmark by 0.28% on a three-year annualized basis and 0.41% on a five-year annualized basis.  The magnitude of the performance shortfall for both periods is greater than the 20 basis points deemed sufficiently substantial to automatically require greater scrutiny under the IPS.  This performance data, indicating an investment manager unable to add value through active management, was made available to the Investment Oversight Committee at its meeting on September 12, 2016, yet committee ignored the clear indicators that Plan participants would be better served by an alternative fund in the real estate space.  The minutes of this meeting, which was attended by Taylor, Sleyster and Neubeck, make no mention of the Real Estate Fund's performance.

55.    Defendants' inaction in response to sustained poor performance was not an isolated incident.  The quarterly report reflecting investment returns as of the end of the Third Quarter of 2016, presented to the Investment Oversight Committee at its meeting on December 7, 2016, showed the Real Estate Fund underperforming its designated benchmark by 0.37% on a

---

[4]The quarterly Investment Performance Monitor reports ("quarterly reports") that Bellwether Consulting LLC ("Bellwether"), the Plan's investment adviser, provided to the Investment Oversight Committee evaluated the Real Estate Fund's performance against a custom benchmark.  Prior to April 1, 2018, the benchmark was weighted 75% to the NCREIF Open-end Diversified Core Equity Fund Index and 25% to the S&P Developed Property Index. Effective April 1, 2018, the custom benchmark swapped out the S&P Developed Property Index for the MSCI US Investable Market Real Estate 25/50 Transition Index.

three-year annualized basis and 0.57% on a five-year annualized basis.  The magnitude of the performance shortfall for both periods is greater than the 20 basis points deemed sufficiently substantial as to require greater scrutiny under the IPS.  The minutes of this meeting, which was attended by Taylor, Sleyster and Neubeck, make no mention of the Real Estate Fund's performance.  The following quarterly report, furnished to the Investment Oversight Committee at its meeting on March 1, 2017, showed the Real Estate Fund underperforming its benchmark by 0.44% on a three-year annualized basis and 0.60% on a five-year annualized basis as of the end of the Fourth Quarter of 2016.  The magnitude of the performance shortfall for both periods is greater than the 20 basis points deemed sufficiently substantial as to automatically require greater scrutiny under the IPS.  The minutes of this meeting, which was attended by Taylor, Sleyster and Neubeck, also make no mention of the Real Estate Fund's performance.

56.    The Investment Oversight Committee continued to refuse to consider removing the Real Estate Fund despite its inability to provide active returns quarter after quarter, throughout the Class Period.  When an investment option's track record is so apparently poor, as it is here, Defendants should necessarily replace the fund in the Plan with an alternative that has demonstrated the ability to consistently outperform the benchmark, or, at the very least, retain a passive alternative that tracks a benchmark in that market sector.  By way of example and to illustrate, there is a passively managed Vanguard Real Estate Index Fund that simply tracks the MSCI US REIT Index, with a very low expense ratio of 10 basis points (0.10%) for the Institutional share class.  Moreover, there is an actively managed Cohen & Steers Institutional Realty Shares Fund that consistently ranked among the best performing real estate funds throughout the Class Period, which could have provided Plan participants with exposure to real

estate securities through a manager with a track record of success in beating both its benchmark and its peers.

57.      Both the Vanguard and Cohen & Steers funds represented superior real estate investment options to the Real Estate Fund.  Considering the returns data provided as an example above, as of the end of the Second Quarter of 2016, the Real Estate Fund had generated three- and five-year annualized returns of 11.70% and 11.14%, respectively.  Both the Vanguard and Cohen & Steers funds achieved significantly and materially superior performance: the Vanguard fund returned 13.44% annualized over the previous three years and 12.47% annualized over the previous five years, while the Cohen & Steers fund returned 13.40% annualized over the previous three years and 11.38% annualized over the previous five years.

58.      As of the end of the Third Quarter of 2016, the Real Estate Fund had generated three- and five-year annualized returns of 11.05% and 11.63%, respectively.  Both the Vanguard and Cohen & Steers funds achieved significantly and materially superior performance: the Vanguard fund returned 14.01% annualized over the previous three years and 15.70% annualized over the previous five years, while the Cohen & Steers fund returned 14.37% annualized over the previous three years and 15.37% annualized over the previous five years.

59.      As of the end of the Fourth Quarter of 2016, the Real Estate Fund had generated three- and five-year annualized returns of 10.24% and 10.90%, respectively.  Both the Vanguard and Cohen & Steers funds achieved significantly and materially superior performance: the Vanguard fund returned 13.14% annualized over the previous three years and 11.79% annualized over the previous five years, while the Cohen & Steers fund returned 13.02% annualized over the previous three years and 11.48% annualized over the previous five years.

60.    Indeed, an objective examination of the Real Estate Fund against any number of the better and readily available real estate funds would have resulted in the replacement of the former with one of the latter.  Instead, Defendants' inaction, likely due at least in part to the Real Estate Fund's affiliation with the plan sponsor, saddled participants who desired to diversify their retirement accounts into real estate with a manager that struggled and failed to beat its benchmark.  Defendants' failure to replace this underachieving investment option with a better performing alternative was a severe breach of fiduciary duty.

