**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| YOUNG CHO, Individually and as Representative of a Class of Similarly Situated Persons, and on Behalf of the PRUDENTIAL EMPLOYEE SAVINGS 401(k) PLAN, | Civil Action No. 19-19886 |
| *Plaintiff*, | **OPINION** |
| v. | |
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, *et al*., | December 19, 2024 |
| *Defendants*. | |

**SEMPER**, District Judge.

This putative class action, brought under the Employee Retirement Income Security Act ("ERISA"), arises out of allegations that fiduciaries of the Prudential Employee Savings Plan breached their fiduciary duties. Currently, this matter comes before the Court on the following motions: (1) Defendants Prudential Insurance Company of America ("PICA"), the Investment Oversight Committee (the "IOC"), and the IOC's members collectively ("Members") (collectively "Defendants") motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 (ECF 178); (2) Defendants' motion to exclude the opinions and testimony of Marcia S. Wagner, Richard A. Marin, and Svetla K. Tzenova pursuant to Federal Rule of Evidence 702 (ECF 180); (3) Plaintiffs' motion to preclude the opinions and testimony of Russel R. Wermers pursuant to Federal Rule of Evidence 702 (ECF 184); and (4) Plaintiffs' motion to strike the declaration of Russel R. Wermers in support of Defendants' motion for summary judgment pursuant to Federal

Rules of Civil Procedure 26 and 37. (ECF 186.) The Court reviewed the parties' submissions[1] and considered the motion without oral argument pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1(b). For the reasons discussed below, Defendants' motion for summary judgment (ECF 178) is **GRANTED**. Plaintiffs' motion to strike the declaration of Russel R. Wermers (ECF 186) is **DENIED.** Defendants' and Plaintiffs' respective motions to preclude expert testimony (ECF 180; ECF 184) are **DENIED as moot**.

## I.    BACKGROUND AND PROCEDURAL HISTORY[2]

On September 12, 2022, Plaintiff – Young Cho, a former employee of PICA and participant in the Prudential Employee Savings Plan – filed his TAC seeking to recover damages under Employee Retirement Income Security Act of 1974, as amended 29 U.S.C. § 1001, *et seq.* ("ERISA") for Defendants' (1) alleged breach of fiduciary duties (Count I); and PICA's and IOC's (2) failure to monitor fiduciaries (Count II). (*See generally* ECF 136.)

### A.  Third Amended Complaint[3]

In the TAC, Plaintiffs allege that "[t]he Plan is an 'employee pension benefit plan' within the meaning of 29 U.S.C. § 1002(2)(A) and a 'defined contribution plan' within the meaning of 29 U.S.C. § 1002(34)" and is commonly referred to as a "401(k) plan." (TAC ¶ 17.) The available

---

[1] For purposes of the summary judgment motion, the submissions consist of Defendants' motion for summary judgment, (ECF 178), and the accompanying brief, (ECF 179, "Defs. MSJ. Br."); Plaintiffs' opposition, (ECF 182, "Pls. MSJ. Opp."); and Defendants' reply, (ECF 204-1, "Def. MSJ. Reply"). (For purposes of the motion to strike, the submissions consist of Plaintiffs' motion to strike the declaration of Russel Wermers, (ECF 186), and the accompanying brief, (ECF 187 "Pl. Mot."); Defendants' opposition, (ECF 189, "Defs. Opp."); and Plaintiffs' reply, (ECF 192, "Pl. Reply.")

[2] Unless otherwise indicated, the Court draws the following facts from Defendants' Statement of Undisputed Material Facts ("DSOMF", ECF 179-1), Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts and Counter Statement of Material Facts ("PSOMF", ECF 182-1), and Defendants' Reply to Plaintiffs' Response to Defendants' Statement of Facts and Response ("DRSOMF", ECF 204-1.) The Court will not consider any statements made in these filings that are unsupported, conclusory allegations. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (explaining a non-moving party must go "beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, [and] designate specific facts showing that there is a genuine issue for trial" to survive a motion for summary judgment) (internal quotation marks omitted).

[3] To orient the parties, the Court briefly discusses the substance of the TAC.

menu of investment options is curated by Defendants, specifically by the Investment Oversight Committee ("IOC"). (*Id.*) The IOC retained an investment advisor for the Plan, Bellwether Consulting LLC ("Bellwether"), which provided quarterly Investment Performance Monitor reports. (*Id.* ¶ 54 n.4.)

Plaintiffs claim that Defendants "severely mismanaged the Plan" by selecting imprudent investment options and by failing "to monitor all of the investments in the Plan to ensure that they provided adequate returns and were not excessively priced, as were many of the investments in the Plan lineup." (*Id.* ¶ 44.) Plaintiffs claim the IOC knew or should have known "that better performing, lower-cost, comparable alternative investments were readily available as compared to the challenged investments[.]" (*Id.* ¶ 47.) Plaintiffs assert that all Defendants were fiduciaries of the Plan and violated ERISA Section 404, 29 U.S.C. § 1104, "by failing to act solely in the interest of the Plan and its participants and beneficiaries and failing to exercise the required care, skill, prudence, and diligence in investing the assets of the Plan and disclosing the fees charged to the participants." (*Id.* ¶ 49.)

Plaintiffs claim that "[i]n addition to unreasonably excessive fees charged by several of the investments available to Plan participants, several of the most expensive funds also produced poor returns relative to their respective benchmarks and other similar alternative funds, rendering these objectively imprudent investments, and their selection and retention by Defendants[] a breach of their fiduciary duty." (*Id.* ¶ 51.) Plaintiffs challenge five funds specifically: (1) the Prudential Retirement Real Estate Fund (*id.* ¶¶ 54-60); (2) the Prudential High Yield Collective Investment Trust (*id.* ¶¶ 61-68); (3) the Wellington Trust Company CIF II Diversified Inflation Hedges Portfolio (*id.* ¶¶ 69-75); (4) the Jennison Opportunistic Equity Collective Investment Trust (*id.* ¶¶ 76-80); and (5) the Wells Capital International Bond Institutional Select Fund (*id.* ¶¶ 81-83).

Plaintiffs also allege that Defendants breached their fiduciary duties by implementing an "optional asset allocation and proprietary tool" named "GoalMaker."[4] (*Id.* ¶ 85.) Plaintiffs claim that GoalMaker "has advanced the interests of Prudential by disproportionately allocating participant funds to investments managed by Prudential or its affiliates." (*Id.* ¶ 88.) Additionally, the Conservative GoalMaker portfolio is the Plan's Qualified Default Investment Alternative ("QDIA"). (*Id.* ¶ 89.) Plaintiffs claim that if the IOC had weighed the benefits of GoalMaker against a suite of target date funds, which are "by far the most widely utilized QDIA in defined contribution plans," they would "inevitably have come to the conclusion that GoalMaker's inferior returns were costing Plan participants significant growth in their retirement assets, resulting in losses of millions of dollars." (*Id.* ¶ 90.)