61.    ***The Prudential High Yield Collective Investment Trust***.  According to the Plan's Summary Plan Description, the objective of the Prudential High Yield CIT is to outperform its benchmark, the Barclays US High Yield Ba/B 1% Issuer Cap Index, by 150 basis points (1.50%) over a full market cycle.  The CIT failed to achieve this objective even once during the Class Period.  That the CIT demonstrated an incredible inability to ever achieve its stated objective should have been sufficient information alone to convince the Investment Oversight Committee to remove it.  The Oversight Committee was presented with data reflecting this concerning shortcoming at every single meeting during the Class Period; no further comparison to any benchmark or peer fund was required to conclude that the CIT was unable to successfully execute its mandate.  Nonetheless, in addition to this abject failure to meet its stated target, the CIT also suffered significant and prolonged periods of underperformance compared to its benchmark, and consistently ranked poorly against other mutual funds in the high yield space.  Again, the Investment Oversight Committee was regularly furnished with the CIT's disappointing returns data, yet opted to ignore this negative pattern.

62.    For example, the quarterly report for the Second Quarter of 2014, reflecting investment returns as of the end of the same quarter, showed the High Yield CIT *trailing* its

benchmark by 0.53% on a three-year annualized basis and 0.38% on a five-year annualized basis. In addition to the CIT's failure to generate anything close to its stated objective of 150 basis points of *outperformance*, the magnitude of the performance shortfall for both periods is greater than the 20 basis points deemed sufficiently substantial as to automatically require greater scrutiny under the IPS. This performance data, indicating an investment manager unable to add value through active management or come close to achieving its explicit target, was made available to the Investment Oversight Committee at its meeting on August 20, 2014. The minutes of this meeting, which was attended by Taylor, Sleyster and Neubeck, make no mention of the High Yield CIT's performance.

63.    Defendants' inaction in response to sustained poor performance was not an isolated incident. The quarterly report reflecting investment returns as of the end of the Third Quarter of 2014, presented to the Investment Oversight Committee at its meeting on December 1, 2014, showed the High Yield CIT underperforming its benchmark by 0.76% on a three-year annualized basis and 0.41% on a five-year annualized basis. In addition to the CIT's failure to generate anything close to its stated objective of 150 basis points of *outperformance*, the magnitude of the performance shortfall for both periods is greater than the 20 basis points deemed sufficiently substantial as to automatically require greater scrutiny under the IPS. The minutes of this meeting, which was attended by Taylor, Sleyster and Neubeck, make no mention of the High Yield CIT's performance. The following quarterly report, furnished to the Investment Oversight Committee at its meeting on March 4, 2015, showed the High Yield CIT underperforming its benchmark by 0.38% on a three-year annualized basis and 0.26% on a five-year annualized basis as of the end of the Fourth Quarter of 2014. In addition to the CIT's failure to generate anything close to its stated objective of 150 basis points of *outperformance*,

the magnitude of the performance shortfall for both periods is greater than the 20 basis points deemed sufficiently substantial as to automatically require greater scrutiny under the IPS.  The minutes of this meeting, which was attended by Taylor, Sleyster and Neubeck, also make no mention of the High Yield CIT's performance.

64.     The High Yield CIT's inability to achieve its ambition of 150 basis points of outperformance, or even beat its benchmark, persisted throughout the Class Period.  Materials showing this stark inability to execute were provided to the Investment Oversight Committee every quarter and were ignored.  Again, when an investment option's track record is so apparently poor and it has repeatedly shown an inability to meet its stated objective, Defendants should undoubtedly replace the investment in the Plan with an alternative that has demonstrated the ability to consistently outperform the benchmark and its peers, or, at the very least, retain an alternative that tracks the benchmark.  By way of example and to illustrate, there is a Vanguard High Yield Corporate Fund that regularly beats the same benchmark, with a very low expense ratio of 13 basis points (0.13%) for the Admiral share class.  Moreover, there is an actively managed BlackRock High Yield Bond Fund that consistently ranked among the best performing high yield bond funds throughout the Class Period, which could have provided Plan participants with exposure to junk bonds through a manager with a track record of success in beating both its benchmark and its peers.

65.     Both the Vanguard and BlackRock funds represented superior real estate investment options to the High Yield CIT.  Considering the returns data provided as an example above, as of the end of the Second Quarter of 2014, the High Yield CIT had generated three- and five-year annualized returns of 8.63% and 12.02%, respectively.  Both the Vanguard and BlackRock funds achieved superior performance: the Vanguard fund returned 8.75% annualized

over the previous three years and 12.03% annualized over the previous five years, while the BlackRock fund returned 10.27% annualized over the previous three years and 15.68% annualized over the previous five years.

66.     As of the end of the Third Quarter of 2014, the High Yield CIT had generated three- and five-year annualized returns of 9.51% and 9.40%, respectively.  Both the Vanguard and BlackRock funds achieved superior performance: the Vanguard fund returned 9.59% annualized over the previous three years and 9.49% annualized over the previous five years, while the BlackRock fund returned 12.11% annualized over the previous three years and 11.90% annualized over the previous five years.

67.     As of the end of the Fourth Quarter of 2014, the High Yield CIT had generated three- and five-year annualized returns of 7.63% and 8.46%, respectively.  Both the Vanguard and BlackRock funds achieved superior performance: the Vanguard fund returned 7.84% annualized over the previous three years and 8.64% annualized over the previous five years, while the BlackRock fund returned 9.85% annualized over the previous three years and 10.16% annualized over the previous five years.

68.     Indeed, an objective examination of the High Yield CIT against any number of the readily available and better performing high yield bond funds would have resulted in the replacement of the former with one of the latter.  Instead, Defendants' inaction, likely due at least in part to the High Yield CIT's affiliation with the plan sponsor, saddled participants who desired to diversify their retirement accounts into high yield bonds with a manager that struggled and failed to beat its benchmark.  Defendants' failure to replace this underachieving investment option with a better performing alternative was a severe breach of fiduciary duty.