Plaintiffs assert that GoalMaker's "ability to generate substantial returns is hampered by the profusion of Prudential products, including the PESP Fixed Rate Fund . . . a proprietary stable value fund which assets are held in Prudential's general account." (*Id.* ¶ 93.) This "substantial concentration," according to Plaintiffs, "is a considerable drag on the Plan's performance" and "is problematic for the Plan's overall ability to grow participants' retirement savings." *Id.* Plaintiffs explain that "Defendants were incentivized to steer participant dollars into the [PSEP Fixed Rate Fund]" and "directed all participants to the GoalMaker and [the PSEP Fixed Rate Fund] to enrich Prudential." (*Id.* ¶ 95.)

Count I of Plaintiffs' Third Amended Complaint alleges breach of fiduciary duty under ERISA against all Defendants. (TAC ¶¶ 106-09.) Count II alleges that Prudential breached its

---

[4] GoalMaker "allocates a participant's retirement funds among certain Plan investment options according to the participant's age and risk tolerance." (TAC ¶ 85.) "GoalMaker creates model portfolios from investments already in a plan's investment menu. These portfolios, based on a participant's time horizon, are broken down into Conservative, Moderate, and Aggressive." (*Id.*)

4

fiduciary duty to monitor the IOC, the Individual Defendants, and Bellwether, and that the IOC breached its fiduciary duty to monitor the Individual Defendants and Bellwether. (*Id.* ¶¶ 110-17.)

**B.  The Prudential Employee Savings Plan ("PESP" or the "Plan")**

PICA and its affiliates "are global leaders in financial services, investment management, and retirement products." (DSOMF ¶ 1.[5]) PICA sponsors the Plan, a 401(k) plan. (DSOMF ¶ 2; PSOMF ¶ 2.) Eligible current and former employees may participate in the Plan. (*Id.*) Generally, Plan participants have the opportunity to exercise control over their individual investment accounts by giving investment instructions at any time. (DSOMF ¶ 3.) The Plan has offered a diversified set of between 20 and 22 investment options from November 5, 2013 to the present (the "Class Period"). These options include a variety of asset classes, investment strategies, risk levels, and investment vehicles to provide for a wide range of investment preferences, sophistication, and risk tolerances. (*Id.* ¶ 4.) Information about the Plan, including information about available investment options, investment managers and allocations, fees, performance, and risk, is regularly provided or made available to participants. (DSOMF ¶ 5; PSOMF ¶ 5.) As of December 31, 2022, the Plan had approximately 43,000 participants and held approximately $9.8 billion total invested assets. (DSOMF ¶ 6; PSOMF ¶ 6.) From 2013 to 2022, the average account balance of participants in the Plan increased by forty-six percent (46%) from $156,560 to $228,638. (DSOMF ¶ 6; PSOMF ¶ 6.)

**C.  Investment Oversight Committee ("IOC")**

The Plan designates the IOC as a "named fiduciary" of the plan. (DSOMF ¶ 7; PSOMF ¶ 7.) The IOC is comprised of three individuals, all of whom are either current or former high-level

---

[5] For brevity, all citations to the parties' Rule 56.1 statements incorporate the evidentiary citations contained therein.

executives, who oversee investment-related responsibilities of the Plan. (DSOMF ¶ 9; PSOMF ¶ 9.) Since 2013, those members have been two financially sophisticated investment professionals and a senior human resource professional. (DSOMF ¶ 9; PSOMF ¶ 9.) The IOC's responsibilities include periodically reviewing the Plan's investment policy statement ("IPS"); selecting and monitoring Plan investment options in accordance with the IPS; monitoring investment manager performance and costs; and replacing and terminating investment managers or options when deemed necessary. (DSOMF ¶ 8; PSOMF ¶ 8.)

Consistent with the Plan's IPS, the IOC has delegated authority to a Chief Investment Officer ("CIO"), who manages the Plan's investment program and is responsible for, among other things, "serv[ing] as the primary point of contact for all investment-related vendors for PESP," for "monitoring and briefing the IOC on investment performance and fee benchmarking, as applicable," and for "propos[ing] appropriate actions for IOC approval." (DSOMF ¶ 18; PSOMF ¶ 18.) Since 2014, Gail Maytin ("Ms. Maytin") has been the CIO for PICA's ERISA funded benefits plans, including the Plan. (DSOMF ¶ 19; PSOMF ¶ 19.) Ms. Maytin leads an internal Employee Benefits Investments ("EBI") team to evaluate and monitor investments and makes recommendations subject to IOC approval. (DSOMF ¶ 20; PSOMF ¶ 20.)

The IOC meets at least quarterly and in advance of each IOC meeting, the EBI team prepares a briefing book. (DSOMF ¶ 30; PSOMF ¶ 30.) The briefing books include draft minutes from the prior quarter's meeting, quarterly performance reports prepared by Bellwether with detailed information—as outlined in the IPS—regarding each Plan investment, presentations or resolutions that will be discussed during the upcoming meeting, and any additional background information that may help the IOC. (*Id*.) Prior to each meeting, the EBI team, often with Bellwether, meets with IOC members to review the briefing book and discuss the topics on the

meeting agenda. (DSOMF ¶ 32; PSOMF ¶ 32.) The IOC members are active participants in these meetings, probing the information provided to them and engaging in discussions relevant to their fiduciary decisions regarding Plan investments. (DSOMF ¶ 32.) The IOC discusses Plan investment options, including the selection, monitoring, and removal of investment funds from the menu of available investment options. (*Id*.) When the IOC considers removing one of the investment funds from PESP's investment lineup, the IOC members evaluate and discuss potential replacement funds. (DSOMF ¶ 36; PSOMF ¶ 36.)

### D.  The Investment Policy Statement

The Plan's IPS is designed to guide the IOC's decision-making process by "providing general guidelines for selecting investment funds offered under [the Plan]." (DSOMF ¶ 37; PSOMF ¶ 37.) The IPS sets forth responsibilities related to management of the Plan, duties and responsibilities of the IOC, investment objectives, and guidance on evaluating and monitoring investment options. (DSOMF ¶ 37; PSOMF ¶ 37.) The IPS is a set of guidelines which grants the IOC discretion to deviate from, modify, or even terminate the IPS as needed. (DSOMF ¶ 38; PSOMF ¶ 38.)

The IPS describes the Plan's investment objectives, which include offering reasonable and materially different investment choices that diversify investments to minimize the risk of large losses and allow participants to develop a portfolio with risk and return characteristics and time horizons appropriate to their personal circumstances. (DSOMF ¶ 39; PSOMF ¶ 39.) The IPS identifies criteria for funds that should be placed on a "watch list" for heightened monitoring. (DSOMF ¶ 41; PSOMF ¶ 41.) The purpose of the watch list is to track funds whose performance is outside expectations. (DSOMF ¶ 41; PSOMF ¶ 41.)