69.    ***The Wellington Trust Company CIF II Diversified Inflation Hedges Portfolio***.
The Inflation Hedges Portfolio was added to the Plan investment lineup on June 21, 2017.  At the time of its selection, the Portfolio had already exhibited substantial and consistent underperformance when measured against its benchmark, the Multi-Asset Inflation Index. Indeed, the quarterly report for the Second Quarter of 2017, the first report provided to the Investment Oversight Committee since the addition of the Portfolio, showed three- and five-year returns trailing the benchmark by 0.68% and 0.58%, respectively.  The magnitude of the performance shortfall for both periods is greater than the 20 basis points deemed sufficiently substantial as to automatically require greater scrutiny under the IPS.  In the same report, the Portfolio's annualized excess return (alpha) relative to the benchmark and its risk-adjusted returns were all negative over the preceding three and five years.  These negative indicators were furnished to the Investment Oversight Committee at its meeting on September 8, 2017.  Minutes of the meeting, which was attended by Sleyster and Neubeck, indicate that Bellwether acknowledged the Inflation Hedges Portfolio's underperformance.

70.    This inaction in response to poor performance was not an isolated incident.  The quarterly report reflecting investment returns as of the end of the Third Quarter of 2017, presented to the Investment Oversight Committee at its meeting on December 6, 2017, showed the Portfolio underperforming its benchmark by 0.77% on a three-year annualized basis and 0.74% on a five-year annualized basis.  The magnitude of the performance shortfall for both periods is greater than the 20 basis points deemed sufficiently substantial as to automatically require greater scrutiny under the IPS.  The minutes of this meeting, which was attended by Sleyster, Neubeck and Alziari, make no mention of the Inflation Hedges Portfolio's performance.  The following quarterly report, furnished to the Investment Oversight Committee

26

at its meeting on March 26, 2018, showed the Portfolio underperforming its benchmark by 0.03% on a three-year annualized basis and 0.74% on a five-year annualized basis as of the end of the Fourth Quarter of 2017.  The magnitude of the performance shortfall for the five-year return is greater than the 20 basis points deemed sufficiently substantial as to automatically require greater scrutiny under the IPS; while the three-year underperformance does not reach the 20 basis point threshold, it still represents a continuation of the Portfolio's persistent inability to generate returns that matched or exceeded the benchmark.  The minutes of this meeting, which was attended by Sleyster, Neubeck and Alziari, also make no mention of the Inflation Hedges Portfolio's performance.

71.     The Inflation Hedges Portfolio's performance issues persisted, and, every quarter, the Investment Oversight Committee received and refused to act upon materials reflecting the Portfolio's underperformance, signaling a troubling trend.  Indeed, reports showing this stark inability to beat or even meet the benchmark were provided to the Investment Oversight Committee every quarter and were ignored.  Again, when an investment option's track record is so apparently poor, Defendants should necessarily replace the fund in the Plan with an alternative that has demonstrated the ability to consistently outperform its benchmark, or, at the very least, retain an alternative that tracks its benchmark.  By way of example and to illustrate, for exposure to inflation-sensitive securities there is a Vanguard Inflation Protected Securities Fund, with a very low expense ratio of 7 basis points (0.07%) for the Institutional share class.  Moreover, there is an actively managed PIMCO Real Return Fund that consistently ranked among the best performing inflation-protected bond funds throughout the Class Period, which could have provided Plan participants with exposure to inflation-protected securities through a manager with a track record of success.

72.     Both the Vanguard and PIMCO funds represented superior investment options to the Inflation Hedges Portfolio for exposure to inflation-protected securities.  Considering the returns data provided as an example above, as of the end of the Second Quarter of 2017, the Inflation Hedges Portfolio had generated three- and five-year annualized returns of -9.20% and -3.85%, respectively.  Both the Vanguard and PIMCO funds achieved superior performance: the Vanguard fund returned 0.68% annualized over the previous three years and 0.25% annualized over the previous five years, while the PIMCO fund returned 2.58% annualized over the previous three years and 2.76% annualized over the previous five years.

73.     As of the end of the Third Quarter of 2017, the Inflation Hedges Portfolio had generated three- and five-year annualized returns of -4.77% and -4.10%, respectively.  Both the Vanguard and PIMCO funds achieved superior performance: the Vanguard fund returned 1.60% annualized over the previous three years and -0.03% annualized over the previous five years, while the PIMCO fund returned 3.22% annualized over the previous three years and 2.43% annualized over the previous five years.

74.     As of the end of the Fourth Quarter of 2017, the Inflation Hedges Portfolio had generated three- and five-year annualized returns of 1.32% and -2.76%, respectively.  Both the Vanguard and PIMCO funds achieved superior performance: the Vanguard fund returned 1.94% annualized over the previous three years and 0.10% annualized over the previous five years, while the PIMCO fund returned 2.80% annualized over the previous three years and 2.21% annualized over the previous five years.

75.     Indeed, an objective examination of the Inflation Hedges Portfolio against any of the best available inflation-sensitive funds would have resulted in the replacement of the former with one of the latter.  While participants should have had the option to hedge against inflation

risk at minimal cost, Defendants' imprudence in retaining the Inflation Hedges Portfolio instead forced them to pay at least 72 basis points (0.72%) for the same privilege, to say nothing of the Portfolio's endemic performance issues. Defendants' failure to replace this expensive, underachieving investment option with a cheaper, better performing alternative was a severe breach of fiduciary duty.