For automatic addition to the watch list, the IPS points to 3-year and 5-year performance on three metrics: (1) an appropriate benchmark, (2) the Sharpe Ratio (a measure of how much return a fund is receiving relative to the risk it takes), and (3) an appropriate peer group. (DSOMF ¶ 42; PSOMF ¶ 42.) The current IPS, as amended in 2020, calls for a fund to be automatically placed on the watch list if (1) 3-year and 5-year net performance is 20 basis points or lower relative to an appropriate benchmark, (2) 3-year and 5-year risk-adjusted performance, as measured by the Sharpe Ratio, is 0.05 or lower relative to the risk-adjusted performance of the benchmark, and (3) 3-year and 5-year performance is at or below the 60th percentile ranking of the appropriate peer group. (DSOMF ¶ 42; PSOMF ¶ 42.)Once a fund is placed on the watch list, the IOC considers whether to retain or remove the fund from the Plan's investment lineup. (DSOMF ¶ 44; PSOMF ¶ 44.)

The IPS has been amended and restated twice since November 2013: on December 1, 2014 and on September 21, 2020. (DSOMF ¶ 47; PSOMF ¶ 47.) Before the IPS is amended, proposed changes are discussed at an IOC quarterly meeting and approved by the IOC. (DSOMF ¶ 47; PSOMF ¶ 47.)The 2014 updates were initiated by counsel, who reviewed the previous version with the Employee Benefits Investments team to make it "more robust, ensure operational consistency and consistency with the delegation of authority." (DSOMF ¶ 47; PSOMF ¶ 47.) The 2020 revisions updated the watch criteria. (DSOMF ¶ 47; PSOMF ¶ 47.)

### E.  Bellwether Consulting

The IOC and Ms. Maytin are assisted in carrying out their responsibilities by Bellwether Consulting LLC ("Bellwether"), which has worked with PESP since 2001. (DSOMF ¶ 27; PSOMF ¶ 27.) Bellwether is an independent investment consultant that advises more than $50 billion in assets. (DSOMF ¶ 27; PSOMF ¶ 27.) Bellwether specializes in providing investment advice to

sponsors of retirement plans and institutional investors. (DSOMF ¶ 27; PSOMF ¶ 27.) Bellwether assists Ms. Maytin and the IOC in identifying investment options, evaluating and monitoring performance of existing options, providing guidance on fiduciary responsibilities, and performing due diligence and recommending investment managers and options. (DSOMF ¶ 28.) The EBI team meets with Bellwether at least every other week to review and discuss the performance of Plan investments. (DSOMF ¶ 29.) Additionally, at the quarterly IOC meetings, the IOC receives presentations from Bellwether and the EBI team to review the Plan's investments' performance. (DSOMF ¶ 33; PSOMF ¶ 33.)

### F.  Challenged Funds

In Count I of the TAC, Plaintiffs allege a breach of the fiduciary duty of prudence against all Defendants. (TAC ¶ 107.) Specifically, Plaintiffs challenge the performance of five of the investment options available to PESP participants: the (1) Wellington Trust Company CIF II Diversified Inflation Hedges Portfolio ("DIH Fund"), (2) Prudential High Yield Collective Investment Trust ("High Yield CIT"), (3) Prudential Retirement Real Estate Fund ("PRREF"), (4) Jennison Opportunistic Equity Collective Investment Trust ("Jennison CIT"), and (5) Wells Capital International Bond Institutional Select Fund ("Wells Capital Fund"). (TAC ¶¶ 51-84.)

Two of the investment funds Plaintiffs challenge were removed from the Plan—the Jennison CIT and Wells Capital Fund. (DSOMF ¶ 51; TAC ¶¶ 80, 83.) Three of these investment funds remain in the Plan—the DIH Fund, High Yield CIT, and PRREF and Plaintiff contends that Defendants breached their fiduciary duties by "failing to 'follow a prudent investment evaluation process.'" (DSOMF ¶ 50; PSOMF ¶ 50.) Plaintiff alleges that the DIH Fund had exhibited "substantial and consistent underperformance" at the time of its addition to the Plan (PSOMF ¶ 50; TAC ¶ 69), that the High Yield CIT failed to achieve the written objective of its manager once

during the relevant period (PSOMF ¶ 50; TAC ¶ 61), and speculates the performance struggles of both the High Yield CIT and the PRREF were likely overlooked by Defendants due to the respective fund managers' affiliation with the Plan sponsor. (PSOMF ¶ 50; TAC ¶¶ 60, 68.)

Plaintiffs also assert a breach of fiduciary duty claim related to GoalMaker, an optional asset allocation tool available to PESP participants that considers Plan participants' stated risk tolerance, age, and anticipated retirement date to help participants select Plan investment options that are appropriate for them in various asset classes. (DSOMF ¶ 52; PSOMF ¶ 52.) Plaintiffs allege that Defendants caused the GoalMaker portfolios to be inappropriately concentrated in Prudential-affiliated funds to advance Prudential's financial interests, including through the designation of the Conservative GoalMaker portfolio as the Plan's QDIA. (TAC ¶¶ 85, 87-89.)

### G. Procedural History

The Court previously issued Opinions addressing motions to dismiss the Amended Complaint and Second Amended Complaint. (ECF 102; ECF 128.) The Court also issued an Opinion granting Plaintiff's motion for class certification, appointing Plaintiff Young Cho as Class Representative and appointing Miller Shah LLP and Carella Byrne Cecchi Olstein Brody & Agnello, P.C. as co-lead class counsel. Plaintiff filed the TAC on September 12, 2022, and Defendants answered. (ECF 139.)

## II.    LEGAL STANDARD

### A. Summary Judgment

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted if the movant shows that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a

motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Del. River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Unsupported allegations, subjective beliefs, or argument alone, however, cannot forestall summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1988) (nonmoving party may not successfully oppose summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."). Thus, if the nonmoving party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*,

477 U.S. at 322-23). Moreover, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48.

## III.    ANALYSIS

### A.   Motion to Strike Declaration of Russell R. Wermers In Support of Defendants' MSJ

As a threshold matter, Plaintiffs move to strike the declaration of Russell Wermers ("Wermers Declaration").