76.    ***The Jennison Opportunistic Equity Collective Investment Trust***. This investment is sub-advised by Jennison Associates LLC as a collective investment trust of the Prudential Trust Company. The CIT was created for the Plan and added to the lineup at the beginning of July 2015. Defendants' selection of the CIT raises questions about their impartiality towards an investment sub-advised by an affiliate of the Plan sponsor. The CIT was chosen along with the Alliance Bernstein Core Opportunities Fund as part of a restructure of the Plan fund menu whereby the large and mid cap growth and value investment options were consolidated into two all cap funds. Among the five finalists considered by Bellwether, the Jennison CIT ranked poorly in both return and risk measurements. Indeed, at the time it was chosen, the CIT ranked fourth out of five candidates in risk-adjusted returns considering all trailing periods, had the highest standard deviation (return volatility) and tracking error (active return volatility), and had the joint-worst downside protection.[5] The Investment Oversight Committee inexplicably ignored the foregoing attributes and selected the Jennison CIT in spite of the statistical measurements, available to the fiduciaries in real time, suggesting that the CIT was not the best choice for Plan participants. As a further indication, the quarterly materials provided to the committee at its December 2, 2015 meeting, reflecting investment returns as of

---

[5]For comparison, the Alliance Bernstein fund had the strongest risk-adjusted returns among the candidates, lowest standard deviation, and best downside protection, and was middle of the group in tracking error.

the end of the Third Quarter of 2015 (the first quarter after the CIT was added), showed the CIT trailing its benchmark, the Russell 3000 Index, by 0.87% on a three-year annualized basis and 1.54% on five-year annualized basis, and ranking in the 61st percentile of its peers over the preceding three years and in the 55th percentile over the preceding five years.  The minutes of this meeting, which was attended by Taylor, Sleyster and Neubeck, indicate that Bellwether acknowledged the CIT's underperformance.

77.    Ultimately, the CIT never managed to produce more favorable returns, continually lagging its index and peers.  Defendants inexplicably ignored the continued underperformance and its deleterious effect on participant account balances at each quarterly meeting.  Just over three years later, on December 7, 2018, Defendants finally acknowledged their error in selecting the CIT and chose to remove it from the Plan lineup, citing performance issues.  At that meeting, the Investment Oversight Committee viewed the below chart of the CIT's quarterly returns against its benchmark, the Russell 3000 Index, and determined that underperformance in 13 of the most recent 20 quarters required removal of the investment.



78.    This same chart was provided to the Investment Oversight Committee at its August 27, 2015 meeting, the first meeting after the CIT's addition to the lineup.  This meeting was attended by Taylor, Sleyster and Neubeck.  Viewing the same most recent 20 quarters (five years), the committee should have noticed a similar inability by the CIT's manager to provide active returns even half the time, as 11 out of the 20 quarters preceding the CIT's selection

trailed the benchmark. Bellwether also acknowledged the CIT's five-year annualized underperformance.



79.     Investment professionals and prudent fiduciaries prefer an investment option that is consistently able to outperform its benchmark to those that have infrequent substantial outperformance. The Jennison CIT clearly did not exhibit that desired consistency at the time of its selection. The Investment Oversight Committee was provided the same chart and uninspiring returns data every quarter, yet its process, or lack thereof, for evaluating investment performance permitted the CIT to remain as a Plan investment option far past its "sell by" date. Indeed, the chart supplied to the Investment Oversight Committee at its September 12, 2016 meeting, reflecting quarterly returns as of the end of the Second Quarter of 2016, showed *the exact same 13 of 20 quarters of underperformance* that ultimately convinced the committee to remove the CIT one and a half years later.



80.     At that meeting, which was attended by Taylor, Sleyster and Neubeck, no action was taken by the Investment Oversight Committee, even though this exact same measure of

underperformance was deemed by Defendants to form a sufficient basis to fire the manager in late 2018.  Apparently, the CIT's status as an investment offered by a Prudential affiliate held sway with Defendants, who failed to maintain a rigorous and consistent process to ensure that poor performing investment choices were timely removed.  Indeed, Defendants' failure to consistently apply the same performance standards needlessly saddled participants with unnecessarily long exposure to the CIT's poor returns.

81.     ***The Wells Capital International Bond Institutional Select Fund***.  Just as with the Jennison Opportunistic Equity CIT, the Wells Capital International Bond Fund was allowed to linger in the Plan lineup despite consistently poor returns that should have seen it removed long before it was ultimately eliminated from the Plan.  The Fund consistently and significantly underperformed its benchmark, the Barclays Global Aggregate Bond ex-US Index, on a three- and five-year annualized basis and consistently ranked poorly among other world bond funds during the Class Period.  The Investment Oversight Committee was regularly furnished with the Fund's disappointing performance data yet neglected to follow a prudent investment evaluation process and ignored this negative trend.  For example, the quarterly report for the Fourth Quarter of 2016, reflecting investment returns as of the end of the same quarter, showed the International Bond Fund underperforming its benchmark by 1.00% on a three-year annualized basis and 0.48% on a five-year annualized basis (both more than the 20 basis points of underperformance highlighted as automatic cause for greater scrutiny in the IPS).  Moreover, the quarterly materials reflect the Fund's low standing among funds in the Morningstar World Bond ex-US grouping; the Fund's three-year returns ranked in the 68th percentile among its peers, while the five-year returns ranked in the 79th percentile.  This performance data, indicating an investment manager unable to add value through active management, was made available to the Investment Oversight

Committee at its meeting on March 1, 2017, yet the committee ignored the clear indicators that Plan participants might be better served by an alternative world bond fund.  The minutes of this meeting, which was attended by Taylor, Sleyster and Neubeck, indicate that Bellwether explicitly acknowledged the International Bond Fund's underperformance.