Pursuant to Rule 56(c), a party may support a motion for summary judgment with declarations, made on personal knowledge, that set out facts that would be admissible in evidence, and show that the declarant is competent to testify on the matters stated. As to the admissibility of expert opinions, Rule 26(a)(2) requires the disclosure of experts "at the times and in the sequence that the court orders," and each expert's report must contain a complete statement of all opinions the expert will express. Fed. R. Civ. P. 26(a)(2). A party also has a duty to timely supplement its expert disclosures if additions or changes need to be made. Fed. R. Civ. P. 26(e). "[C]ourts have refrained from 'automatically exclud[ing] [a later submission] an expert could have included in his or her original report.'" *See New Jersey Dep't of Env't Prot. v. Amerada Hess Corp.*, No. 156468-19, 2019 WL 4052431, at *4 (D.N.J. Aug. 28, 2019) (quoting *Crowley v. Chait*, 322 F. Supp. 2d 530, 551 (D.N.J. 2004)). An expert declaration "need not be stricken if it is merely 'an elaboration of and consistent with an opinion/issue previously addressed' in the expert report."[6]

---

[6] If a party violates the disclosure requirements of Rule 26, courts may impose sanctions under Rule 37. *See* Fed. R. Civ. P. 37. Specifically, Rule 37 provides "if a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." *Id.* "[S]ubstantial justification" for a failure to make a required disclosure has been regarded as "justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request." *United States v. Dentsply Intern., Inc.*, No. 99-5, 2000 WL 654378, *7 (D. Del. May 10, 2000).

*Amerada Hess Corp.*, 2019 WL 4052431, at *4 (quoting *Pritchard v. Dow Agro Scis.*, 263 F.R.D. 277, 284-85 (W.D. Pa. 2009)).

Therefore, "the Court must first determine whether the submission of the Declaration constitutes an improper supplementation of an expert report." *Amerada Hess Corp.*, 2019 WL 4052431, at *5. Because the Wermers Declaration does not contain new or contradictory opinions, it is not an improper expert report supplementation. *Id*. Dr. Wermers was retained by Defendants as an economic expert to evaluate, from an economic perspective, Plaintiffs' specific claims about the five Plan funds[7] they challenge, the Fixed Rate Fund, and GoalMaker (*id*. at Ex. 7, Wermers Rpt. ¶ 13), and to evaluate and rebut the opinions of Plaintiffs' experts (*id*. at Ex. 9, Wermers Reply Rpt. ¶ 7). Defendants timely served two reports prepared by Dr. Wermers. (Amert Decl. ¶¶ 15, 17.) In Dr. Wermers' initial expert report ("Opening Report"), Dr. Wermers concluded that the five funds challenged by Plaintiffs, the Fixed Rate Fund, and GoalMaker were all economically reasonable. (Amert Decl. at Ex. 9, Wermers Rpt. ¶ 18.) In his Reply Report ("Reply Report"), Dr. Wermers concluded that: (1) Plaintiffs' expert Dr. Svelta K. Tzenova's ("Dr. Tzenova") calculations of damages purportedly resulting from the performance of the five funds challenged by Plaintiffs were speculative and highly dependent on selected choices of replacement funds; and (2) extending Dr. Tzenova's calculation of GoalMaker damages from the particular end date of March 31, 2020, through December 31, 2022, led to negative estimated damages, which demonstrates that her damages estimate is speculative. (*Id*. ¶ 8.)

---

[7] The five funds are: the Prudential High Yield Collective Investment Trust (the "High Yield CIT"), the Wellington Trust Company CIF II Diversified Inflation Hedges Portfolio (the "Diversified Inflation Hedges Portfolio" or "DIH"), the Prudential Retirement Real Estate Fund (the "Real Estate Fund" or "PRREF"), the Jennison Opportunistic Equity Collective Investment Trust (the "Opportunistic Equity CIT" or "Jennison CIT") and the Wells Capital International Bond Institutional Select Fund (the "International Bond Fund" or "Wells Capital Fund"). (Amert Decl. at Ex. 7, Wermers Rpt. ¶ 10).

While Plaintiffs take issue with the "excess value" calculations and GoalMaker damages calculation set forth in the Wermers Declaration, Dr. Wermers has not offered any new opinions or in any way contradicted the opinions and analyses he provided in the Wermers Reports. Rather, the Wermers Declaration illustrates the same analyses in a slightly different way, using the annualized return percentages in the Wermers Reports to show how those funds outperformed their comparators in dollars. Thus, the "excess value" calculations that Plaintiffs challenge illustrate in dollars Dr. Wermers' opinion, previously expressed in percentages, that in his opinion, the funds challenged by Plaintiffs were economically reasonable investment options. Further, Dr. Wermers' updated GoalMaker damages calculation does not contain new opinions nor contradict previously provided opinions. Instead, in response to Dr. Tzenova's calculations and using Dr. Tzenova's methodology and other previously produced data, Dr. Wermers in his Reply Report calculated GoalMaker damages through December 31, 2022 to further support the conclusions that Plaintiffs suffered no damages. (Amert Decl. ¶ 16.) In the Wermers Declaration, Dr. Wermers offered no new opinions. He simply repeated the opinion from his Reply Report that using Dr. Tzenova's methodology to perform a GoalMaker damages calculation for the period through December 31, 2022 resulted in negative damages.

The Wermers Declaration was submitted as a declaration in support of Defendants' Motion for summary judgment, pursuant to Rule 56(c). The Wermers Declaration does not contain any new opinions, nor contradict the opinions Dr. Wermers previously provided. Indeed, the Wermers Declaration is consistent with the opinions expressed in his prior reports and does not violate Rule 26. Because the Wermers Declaration is not an improper supplementation of his expert reports, there is no need to assess whether Rule 37 sanctions are appropriate.

14

Accordingly, Plaintiffs' motion to strike the Wermers Declaration in support of Defendants' motion for summary judgment is **DENIED**.

### B. Summary Judgment

"ERISA is . . . a 'comprehensive and reticulated statute,' the product of a decade of congressional study of the Nation's private employee benefit system." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 251 (1993) (quoting *Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 361 (1980)). The statute provides that not only the persons named as fiduciaries by a benefit plan, *see* 29 U.S.C. § 1102(a), but also anyone else who exercises discretionary control or authority over the plan's management, administration, or assets, *see* § 1002(21)(A), is an ERISA "fiduciary." *Mertens*, 508 U.S. at 251. Fiduciaries are assigned a number of detailed duties and responsibilities, which include "the proper management, administration, and investment of [plan] assets, the maintenance of proper records, the disclosure of specified information, and the avoidance of conflicts of interest." *Id*. at 251-52 (citing *Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 142–43 (1985)). As the Third Circuit has expressed, "ERISA nowhere mandates the institution of a pension program or the right to a pension. ERISA is not a direction to employers as to what benefits to grant their employees. Rather, ERISA is concerned with the administration of an established plan and its elements." *Hlinka v. Bethlehem Steel Corp.*, 863 F.2d 279, 283 (3d Cir. 1988).