82.     Defendants' inaction in response to poor performance was not an isolated incident.  The quarterly report reflecting investment returns as of the end of the First Quarter of 2017, presented to the Investment Oversight Committee at its meeting on May 23, 2017, showed the International Bond Fund underperforming its benchmark by 0.69% on a three-year annualized basis and 0.04% on a five-year annualized basis, while ranking in the 67th percentile among its peers for three-year returns and 60th percentile for five-year returns.  The minutes of this meeting, which was attended by Taylor, Sleyster and Neubeck, indicate that Bellwether acknowledged the International Bond Fund's underperformance.  The following quarterly report, furnished to the Investment Oversight Committee at its meeting on September 8, 2017, showed the International Bond Fund underperforming its benchmark by 0.79% on a three-year annualized basis and 0.06% on a five-year annualized basis while ranking in the 80th percentile over the preceding three years and the 65th percentile over the preceding five years as of the end of the Second Quarter of 2017.  The minutes of this meeting, which was attended by Sleyster and Neubeck, also indicate that Bellwether acknowledged the International Bond Fund's underperformance.

83.     The Fund's performance issues persisted, and, every quarter, the Investment Oversight Committee received and refused to act upon materials signaling the troubling returns associated with the International Bond Fund.  Materials showing this stark inability to execute were provided to the Investment Oversight Committee every quarter and were ignored.

Defendants finally chose to replace the fund on December 7, 2018. Given the Fund's poor track record earlier in the Class Period, it should necessarily have been removed from the Plan lineup at least six quarters before the decision was ultimately made. Again, Defendants' failure to maintain a rigorous and consistent process burdened participants with nearly two additional years of the fund's lacking returns.

84.     To be clear, none of the above analysis contained in paragraphs 54-83 regarding the challenged investments in based on any hindsight analysis. Rather, it is based on information in Defendants' possession at the time they made or failed to make decisions concerning the challenged investments.

### 2.    GoalMaker

85.     GoalMaker is an optional asset allocation and proprietary tool created and provided to the Plan by Prudential that allocates a participant's retirement funds among certain Plan investment options according to the participant's age and risk tolerance. The service automatically rebalances a participant's assets among the various funds in accordance with a predetermined asset mix that shifts to become more conservative as one gets closer to retirement. GoalMaker creates model portfolios from investments already in a plan's investment menu. These portfolios, based on a participant's time horizon, are broken down into Conservative, Moderate, and Aggressive. In the Plan, the program served as another tool for Prudential to further enrich itself by funneling participant dollars into proprietary Prudential products.

86.     In the Plan, the Investment Oversight Committee select the limited universe of investment options from which the third-party manager of GoalMaker, Mesirow Financial Investment Management, Inc. ("Mesirow"), creates portfolios. Thus, Mesirow is constrained in the construction of its portfolios within the context of the Plan's investment menu, and,

34

accordingly, is required to fill the portfolios with Prudential funds; Mesirow did not have the discretion to avoid GoalMaker's concentration of assets in Prudential products.

87.     Any suggestion that Prudential and the Investment Oversight Committee are not fiduciaries with regard to GoalMaker ignores that Prudential and the Investment Oversight Committee define the universe of investment alternatives among which GoalMaker may allocate participant dollars, and that Prudential and the Investment Oversight Committee actively influence the concentrations of those dollars within GoalMaker.  Mesirow is tasked with setting the asset allocation of the various GoalMaker portfolios, but has succumbed to significant pressure from Prudential in doing so.  Indeed, in a presentation to the Investment Oversight Committee from late 2016, when Mesirow took over management of GoalMaker from Prudential and the Investment Oversight Committee, Mesirow expressed concern about the significant allocation in the then-current GoalMaker portfolios to the Prudential Fixed Rate Fund, noting that Prudential's allocation far exceeded Mesirow's typical maximal stable value allocation. The high Fixed Rate Fund allocation, however, did not change, confirming that Mesirow was not making independent decisions and that Prudential and the Investment Oversight Committee were influencing the construction of the GoalMaker portfolios in a self-interested manner, as the Fixed Rate Fund is an enormously profitable product for Prudential.  Indeed, in maintaining the high concentration in the Fixed Rate Fund within GoalMaker, Prudential and the Investment Oversight Committee specifically chose profits to Prudential over returns to the Plan and its participants.  Notably, Mesirow's presentation noted its willingness to compromise on its typical asset mix to accommodate Prudential's then-current allocations.

88.     At all times during the Class Period, GoalMaker has advanced the interests of Prudential by disproportionately allocating participant funds to investments managed by

35

Prudential or its affiliates.  The Plan lineup is substantially composed of proprietary investments, with Prudential-affiliated funds comprising 57% of the options as of June 30, 2019.  By contrast, GoalMaker creates portfolios from choices that are 70% Prudential-affiliated and allocates at least 71% of assets to Prudential products no matter how close an individual is to retirement.  By the time participants reach retirement, GoalMaker has almost completely phased out their investments in any non-Prudential fund; an individual over age 65, and therefore considered "in retirement" by GoalMaker, will have an incredible 98% of their retirement assets in products managed by Prudential or its affiliates.