ERISA requires fiduciaries administering employee-benefit plans to prudently investigate, choose, and monitor investments. 29 U.S.C. § 1104(a)(1)(B). "The elements of an ERISA breach of fiduciary duty claim are: '(1) a plan fiduciary (2) breaches an ERISA-imposed duty (3) causing a loss to the plan.'" *Mator v. Wesco Distribution, Inc.*, 102 F.4th 172, 184 (3d Cir. 2024) (quoting *Sweda v. Univ. of Penn.*, 923 F.3d 320, 328 (3d Cir. 2019)).

15

### 1. Duty of Prudence

The parties dispute whether Defendants breached their duty of prudence by failing to adequately monitor and manage the Challenged Funds. (*See* Defs. MSJ Br. at 11-28; Pls. MSJ Opp. 20-24.) As Plaintiffs have failed to raise a triable issue of fact as to whether Defendants engaged in a prudent process in reaching their investment decisions, the Court finds Plaintiffs' breach of fiduciary claim fails.

An ERISA fiduciary is held to the "prudent person" standard of care and thus must exercise "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). This duty of prudence requires a fiduciary to diligently monitor investments[8] and is "objective, judged by the information available at the time of each investment decision—not by the glow of hindsight." *Pizzaro v. Home Depot, Inc.*, 111 F.4th 1165, 1173 (11th Cir. 2024) (citing *Sacerdote v. New York Univ.*, 9 F.4th 95, 107 (2d Cir. 2021)). To prevail in a duty-of-prudence case under ERISA, a plaintiff must demonstrate that a plan fiduciary failed to both (1) engage in objectively prudent conduct "in arriving at [its] investment decision[s]," and (2) make decisions that "led to objectively prudent investments." *Renfro v. Unisys Corp.*, 671 F.3d 314, 322 (3d Cir. 2011) (internal quotation marks omitted).

In assessing this duty, courts look at a fiduciary's "process rather than results," considering "'whether a fiduciary employed the appropriate methods to investigate and determine the merits

---

[8] *See Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015) (defining breach of duty of prudence as "failing to properly monitor investments and remove imprudent ones"); *Cunningham v. Cornell Univ.*, 86 F.4th 961, 983 (2d Cir. 2023) (same); *In re Omnicom Grp. Inc. Erisa Litig.*, No. 20-4141, 2022 WL 18674830, at *16 (S.D.N.Y. Dec. 23, 2022) (citing *Tibble*, 575 U.S. at 529) (finding that an ERISA fiduciary "must review investments at 'regular intervals.'").

of a particular statement.'" *Sweda*, 923 F.3d at 329 (quoting *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996)). Such inquiry must evaluate the circumstances present at the time the fiduciary acted. *See Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022); *see also McCaffree Fin. Corp. v. ADP, Inc.*, No. 20-5492, 2023 WL 2728787, at *13 (D.N.J. Mar. 31, 2023) ("Hindsight indeed is 20/20, so the focus must be on the fiduciary's conduct in arriving at a decision") (internal citations omitted); *Falberg v. Goldman Sachs Grp., Inc.*, No. 19-9910, 2022 WL 4280634, at *11 (S.D.N.Y. Sept. 14, 2022) ("[T]he central question is whether a prudent fiduciary in like circumstances would have acted differently." (internal quotation marks omitted)), *aff'd*, No. 22-2689, 2024 WL 619297 (2d Cir. Feb. 14, 2024).[9]

Defendants contend they employed a prudent process in selecting, monitoring, and removing PESP investment options. This process, Defendants argue, involved three layers of investment expertise, an independent fiduciary for GoalMaker, and a consistent process for evaluating PESP investments. (Defs. MSJ Br. at 11.) In opposition, Plaintiffs contend "Defendants indisputably failed to act "with the care, skill, prudence, and diligence" of a prudent fiduciary under similar circumstances." (Pls. MSJ Opp. at 20.) The Court disagrees with Plaintiffs.

### a. The IOC's Process

The IOC meets quarterly to review the performance and other attributes of PESP's investment options. Before each quarterly meeting, the IOC members review detailed performance reports and other materials prepared by Bellwether and vetted by the EBI team. (DSOMF ¶ 30; Defs. MSJ at 15.)

---

[9] In evaluating the duty of prudence, the Third Circuit has recognized an objective standard irrespective of process. *See Renfro*, 671 F.3d at 322. ("[W]e have also approved of an approach examining whether a questioned decision led to objectively prudent investments."). In other words, even if a fiduciary failed to properly investigate, it cannot be held liable if the investments were objectively reasonable. *See id*. (citing cases).

In *Silva v. Evonik Corp.*, the court found the investment committee's process for monitoring investments was "diligent" because the committee had engaged an investment advisor that, prior to quarterly meetings, "prepared and distributed reports containing information on Plan investments' asset allocations, fees, and performance against industry benchmarks." No. 20-02202, 2024 WL 3379067, at *5 (D.N.J. June 28, 2024). The reports also contained, "among other things, a watchlist that assigned investment option[] ratings, including those to 'watch,' 'discuss,' or 'terminate' at [investment committee] meetings, and undisputed evidence shows that the committee discussed such investments, even having an off-cycle meeting to discuss the [investment advisor's] recommendation to remove a fund." *Id.*

Similarly, in *Nunez v. B. Braun Medical, Inc.*, the court found the investment committee engaged in prudent conduct in relation to its choice of investment options for the plan because (i) "the Committee met regularly, at least annually since 2014 and at least quarterly since 2019[;]" (ii) "[t]he Committee relied upon not only its own assessments, but the advice of third-party consultants when monitoring investment performance, reviewing detailed monthly and quarterly reports prepared by [its investment advisors] that analyzed the performance of the Plan's investment options and the market generally[;]" (iii) "[t]he Committee also used a watchlist to more heavily scrutinize underperforming investments and would vote to remove funds from the Plan's lineup that continually underperformed." No. 20-4195, 2023 WL 5339620, at *8, *12 (E.D. Pa. Aug. 18, 2023). *See also Falberg*, 2024 WL 619297, at *3 (affirming summary judgment where undisputed evidence revealed that "[t]he Committee's independent advisor continually monitored and evaluated the [p]lan's investment options, and provided the Committee members with detailed information, including monthly and quarterly performance reports" and where "Committee members reviewed those reports prior to attending Committee meetings").

Likewise, and most recently, in *In re Quest Diagnostics Inc. ERISA Litig.*, No. 20-07936, 2024 WL 4285163 (D.N.J. Sept. 25, 2024), the court found the investment committee engaged in prudent conduct in finding that the Investment Committee (i) engaged a third party to provide investment advice; (ii) met on a quarterly basis to review the Challenged Funds; and (iii) prior to the meetings, the third party consultant prepared and circulated quarterly reports containing investment returns of the Challenged Funds.