89.    Exacerbating GoalMaker's transparent attempts to steer participant assets into proprietary funds is the Conservative GoalMaker portfolio's role since 2008 as the Plan's Qualified Default Investment Alternative ("QDIA").  Pursuant to U.S. Department of Labor ("DOL") regulations, retirement plan fiduciaries can designate one of the investment offerings in a plan or, in this case, a service as a substitute for an investment offering, from its lineup as the QDIA to aid participants who lack the knowledge or confidence to make investment elections for their retirement assets; if participants do not direct where their assets should be invested, all contributions are automatically invested in the QDIA.  Plan fiduciaries are responsible for the prudent selection and monitoring of an appropriate QDIA.  GoalMaker's function as the QDIA has helped augment its number of users in the Plan; as of December 31, 2017, approximately 27.6% of the Plan's 44,910 participants utilized the GoalMaker tool.  Though the GoalMaker service is optional for participants who choose to direct their contributions, for those participants who elect to do nothing, GoalMaker is not.  Accordingly, GoalMaker is not truly a voluntary tool, as a substantial portion of the participant population has their entire account balance automatically allocated by GoalMaker.  Indeed, over a quarter of the Plan's participants were

having their retirement funds gradually steered toward products that would further enrich

Prudential and its affiliates through the collection of investment management fees and away from

those funds from which Prudential derived no revenues.  Thus, Prudential and the Investment

Oversight Committee are and were fiduciaries with regard to GoalMaker due to the authority

they wielded over which investment or service to designate as the QDIA and their discretion to

define the investment menu from which Mesirow could select the components of its GoalMaker

portfolios.

90.    The Investment Oversight Committee failed to investigate whether Plan

participants would be better situated with the addition of a suite of target date funds,[6] by far the

most widely utilized QDIA in defined contribution plans, to the investment menu in lieu of

GoalMaker.  Had the Investment Oversight Committee acted in the sole interest of Plan

participants by, for example, simply weighing the benefits of the GoalMaker asset allocation

service against the most widely utilized target date suites (which are asset allocation investment

vehicles bereft of the substantial concentration of Prudential-affiliated investments that plagues

GoalMaker portfolios), it would inevitably have come to the conclusion that GoalMaker's

inferior returns were costing Plan participants significant growth in their retirement assets,

resulting in losses of millions of dollars.  The Investment Oversight Committee undertook no

such analysis, however, because the GoalMaker service directs millions of participant dollars

into Prudential products.  The Investment Oversight Committee need not have scoured the

market to find an appropriate target date suite; participant retirement savings would have been

remarkably augmented by investing in any of the top available target date families, which are

---

[6]A target date fund is an all-in-one retirement solution that serves the same function as GoalMaker, providing simple asset allocation through a portfolio of underlying funds that gradually shifts to become more conservative as the year of retirement approaches.

typically used in similarly situated defined contribution plans.  Target date fund assets are heavily concentrated among a handful of proven managers, any of which provide a clearly superior option to GoalMaker.  For example, the table below shows the five-year annualized returns[7] as of December 31, 2017 of the Conservative GoalMaker portfolio,[8] which serves as the Plan's default investment, at different ages, compared to the vintage of Vanguard, American Funds, and T. Rowe Price target date funds[9] with a time horizon most closely resembling GoalMaker's.[10]

| 5-Year Trailing Return | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Conserative GoalMaker | | | Vanguard TDF | | Am Funds TDF | | T. Rowe Price TDF | |
| Years to Retirement | Return | Target Year | Return | GM Outperf | Return | GM Outperf | Return | GM Outperf |
| 0-5 | 5.52% | 2020 | 8.50% | -2.98% | 8.93% | -3.41% | 9.09% | -3.57% |
| 6-10 | 6.82% | 2025 | 9.36% | -2.54% | 10.36% | -3.54% | 10.06% | -3.24% |
| 11-15 | 7.72% | 2030 | 10.13% | -2.41% | 11.50% | -3.78% | 10.92% | -3.20% |
| 16+ | 8.58% | 2035 | 10.90% | -2.32% | 12.13% | -3.55% | 11.53% | -2.95% |

91.     The Investment Oversight Committee was provided the above GoalMaker returns, as it was every quarter, at its meeting on March 26, 2018, alongside no comparator or benchmark.  The committee members made no attempt to investigate how the returns GoalMaker provided to Plan participants compared to what growth participants could achieve through alternative asset allocation options.  The Investment Oversight Committee benchmarked the

---

[7] Three-year returns data as of December 31, 2017 is not publicly available for two of the three comparator target date funds.

[8] Although better than the Conservative GoalMaker portfolio, the Moderate and Aggressive GoalMaker portfolios also produced returns that fell far short of the target date fund comparators.

[9] The Vanguard Target Retirement Funds, American Funds Target Date Retirement Funds, and T. Rowe Price Retirement Funds represent three of the five largest investment managers by total assets in the target date space, together holding approximately 55% of all target date assets as of the end of 2017.

[10] For example, by the end of 2017, a participant who fell into the "11-15 years to retirement" bracket would appropriately invest in a 2030 target date fund, as the fund series are offered for every five years.

performance of every individual investment in the Plan lineup, but inexplicably failed to scrutinize the performance of the default allocation service in which over a quarter of the Plan's participants were invested. Had the Investment Oversight Committee engaged in any such examination, they would have found that the retirement savings of Plan participants would be significantly better off invested in any of the above target date funds. The Investment Oversight Committee should have removed their proprietary GoalMaker as a tool from the Plan and replaced it with a more suitable target date fund; likewise, GoalMaker never should have been designated as the Plan's QDIA.

92.     Like a target date fund, GoalMaker is designed to be the only investment election a participant makes. In other words, both target date funds and the portfolios created by GoalMaker are intended to hold 100% of a participant's account balance. Prudential and the Investment Oversight Committee's failure to provide an appropriate QDIA caused harm to the Plan and all participants, including Plaintiff, by failing to provide them with (1) an appropriate default investment option to serve as an all-in-one retirement solution; and (2) a target date fund alternative that was suitable for participants' retirement needs. If Prudential and the Investment Oversight Committee had offered an appropriate target date fund alternative, Plaintiff would have considered and likely invested in such target date alternative.