Here, the Court finds Defendants have set forth sufficient evidence that the IOC engaged in conduct comparable to the fiduciaries in *Silva*, *Nunez*, *Falberg*, and *Quest*. The following facts are undisputed: (i) the IOC has engaged Bellwether, an external investment consultant, since 2001 to identify investment options, evaluate and monitor performance of existing options, provide guidance on fiduciary responsibilities, and perform due diligence and recommend investment managers and options (DSOMF ¶¶ 27-28; PSOMF ¶¶ 27-28); (ii) the IOC met on at least a quarterly basis (DSOMF ¶ 30; PSOMF ¶ 30); (iii) typically a week prior to the quarterly meetings, the IOC members received briefing books which included draft minutes from prior quarter's meetings, quarterly performance reports prepared by Bellwether and other background information to assist the IOC (DSOMF ¶¶ 30-31; PSOMF ¶¶ 30-31); and (iv) new IOC members each receive fiduciary training upon their first IOC appointment. (DSOMF ¶ 10; PSOMF ¶ 10.)

Plaintiffs contend that Defendants "seek cover in routine fiduciary process features like the structure and frequency of meetings" asserting this "elevates form over substance." (Pls. MSJ Opp. at 21.) The Court disagrees as Defendants have shown that substantively "[d]uring quarterly IOC meetings, the IOC [discussed] the funds with the EBI team and Bellwether, specifically reviewing any funds on the watch list, and [voting] on any decision points." (Defs. MSJ Br. at 15.) Further, "[i]n between quarterly IOC meetings, Bellwether and the EBI team review fund performance and

fees, meet with the fund managers, and, when appropriate, report their findings back to the IOC . . . [with] funds on the watch list receiv[ing] additional scrutiny." (*Id*.) Despite Plaintiffs' contentions that Defendants merely rely on "form," Defendants have shown that Bellwether was extremely thorough in its processes as Bellwether and the EBI team would meet at least once every other week and communicate "daily" in between IOC quarterly meetings. (*Id*. at 15-16.) Finally, the Court is satisfied that the process for removal or additions to the Plan's investment lineup is sufficiently thorough as the respective processes involve Bellwether and the EBI team working in tandem to perform qualitative and quantitative assessments culminating in a vote at a quarterly IOC meeting. (*Id*. at 16-17.) Given the thoroughness of the Bellwether reports, the EBI team, and the frequency of the IOC meetings, the Court is satisfied that the IOC engages in a thorough and prudent process with respect to selecting and monitoring investments.

### b. The Challenged Funds

Plaintiffs assert Defendants' alleged breaches of fiduciary duty caused the Plan to suffer losses of at least $158 million. (Pls. MSJ Opp. at 24.) However, Plaintiff does not present any valid disputes of fact.[10] Plaintiffs' attacks on specific funds are devoid of record evidence and rather rely on unpersuasive speculation. With respect to the challenged funds, the Court finds and the undisputed record shows that: (1) the IOC regularly received independent advice regarding investment decisions and selected an independent fiduciary for asset allocations (DSOMF ¶¶ 27, 127–28); (2) the IOC offers many funds in the Plan lineup that are not Prudential-affiliated (*id*. ¶¶ 61, 101); and (3) the IOC, with the help of the EBI team and Bellwether, consistently deployed a

---

[10] Plaintiffs' reliance on their expert reports to create factual disputes is misplaced because "the factual predicate of an expert's opinion must find some support in the record." *Pa. Dental Ass'n v. Medical Service Ass'n of Pa.*, 745 F.2d 248, 262 (3d Cir. 1984). Dueling experts do not preclude summary judgment, even if the disputes involve: whether offering affiliated funds created a conflict of interest, *Falberg*, 2022 WL 4280634, at *4; whether certain actions caused losses, *Lucas v. MGM Resorts Int'l*, No. 20-01750, 2024 WL 1199514, at *9 (D. Nev. Mar. 19, 2024); whether fund removal was timely, *Pizarro v. Home Depot, Inc.*, 634 F. Supp. 3d 1260, 1304 (N.D. Ga. Sept. 30, 2022); or whether fund monitoring was prudent, *Scalia v. WPN Corp.*, 417 F. Supp. 3d 658, 666 (W.D. Pa. 2019).

thorough investigative process before adding any fund—Prudential-affiliated or not—to the Plan (*id.* ¶¶ 57–59).

### i. Jennison CIT and Wells Capital Fund

Plaintiffs allege that Defendants should not have added the Jennison CIT and the Wells Capital Fund to PESP's lineup, and having done so, should have removed them sooner. (TAC ¶¶ 76–84.) The undisputed facts show, however, that the IOC followed the prudent fiduciary processes documented in the relevant investment policy statements when adding, monitoring, and ultimately removing the Jennison CIT and Wells Capital Fund. (DSOMF ¶¶ 85-111.)

With respect to the Jennison CIT, Plaintiff asserts that despite "failing IPS monitoring criteria prior to and during its addition to the Plan" (Pls. MSJ. Opp. at 13), the "Prudential-affiliated" Jennison CIT was added to the Plan lineup. (*Id.*) However, despite Plaintiffs' contentions, the Jennison CIT was added to the PESP following an extensive search that included nearly 400 funds. (*Id.* at 24.) Ultimately, following its search, Bellwether recommended the IOC add the Jennison CIT and the Alliance Bernstein Fund because those funds were strong overall performers whose respective performance were not highly correlated. (*Id.* at 25.) Despite Plaintiffs' concern over the selection of the Jennison CIT, it was added to the Plan as part of the same analysis used to select the Plaintiffs' favored Alliance Bernstein Fund, which is the same process the IOC used for all Plan funds. (Defs. MSJ. Br. at 9.) The IOC closely assessed both funds' performance on a quarterly basis, following the criteria set forth in the relevant investment policy statements. (*Id.* at 25.) The Jennison CIT generated lower returns than its benchmark's returns. (*Id.*) The Alliance Bernstein Fund, in contrast, generated higher returns than its benchmark. (*Id.*) This aligned with reasonable expectations, because the 2015 – 2018 markets generally favored growth, rather than value investing. (*Id.*) When the Jennison CIT failed all the

investment policy statement performance triggers, it was added to the watch list on March 31, 2016. (*Id*.) The IOC closely monitored the Jennison CIT's performance for several quarters, when market conditions continued to favor a growth tilt, and met with the fund's management team. (*Id*. at 25-26.) In 2018, market conditions shifted favorably for value-tilt strategies, but the Jennison CIT's performance failed to improve. (*Id*. at 26.) As a result, on December 7, 2018, the IOC voted to remove the fund, and its remaining Plan assets were moved to the Alliance Bernstein Fund effective April 4, 2019. (*Id*.) *See In re Prime Healthcare ERISA Litig.*, No. 8:20-cv-1529, 2024 WL 3903232, at *20 (C.D. Cal. Aug. 22, 2024) (finding the committee "closely monitored and reviewed the performance of the Invesco Fund" where its third-party investment consultant flagged the fund's recent underperformance and recommended consideration of alternative funds, and the committee ultimately replaced the fund "following a comprehensive review").