### 3.    The PESP Fixed Rate Fund

93.     Although the GoalMaker service is analogous to a target date fund, its ability to generate substantial returns is hampered by the profusion of Prudential products, including the PESP Fixed Rate Fund (the "Fixed Rate Fund"), a proprietary stable value fund which assets are held in Prudential's general account. In the GoalMaker service, the Fixed Rate Fund occupies, at all time horizons, between a 6% and 36% position in the Plan's QDIA. The Plan's overall asset

mix weights even more heavily to the Fixed Rate Fund, with 41%[11] of its nearly $8.7 billion in assets invested in the stable value option, or over $3.5 billion. This incredible balance is problematic for the Plan's overall ability to grow participants' retirement savings; although the Fixed Rate Fund provides a guaranteed interest rate, currently set at 3.5%, its substantial concentration is a considerable drag on the Plan's performance. A benchmarking study provided to Prudential and the Investment Oversight Committee by CEM Benchmarking determined that the Plan participants' 2017 average total return measured well below par in a universe of similarly situated defined contribution plans.[12]



94.    The study identified the Plan's asset mix as the root cause, and specifically observed that the 41% concentration of assets in the stable value option (*i.e.*, the Fixed Rate Fund) was a red flag. By contrast, the average plan in the similarly situated universe had 11% of assets in its stable value option; the median plan came in at 8%. Indeed, there are far more assets

---

[11]As of December 31, 2017.
[12]The universe comprises 122 plans with total assets between $1.2 billion and $20.1 billion. The median asset size of the universe is $5.7 billion.

in the Fixed Rate Fund than in the stable value fund in the average plan in Prudential's own

defined contribution plan book of business.

| Percent of Plan Assets in Stable Value Option | | | | | | |
|---|---|---|---|---|---|---|
| | Participant Age | | | | | |
| | >25 | 25-34 | 35-44 | 45-54 | 55-65 | 65+ |
| **PESP** | 8.2% | 8.6% | 12.9% | 22.1% | 41.3% | 68.0% |
| **Prudential Book of Business** | 10.4% | 9.0% | 10.5% | 15.8% | 27.9% | 46.7% |

95.     As another product generating significant revenues for Prudential, both from fees

and the spread between the crediting rate and what the Fixed Rate Fund actually returns,

Defendants were incentivized to steer participant dollars into the fund.  Before the Fixed Rate

Fund served as a significant component in the Plan's current QDIA, it *was* the Plan's QDIA until

2008.  It is obvious that Defendants have directed all participants to the GoalMaker and Fixed

Rate Fund to enrich Prudential.  It was a significant and apparent breach of fiduciary for

Defendants to do so.

## CLASS ACTION ALLEGATIONS

96.     This action is brought as a class action by Plaintiff on behalf of himself and the

following proposed class ("Class"):

> All participants and beneficiaries in the Prudential Employee
> Savings Plan (the "Plan") at any time on or after November 5, 2013
> to the present (the "Class Period" or "Relevant Time Period"),
> including any beneficiary of a deceased person who was a participant
> in the Plan at any time during the Class Period.

Excluded from the Class are Defendants, any other fiduciaries to the Plan and Judge to whom this

case is assigned or any other judicial officer having responsibility for this case who is a beneficiary.

97.     This action may be maintained as a class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure.

98.    **Numerosity**.  Plaintiff is informed and believes that there are at least thousands of Class members throughout the United States.  As a result, the members of the Class are so numerous that their individual joinder in this action is impracticable.

99.    **Commonality**.  There are numerous questions of fact and/or law that are common to Plaintiff and all the members of the Class, including, but not limited to the following:

(a)    whether Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants for the exclusive purpose of providing benefits to participants and their beneficiaries;

(b)    whether Defendants breached their fiduciary duties under ERISA by failing to defray the reasonable expenses of administering the Plan; and

(c)    whether and what form of relief should be afforded to Plaintiff and the Class.

100.    **Typicality**.  Plaintiff, who is a member of the Class, has claims that are typical of all of the members of the Class.  Plaintiff's claims and all of the Class members' claims arise out of the same uniform course of conduct by Defendants and arise under the same legal theories that are applicable as to all other members of the Class.

101.    **Adequacy of Representation**.  Plaintiff will fairly and adequately represent the interests of the members of the Class.  Plaintiff has no conflicts of interest with or interests that are any different from the other members of the Class.  Plaintiff has retained competent counsel experienced in class action and other complex litigation, including class actions under ERISA.

102.    **Predominance**.  Common questions of law and fact predominate over questions affecting only individual Class members, and the Court, as well as the parties, will spend the vast majority of their time working to resolve these common issues.  Indeed, virtually the only

individual issues of significance will be the exact amount of the Plan's losses allocable to each Class member, the calculation of which will ultimately be a ministerial function and which does not bar Class certification.

103.    **Superiority**.  A class action is superior to all other feasible alternatives for the resolution of this matter.  The vast majority, if not all, of the Class members are unaware of Defendants' breaches of fiduciary duty and prohibited transactions such that they will never bring suit individually.  Furthermore, even if they were aware of the claims they have against Defendants, the claims of virtually all Class members would be too small to economically justify individual litigation.  Finally, individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the courts and of the parties, and potentially could lead to inconsistent results that would be contrary to the interests of justice.