The Wells Capital Fund has been in the Plan's lineup since before November 2013 and provided Plan participants with an investment option in international fixed income. (DSOMF ¶ 102.) Initially, the Wells Capital Fund demonstrated solid long-term performance. (*Id*. ¶ 103.) The IOC reviewed the fund's performance quarterly following the criteria set forth in the relevant investment policy statements. (*Id*. ¶ 104.) In or around May 2018, however, the Wells Capital Fund began to underperform in the short-term. (*Id*. ¶ 105.) Although the fund had not triggered all investment policy statement watch list criteria, the IOC decided to add the fund to its watch list on May 23, 2018 due to its short-term underperformance and personnel changes with its investment manager. (*Id*. ¶ 107.) After continued monitoring of the Wells Capital Fund, including meetings with the Fund's investment managers, the IOC voted to terminate the Wells Capital Fund on December 7, 2018. (*Id*.) While the Wells Capital Fund was offered in the PESP lineup, it generated $0.65 million in excess returns compared to its peer group. (*Id*. ¶ 111.)

Despite, Plaintiffs' assertions that the Wells Capital Fund underperformed its benchmark and should have been removed sooner, Plaintiffs cannot show Defendants breached their duty of prudence as ERISA does not require Plan fiduciaries to ensure perfect results in hindsight, but only to make reasoned decisions, considering the quantitative and qualitative information available at the time to a fiduciary. *Ellis v. Fid. Mgt. Tr. Co.,* 883 F.3d 1, 11 (1st Cir. 2018). The undisputed facts show that both funds were selected and removed through the same prudent process wholly consistent with ERISA's concept of prudence. *See Ellis*, 883 F.3d at 10; *Birse v. CenturyLink, Inc.*, 17-02872, 2020 WL 1062902, at *5 (D. Colo. Mar. 5, 2020).

### ii. DIH Fund, High Yield CIT, PRREF, and GoalMaker

Plaintiffs have similarly failed to present a triable issue of fact with respect to the DIH Fund, the High Yield CIT and PRREF as the undisputed evidence reveals that Defendants had expansive processes for selecting, monitoring, and reviewing the respective challenged funds. Further, although Plaintiffs allege that it was imprudent for Defendants to disproportionately allocate assets to Prudential-affiliated funds through GoalMaker, Plaintiffs have similarly failed to raise a triable issue of fact with respect to same as the undisputed evidence demonstrates that the IOC closely monitors GoalMaker and that the IOC's decisions regarding GoalMaker have been reasonable.

Plaintiffs contend that Defendants breached their fiduciary duties by failing to replace the DIH Fund, the High Yield CIT, and the PRREF with "better performing alternative[s]." (TAC ¶¶ 60, 68, 75.) Plaintiffs allege that the funds required greater scrutiny according to the Plan's investment policy statement because the funds, at times, underperformed by more than 20 basis points on a 3 and/or 5-year basis. (*Id*. ¶¶ 54–55, 62–63, 69–70.) Regardless of the specific fund in question, Defendants contend they utilized "robust fiduciary processes" to deliver value to PESP's

23

participants. (Defs. MSJ. Br. at 7-8.) These processes included: (1) adherence to investment policy statements and the IOC's process for monitoring all Plan funds (*id*. at 20, 22); (2) IOC review of each Fund's performance against various metrics, including its respective benchmark over a 3 and 5-year basis[11] (*id.*); (3) communication between Bellwether and the EBI team to discuss respective fund performance (*id*. at 19); and (4) when applicable, interviewing the respective Fund managers. (*id*. at 18.)

The DIH fund was added to the PESP lineup on June 21, 2017 (DSOMF ¶ 67), while the High Yield CIT and the PRREF have been in PESP's lineup since before November 2013. (*Id*. ¶¶ 73, 79.) The DIH Fund was selected to provide PESP participants with an investment option that is designed to perform well during periods of inflation. (*Id*. ¶ 62.) The High Yield CIT offers an opportunity to invest in higher risk fixed income securities to pursue higher returns. (*Id*. ¶ 74.) The PRREF provides Plan participants with an opportunity to invest in portfolios of direct real estate investments, largely investing in existing private real estate funds. (*Id*. ¶ 80.)

Plaintiffs contend that the DIH fund's five year returns never exceeded those of the fund's benchmark and the DIH Fund's three-year returns beat the benchmark just once. (PSOMF ¶ 34.) Additionally, Plaintiffs argue that the High Yield CIT's failure to outperform its benchmark by 150 basis points, the investment manager's stated objective at one point in the class period, "should have been sufficient information alone to convince the [IOC] to remove [the High Yield CIT]." (TAC ¶ 61.) Finally, Plaintiff contends that from Q1 2013, the PRREF's three- or five-year returns failed to beat those of its benchmark by the 20 basis points prescribed by the then-operative IPS for thirteen consecutive quarters through Q1 2016; by Q2 2016, both three- and five-year performance trailed the benchmark by over 20 basis points. (PSOMF ¶ 34.)

---

[11] For the PRREF, the IOC uses a custom benchmark because there is no appropriate pre-existing benchmark for a real estate fund with PREEF's mix of underlying investments. (DSOMF ¶ 83.)

Consistent with the IOC's typical process, the IOC met quarterly and discussed the qualitative and quantitative aspects of the respective fund performances. (DSOMF ¶¶ 40, 43, 45, 58, 82.) Furthermore, as they do with all of the funds in the Plan's lineup, Bellwether and the EBI team also monitored and discussed the respective performances at their meetings, which occur at least every other week. (*Id*. ¶¶ 29, 68, 75, 81.)

Process aside, on average, since being added to the Plan, the DIH Fund outperformed its benchmark. (DSOMF ¶ 69.) It has delivered annualized returns of 8.2%, while its benchmark delivered annualized returns of 7.7%, during the time period that Plaintiffs contend the DIH Fund was inappropriately included in PESP. (*Id*. ¶ 71.) In comparison, during the class period, the alternative funds Plaintiffs identified in their TAC, the Vanguard Inflation Protected Securities Fund and the PIMCO Real Return Fund, delivered annualized returns of 2.5% and 2.6%, respectively. (*Id*.)

Since November 2013, the High Yield CIT consistently outperformed its benchmark index on a 5 and 10-year basis and its peer group on a 3, 5, and 10- year basis; the High Yield CIT particularly outperformed its expected returns based on its risk. (DSOMF ¶ 76.) In fact, the High Yield CIT delivered annualized returns of 4.2%, compared to the High Yield CIT's benchmark, which delivered annualized returns of 3.8%, during the time period that Plaintiffs contend the High Yield CIT was inappropriately included in PESP. (*Id*. ¶ 77.)