104.    **Manageability**.  This case is well-suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a Class-wide basis, while the allocation and distribution of damages to Class members would be essentially a ministerial function.

105.    Defendants have acted on grounds generally applicable to the Class by uniformly subjecting them to the breaches of fiduciary duty described above.  Accordingly, injunctive relief, as well as legal and/or equitable monetary relief (such as disgorgement and/or restitution), along with corresponding declaratory relief, are appropriate with respect to the Class as a whole.

**COUNT I**
**(For Breach of Fiduciary Duty – Against All Defendants)**

106.    Plaintiff incorporates the allegations in the previous paragraphs of this Third Amended Complaint as if fully set forth herein.

107.     Defendants' conduct, as set forth above, violates the fiduciary duties defined under ERISA Sections 404(a)(1)(A), (B), and (D), 29 U.S.C. § 1104(a)(1)(A), (B), and (D), in that Defendants failed and continue to fail to discharge their duties with respect to the Plan solely, in the interest of the Plan's participants and their beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries, and (ii) defraying reasonable expenses of administering the Plan with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and like aims, and (c) by failing to act in accordance with the documents and instruments governing the Plan.  In addition, as set forth above, Defendants violated their respective fiduciary duties under ERISA to monitor other fiduciaries of the Plan in the performance of their duties and by failing to provide timely, accurate and complete information to the Plan participants regarding the investments in the Plan when they undertook the duty to do so.

108.     As a direct result of Defendants' breaches of duties, Plaintiff and the Plan have suffered losses and damages.

109.     Pursuant to ERISA Sections 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2), Defendants are liable to restore to the Plan the losses that have been suffered as a direct result of Defendants' breaches of fiduciary duty and are liable for damages and any other available equitable or remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs and other recoverable expenses of litigation.

## COUNT II
### (Failure to Monitor Fiduciaries – Against Prudential and the Investment Oversight Committee)

110.    Plaintiff incorporates the allegations in the previous paragraphs of this Third Amended Complaint as if fully set forth herein.

111.    Prudential is responsible for appointing, overseeing, and removing members of the Investment Oversight Committee.

112.    In light of its appointment and supervisory authority, Prudential had a fiduciary responsibility to monitor the performance of the Investment Oversight Committee, the Individual Defendants, and Bellwether.  In addition, the Investment Oversight Committee had a fiduciary responsibility to monitor the performance of Individual Defendants and Bellwether.

113.    A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

114.    To the extent that fiduciary monitoring responsibilities of Prudential or the Investment Oversight Committee were delegated, each Defendant's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

115.    Prudential and the Investment Oversight Committee breached their fiduciary monitoring duties by, among other things:

      (a)    Failing to monitor and evaluate the performance of their appointees or have a system in place for doing so, standing idly by as the Plan suffered enormous losses as a result of the appointees' imprudent actions and omissions with respect to the Plan;

      (b)    Failing to monitor their appointees' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein, in clear violation of ERISA; and

45

      (c)    Failing to remove appointees whose performances were inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and Plan participants' retirement savings.

116.    As a consequence of these breaches of the fiduciary duty to monitor, the Plan suffered substantial losses.  Had Prudential and the Investment Oversight Committee discharged their fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct result of the breaches of fiduciary duties alleged herein, the Plan and its participants have lost millions of dollars of retirement savings.

117.    Prudential and the Investment Oversight Committee are liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, to restore to the Plan any profits made through use of Plan assets, and are subject to other equitable or remedial relief as appropriate.  Each also knowingly participated in the breaches of the other Defendants, knowing that such acts were a breach; enabled the other Defendants to commit a breach by failing to lawfully discharge their own fiduciary duties; and knew of the breaches by the other Defendants yet failed to make any reasonable effort under the circumstances to remedy the breaches. Prudential, thus, is liable for the losses caused by the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

## NOTICE PURSUANT TO ERISA § 502(h)

To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h), the undersigned hereby affirms that, on this date, a true and correct copy of this Third Amended

Complaint was served upon the Secretary of Labor and Secretary of Treasury by certified mail, return receipt requested.

Dated: September 12, 2022                    Respectfully submitted,

                                             **MILLER SHAH LLP**

                                             */s/ James C. Shah*
                                             Natalie Finkelman Bennett
                                             James C. Shah
                                             Alec J. Berin
                                             Miller Shah LLP
                                             2 Hudson Place, Suite 100
                                             Hoboken, NJ 07030
                                             Telephone: (866) 540-5505
                                             Facsimile: (856) 300-7367
                                             Email: jcshah@millershah.com
                                                     nfinkelman@millershah.com
                                                     ajberin@millershah.com

                                             James E. Miller
                                             Laurie Rubinow
                                             Miller Shah LLP
                                             65 Main Street
                                             Chester, CT 06412
                                             Telephone: (860) 526-1100
                                             Facsimile: (866) 300-7367
                                             Email: jemiller@millershah.com
                                                     lrubinow@millershah.com

                                             Ronald S. Kravitz
                                             Kolin C. Tang
                                             Miller Shah LLP
                                             201 Filbert Street, Suite 201
                                             San Francisco, CA 94133
                                             Telephone: (415) 429-5272
                                             Facsimile: (866) 300-7367
                                             Email: rskravitz@millershah.com
                                                     kctang@millershah.com

James E. Cecchi
Caroline F. Bartlett
Carella Byrne Cecchi Olstein Brody
& Agnello, P.C.
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
Email: jcecchi@carellabyrne.com
   cbartlett@carellabyrne.com

***Attorneys for Plaintiff, the Plan,
and the Proposed Class***