Additionally, during the Class Period, the PRREF outperformed its benchmark on average, gross of fees. (DSOMF ¶ 83.) The PRREF delivered annualized returns of 8.1%, gross of fees, compared to the PRREF's benchmark, which delivered annualized returns of 7.7%, during the time period that Plaintiffs contend the PRREF was inappropriately included in PESP. (*Id*. ¶ 84.) During the Class Period, the PRREF also delivered annualized returns of 8.1%, compared to Plaintiffs'

identified alternative funds in the TAC, the Vanguard Real Estate Index Fund and the Cohen & Steers Institutional Realty Shares Fund, which delivered annualized returns of 6.2% and 7.8%, respectively.

Similar to the other challenged funds, the IOC monitors GoalMaker's underlying investments and each GoalMaker portfolio through the quarterly performance reports prepared by Bellwether, including the 1, 3, 5, and 10-year annualized returns for each GoalMaker portfolio. (DSOMF ¶¶ 125, 130.) At the start of the class period, the IOC followed asset allocation recommendations for the overall GoalMaker product from Morningstar; since 2017, Mesirow, has created custom, PESP specific asset allocations for GoalMaker portfolios. (*Id*. ¶¶ 127–28.) It is undisputed that the IOC, Ms. Maytin, and Bellwether regularly review Mesirow's work. (*Id*. ¶¶ 26, 125.) Ms. Maytin and her team discuss Mesirow's evaluation of GoalMaker asset allocations annually, and Mesirow's work is presented to the IOC, either by Mesirow or Ms. Maytin's team to make sure Mesirow's work product is appropriate and that Mesirow is thoughtful and understands the GoalMaker platform. (*Id*. ¶¶ 26, 131.) Because Mesirow is an independent fiduciary, the IOC does not approve those asset allocations, but does monitor them. (*Id*. ¶ 128.) As a result, during the class period, GoalMaker portfolios have generated $52.6 million in excess returns compared to comparable Morningstar Lifetime indexes, and $25.5 million in excess returns compared to Plaintiffs' alternative asset allocations. (*Id*. ¶ 134.)

Ultimately, it is undisputed the IOC engaged in a robust process for selecting and monitoring the PESP during the class period. Furthermore, although the record evidence confirms generally positive performance for the challenged funds as compared to benchmarks, the respective funds benchmark performance does not present a triable issue of fact for a multitude of reasons. First, even if a fund falls short of its benchmark, this does not indicate that a prudent

fiduciary, even knowing of the funds' underperformance, would have removed the funds sooner. *See Jenkins v. Yager*, 444 F.3d 916, 926 (7th Cir. 2006) (citing *DeBruyne v. Equitable Life Assurance Soc. of the United States*, 920 F.2d 457, 465 (7th Cir. 1990)) ("[I]nvestment losses are not proof that an investor violated his duty of care"); *see also White v. Chevron Corp.*, No. 16-0793, 2016 WL 4502808, at *17 (N.D. Cal. Aug. 29, 2016) ("Indeed, a fiduciary may – and often does – retain investments through a period of underperformance as part of a long-range investment strategy"); *see also Cunningham*, 2019 WL 4735876, at *11 ("Long-term investment options, like those offered in a retirement plan, may have varying levels of performance over the course of time."). Second, each of the funds had points where they exceeded their benchmarks and any discrepancy in benchmark performance cannot, on its own, support a finding of imprudence. *See Smith*, 37 F.4th at 1167 (finding that while "an after-the-fact performance gap between benchmark comparators . . . may offer a building block for a claim of imprudence" it does not "by itself violate[ ] the process-driven duties imposed on ERISA fund managers").

Notwithstanding the above, Courts have further held that even if an expert proposes a better alternative to a fiduciary's conduct, the fiduciary will not be in breach of its duties if its course of conduct was prudent. *See Taylor v. United Techs. Corp.*, 2009 WL 535779, at *9 (D. Conn. Mar. 3, 2009), *aff'd*, 354 F. App'x 525 (2d Cir. 2009). "[S]o long as the 'prudent person' standard is met, ERISA does not impose a duty to take any particular course of action if another approach seems preferable." *Cunningham v. Cornell Univ.*, No. 16-cv-6525, 2019 WL 4735876, at *5 (S.D.N.Y. Sept. 27, 2019) (quoting *Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006)). Here, based on the foregoing, the Court finds Defendants' course of conduct was prudent.

The Court therefore grants summary judgment as to the alleged breach of fiduciary duties.[12] Because there is no breach of duty, the Court need not consider whether Plaintiffs sustained any loss.[13]

### 2. Duty to Monitor Fiduciaries

Plaintiffs also assert that "Prudential and the Investment Oversight Committee" breached their fiduciary monitoring duties by, in part: (a) failing to monitor and evaluate the performance of their appointees; (b) failing to monitor their appointees' fiduciary processes; and (c) failing to remove appointees whose performances were inadequate. (*See* TAC ¶ 115.) However, Plaintiffs "'cannot maintain a claim for breach of the duty to monitor . . . absent an underlying breach of the duties imposed under ERISA.'" *In re Allergan ERISA Litig.*, No. 17-1554, 2018 WL 8415676, at *7 (D.N.J. July 2, 2018) (quoting *Rinehart v. Lehman Bros. Holdings Inc.*, 817 F.3d 56, 68 (2d Cir. 2016)). As such, the Court grants Defendants' summary judgment motion as to Plaintiffs' derivative claim for breach of the duty to monitor.

## IV. CONCLUSION

Accordingly, Defendants' motion for summary judgment (ECF 178) is **GRANTED**. Plaintiffs' motion to strike the declaration of Russel R. Wermers (ECF 186) is **DENIED**. Defendants' and Plaintiffs' respective motions to preclude expert testimony (ECF 180; ECF 184) are **DENIED as moot**.

---

[12] As the Court finds there is ample evidence in the record to demonstrate the IOC engaged in a prudent process, the Court need not consider whether the funds are objectively prudent. *See Renfro*, 671 F.3d at 322. As such, Plaintiffs' motion to exclude the opinions and testimony of Russel R. Wermers, Defendants' expert who opined on the objective prudence and economic reasonableness of the Challenged Funds, is **DENIED as moot**. (ECF 184.)

[13] Since the Court finds there is no breach of a fiduciary duty, the Court need not address Defendants' motion to exclude the opinions and testimony of Plaintiffs' experts: Marcia S. Wagner, Richard A. Marin, and Svetla K. Tzenova. Accordingly, Defendants' motion is **DENIED as moot**. (ECF 180.)

*/s/ Jamel K. Semper*

HON. JAMEL K. SEMPER
**United States District Judge**

Orig:  Clerk
cc:    Jose R. Almonte, U.S.M.J.
       Parties